Appeal No. 2016-2282

===========================================================

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

===========================================================

## VICOR CORPORATION,
*Appellant*

v.

## SYNQOR, INC.,
*Appellee*

===========================================================

**Appeal from the United States Patent and Trademark Office
for *Inter Partes* Reexamination 95/001853.**

===========================================================

## OPENING BRIEF FOR REQUESTER – APPELLANT
## VICOR CORPORATION

===========================================================

Matthew A. Smith
Turner Boyd LLP
702 Marshall St. Ste 640
Redwood City, CA 94063
(650) 265-6109
smith@turnerboyd.com

Lawrence K. Kolodney          Andrew D'Amico
Fish & Richardson             Vicor Corporation
One Marina Park Drive         25 Frontage Road
Boston, MA 02210-1878         Andover, MA 01810-1216
(617) 521-7002
kolodney@fr.com

*Attorneys for Requester-Appellant*

===========================================================

# CERTIFICATE OF INTEREST

Pursuant to Federal Rule of Appellate Procedure 26.1 and Federal Circuit Rule 47.4, the undersigned counsel for Requester-Appellant Vicor Corporation hereby certifies that:

1. The full names of every party or amicus represented by me is:

   VICOR CORPORATION.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   None.

3. The parent companies, subsidiaries (except wholly-owned subsidiaries), and affiliates that have issued shares to the public, of the party or amicus represented by me are:

   None.

4. The names of all law firms and the partners and associates that appeared for any of the parties represented by me below or are expected to appear in this Court are:

   Matthew A. Smith of Turner Boyd LLP.  Mr. Smith was with Foley & Lardner LLP in Washington, D.C. during some of the proceedings below.  Appearing below was also Christopher (Max) Colice, then with Foley & Lardner LLP.

   Lawrence K. Kolodney, Fish & Richardson.

   Andrew D'Amico, Vicor Corporation.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ...............................................................i

TABLE OF CONTENTS........................................................................ ii

TABLE OF AUTHORITIES ...................................................................v

I.    STATEMENT OF RELATED CASES ...........................................1

II.   JURISDICTIONAL STATEMENT ...............................................1

III.  STATEMENT OF THE ISSUES....................................................1

IV.   STATEMENT OF THE CASE ......................................................2

V.    INTRODUCTION AND STATEMENT OF FACTS.........................2

VI.   SUMMARY OF THE ARGUMENT ..............................................7

VII.  ARGUMENT.............................................................................8

    A.    STANDARD OF REVIEW ...................................................8

        1).    General ................................................................8

        2).    Obviousness ........................................................8

    B.    DISCUSSION ...................................................................9

        1).    Overview of the independent claims .........................9

        2).    The Board erred by reversing Examiner rejections I-III. .........10

            i).    Overview of the Examiner's rejection...........................11

                (a)    Reasons to use the converter of Cobos ................16

                (b)    Reasons to make the first conversion stage of Pressman unregulated...........................................18

ii).    The Board's opinion .................................................22

iii).   The Board erred by not addressing the proposed
        rejection ............................................................23

iv).    The Board erred by finding that Cobos I teaches
        regulation ..........................................................26

        (a)    Background of the argument ...............................26

        (b)    The Board's finding ...........................................28

        (c)    Legal requirements for adding limitations to
               a reference via extrinsic testimony.......................29

        (d)    The Board could not have accepted Dr.
               Schlecht's biased and contradictory
               testimony in the face of Cobos I's clear
               disclosure............................................................31

        (e)    The Board's additional reasoning committed
               reversible errors ..................................................35

v).     The secondary evidence demonstrates obviousness.......37

3).   The Board erred by reversing the Examiner's rejections
      VII and VIII ................................................................38

        (a)    Overview of the proposed rejection .....................38

        (b)    Pressman teaches a modification of Fig. 3-3 .......42

        (c)    Using synchronous rectifiers with Pressman
               was well within ordinary skill in 1997................46

        (d)    The Board committed reversible error in its
               consideration of secondary evidence ..................52

i).     The secondary considerations demonstrate
        obviousness...................................................52

(a)     The Board erred by applying the wrong standard for nexus. ...............................................54

(b)     The timing of industry events was dictated by commercial factors unrelated to SynQor..............58

(c)     The nature of events concerning alleged secondary considerations does not support an inference of non-obviousness...............................62

VIII.  CONCLUSION...............................................................................69

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Cont'l Can Co. USA v. Monsanto Co.*,
    948 F.2d 1264 (Fed. Cir. 1991) ....................................................30

*Dayco Prods., Inc. v. Total Containment, Inc.*,
    329 F.3d 1358 (Fed. Cir. 2003) ....................................................30

*EWP Corp. v. Reliance Universal Inc.*,
    755 F.2d 898 (Fed. Cir. 1985) ......................................................65

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966)...........................................................................52

*In re GPAC Inc.*,
    57 F.3d 1573 (Fed. Cir. 1995) ........................................51, 53, 66

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.*,
    430 F.3d 1377 (Fed. Cir. 2005) ....................................................54

*Leapfrog Enters. v. Fisher-Price, Inc.*,
    485 F.3d 1157 (Fed. Cir. 2007) ....................................................37

*Prolitec, Inc. v. ScentAir Techs., Inc.*,
    807 F.3d 1353 (Fed. Cir. 2015) ..............................................30, 37

*Randall Mfg. v. Rea*,
    733 F.3d 1355 (Fed. Cir. 2012) ..........................................8, 9, 54

*Ruben Condenser Co. v. Aerovox Corp.*,
    77 F.2d 266 (2d Cir. 1935)...........................................................59.

*Sightsound Techs., LLC v. Apple Inc.*:
    809 F.3d 1307 (Fed. Cir. 2015) ..............................................55, 65

*SynQor, Inc. v. Artesyn Techs., Inc.*,
    709 F.3d 1365 (Fed. Cir. 2013) .............................................*passim*

v

*Velander v. Garner*,
    348 F.3d 1359 (Fed. Cir. 2005) ........................................................49

*Vicor Corp. v. SynQor, Inc.*,
    2016 Pat. App. LEXIS 1944 (PTAB May 2, 2016) .............................*passim*

*Vicor Corp. v. SynQor, Inc.*,
    603 Fed. Appx. 969 (Fed. Cir. 2015) ......................................*passim*

**Statutes:**

5 U.S.C. § 706(2)(A)........................................................................54.

28 U.S.C. § 2107 ...............................................................................1

28 U.S.C. § 1295(a)(4)(A) .................................................................1.

35 U.S.C. § 134................................................................................1

35 U.S.C. § 141................................................................................1

35 U.S.C. § 142................................................................................1

**Rule:**

Fed. R. App. P. 4 .............................................................................1

## I.    STATEMENT OF RELATED CASES

No appeal in or from this proceeding was previously before this or any other appellate court.

This Court has rendered two related decisions:

- *Vicor Corp. v. SynQor, Inc.*, 603 Fed. Appx. 969 (Fed. Cir. 2015); and

- *SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365 (Fed. Cir. 2013).

## II.    JURISDICTIONAL STATEMENT

The United States Patent & Trademark Office Patent Trial and Appeal Board ("the Board") had jurisdiction under 35 U.S.C. § 134.  The Board mailed its initial decision on April 20, 2015 (Appx22-55).  The Board mailed its rehearing decision on May 2, 2016.  (Appx1-Appx21).  Requester Vicor Corporation ("Vicor") filed a Notice of Appeal on June 30, 2016 in accordance with 28 U.S.C. § 2107 and Fed. R. App. P. 4. The appeal was docketed on July 1, 2016. The Notice of Appeal was timely filed pursuant to 35 U.S.C. § 142. This Court has jurisdiction under 35 U.S.C. § 141 and 28 U.S.C. § 1295(a)(4)(A).

## III.    STATEMENT OF THE ISSUES

I.    Did the Board err by reversing the Examiner's rejections I, II and III?

II.    Did the Board err by reversing the Examiner's rejections VII and VIII?

To limit the issues, Vicor does not appeal the Board's reversal of the Examiner's other rejections.

## IV.  STATEMENT OF THE CASE

This is an appeal from a decision of the Board in an *inter partes* reexamination of U.S. Pat. 7,564,702 ("the '702 patent"). The '702 patent is purportedly owned by SynQor, Inc. of Boxborough, Massachusetts (hereinafter "SynQor"). Vicor Corporation, the third party requester, is headquartered about thirty miles away in Andover, Massachusetts. SynQor has sued Vicor for infringement of the '702 patent in the United States District Court for the Eastern District of Texas.

## V.  INTRODUCTION AND STATEMENT OF FACTS

The '702 patent at issue in this appeal relates to a design for a DC-DC power converter. (Appx77, 1:22-25). A DC-DC power converter is a component of an electronic circuit that provides DC power. The power is provided at a desired voltage to another circuit component, called a "load". (*Id.*; Appx77, 1:42-44).

While DC-DC power converters had been well-known in the art for decades, the '702 patent purported to provide an improved design for such a converter. This purportedly improved design was based on a technique—also known in the prior art—called "synchronous rectification." (Appx77, 1:42-2:4). By using a particular type of synchronous or "controlled" rectifier,[1] the specification of the '702 patent purports to improve the efficiency of a DC/DC converter. (*Id.*).

---

[1] The difference between a "synchronous rectifier" and a "controlled rectifier" is not relevant to this appeal.

2

Although the original specification of the '702 patent focused on a particular synchronous rectification technique *within* a DC/DC converter, the claims of the '702 patent were drafted more broadly in an attempt to target a different technology. (Appx85). This technology, known as "Intermediate Bus Architecture" or "IBA", uses several different converters, and concerns how power is distributed *between* converters. Because IBA focuses on an overall power system containing multiple converters, it is referred to as an "architecture".

A typical Intermediate Bus Architecture system is illustrated in the figure below (taken from White 2003, Appx749-754).



Figure 2. Two Level Distributed Power System (Intermediate Bus Architecture)

(Appx751). In an IBA system, a front-end power supply (left side) provides an input voltage, typically 48 volts. This voltage is fed to a first stage called a "bus converter." (Appx752). The bus converter uses a transformer to reduce the voltage by fixed ratio (*e.g.,* 4:1) to a lower "intermediate" voltage (*e.g.,* 12V). (Appx751-753). The intermediate voltage is then distributed over a "second level distribution bus" or "intermediate bus" to different loads on a circuit board. (Appx751-752). At each load there is a "point of load" (POL) regulator. (Appx751-752). A POL regulator is a device that regulates the intermediate bus voltage to the desired final voltage (e.g. V1, V2, or V3 in the figure above) for a particular load. (Appx751-752).

Widespread use of IBA began in the early 2000s (when certain components became less expensive), but the technology was known much earlier. For example, an introductory textbook by Pressman (Appx755-770), published in 1977, clearly discloses the basic IBA concept. (Appx847-852). The basic difference between Pressman's circuit and the '702 patent claims is the absence of synchronous rectifiers in Pressman. (Appx115-117). Pressman uses an older technology, diode rectifiers, to perform the equivalent function. (Appx116). But by 1997, the '702 patent's earliest possible effective filing date, the use of synchronous rectifiers in lieu of diodes was well-understood—a fact admitted by the '702 patent's inventor and SynQor CEO, Dr. Schlecht. (Appx1169; Appx1146-1149).

4

In fact, in 1993, four years before the '702 patent's earliest possible effective date, an IBA system that used diodes and synchronous rectifiers *interchangeably* was disclosed in a patent granted to Dr. Robert Steigerwald. (Appx1181-1185). The Steigerwald patent—U.S. Pat. No. 5,377,090 ("Steigerwald '090")—was previously addressed by this Court. In its 2015 decision, this Court found that Steigerwald '090 anticipates multiple claims of a grand-parent to the '702 patent: U.S. Patent No. 7,072,190 ("the '190 patent"). *See Vicor Corp. v. SynQor, Inc.*, 603 Fed. Appx. 969 (Fed. Cir. 2015). On remand from this Court, the Board rejected *all* claims of the '190 patent over combinations of the Steigerwald '090, Cobos and Pressman prior art.[2]

The claims of the '190 patent invalidated in *Vicor v. SynQor* are "substantially identical" to the claims of the '702 patent at-issue here—as SynQor itself has argued. (Appx1213, Appx1201). Despite this fact, the Board reversed the Examiner's rejections of the '702 patent claims. In so doing, the Board committed several errors of law and fact.

For example, the Board reversed the Examiner's rejection over Pressman in view of Cobos and Jovanovic. (Appx22-27). Relying on the testimony of SynQor's CEO, the Board incorrectly held that the Cobos reference *inherently* required

---

[2] *See Vicor Corp. v. SynQor, Inc.*, 2016 Pat. App. LEXIS 1944, *10 (PTAB May 2, 2016).

regulation, and thus fell outside the scope of a negative claim limitation—contrary to the clear disclosure of the Cobos reference itself. (Appx25-26). The Board then ignored the Examiner's finding that it would have been obvious to omit regulation at the input stage, and in the process confused key teachings in the Pressman and Jovanovic references. (Appx24).

The Board also improperly held that it would not have been obvious to replace diode rectifiers in Pressman with synchronous rectifiers. (Appx47). Instead, the Board—at SynQor's urging—found that synchronous rectifiers were too complex for a skilled artisan to implement. (Appx47). The Board reached this conclusion even though:

- the '702 patent itself readily admits that synchronous rectifiers can replace diode rectifiers "in a well-known manner," (Appx78, 4:50-64);

- the inventor of the '702 patent admitted that synchronous rectification was "well understood and anticipated for two decades" before the '702 patent's earliest possible filing date (Appx1169);

- this Court previously concluded that Steigerwald '090 anticipated the synchronous rectifier-based claims of the prior '190 patent, *Vicor Corp. v. SynQor, Inc.*, 603 Fed. Appx. 969, 974-75 (Fed. Cir. 2015); and

- the same panel of the Board, on the same day, found in a related case that synchronous rectification *was* within ordinary skill in 1997, *Vicor Corp. v. SynQor, Inc.*, 2016 Pat. App. LEXIS 1944, *10 (PTAB May 2, 2016).

As explained in more detail below, the Board made numerous other reversible errors in its analysis of the prior art of record.

Lastly, the Board also erred in its analysis of secondary considerations. The Board applied the wrong standard for nexus, by failing to require SynQor to prove nexus to the merits of the claimed invention. The Board found nexus to the '702 patent claims, even though SynQor admitted in related proceedings that the patent claims were "substantially identical" to claims of the prior '190 patent that this Court found to be anticipated by Steigerwald '090. The Board further erred because compelling evidence demonstrated that the increase in the use of IBA had nothing to do with SynQor, but rather was driven by the falling price of components known in the prior art.

## VI.    SUMMARY OF THE ARGUMENT

The Board erred by reversing the Examiner's rejections. Regarding the Examiner's rejections I, II, and III, the Board erred by not addressing the rejection as adopted—in the process ignoring key teachings of the Jovanovic reference. The Board also erred by finding that the Cobos I reference teaches a circuit that is inherently regulated.

Regarding the Examiner's rejections VII and VIII, the Board erred in two principal ways. First, the Board erred as a matter of law and fact in finding that the Pressman reference did not teach the starting point of the Examiner's rejection. Second, the Board erred by accepting the contradictory testimony of SynQor's CEO that synchronous rectification was not within ordinary skill, in the face of overwhelming evidence to the contrary.

Regarding each of the rejections, the Board erred in drawing the legal inference of obviousness. To the extent the Board considered secondary evidence, it erred as a matter of law by applying the incorrect standard for nexus. The Board found nexus to the '702 patent claims, even though SynQor admitted during proceedings below that the '702 patent claims are "substantially identical" to claims of the prior '190 patent that this Court held anticipated by Steigerwald '090. The Board further erred by improperly weighing the secondary evidence against the strong evidence under the other *Graham* factors.

## VII. <u>ARGUMENT</u>

### A.    STANDARD OF REVIEW

#### 1).    General

This Court reviews the Board's "compliance with governing legal standards de novo and its underlying factual determinations for substantial evidence." *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2012).

### 2).    Obviousness

Obviousness is a question of law, reviewed *de novo*.  *See Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2012).  The analysis is supported by facts that are reviewed for substantial evidence.  *See id.*

## B.    DISCUSSION

### 1).    Overview of the independent claims

There are a large number of claims in the '702 patent, but the overall structure is simpler than it first appears.

Claims 1, 28, 55, 78, 82 and 86 are independent.  Claims 1, 28 and 55 are apparatus claims.  Claim 55 is the broadest of these three claims and is reproduced here:

> "55. A DC-DC power converter system providing plural regulated DC outputs, each having a regulated voltage, comprising: ¶¶a) a rectified source of power that is a DC input, the DC input providing an input voltage; ¶¶b) a non-regulating isolating step-down converter through which power from the DC input flows first before flowing through any regulation stage, the non-regulating isolating step-down converter providing a non-regulated, isolated DC output having a non-regulated voltage and comprising: ¶¶i) at least one transformer that is not driven into saturation, the at least one transformer having plural windings including at least one primary winding and at least one secondary winding; ¶¶ii) plural power MOSFET switches in circuit with the at least one primary winding, the plural power MOSFET switches causing power to flow into the at least one primary winding; ¶¶iii) control circuitry coupled to the plural MOSFET switches, the control circuitry determining when the power MOSFET switches are turned on and off in a switching cycle at a switching frequency; and ¶¶iv) plural controlled rectifiers in circuit with the at least one secondary winding, each having a parallel uncontrolled rectifier, each controlled rectifier being turned on for an on-state time and off for an off-state time in synchronization with a

9

voltage waveform of the at least one primary winding to provide the non-regulated, isolated DC output, the voltage waveform of the at least one primary winding having a fixed duty cycle and transition times which are short relative to the on-state and the off-state times of the controlled rectifiers; and ¶¶c) plural non-isolating down-converter switching regulators, each receiving power from the non-regulated, isolated DC output and each providing one of the regulated DC outputs having a regulated voltage."

(Appx87).

The overall structure of the independent claims is similar. Each requires (a) a DC input, (b) a "non-regulating isolating step-down converter" that includes "controlled" (or as relevant here: "synchronous") rectifiers and that provides a "non-regulated, isolated DC output," and (c) "plural non-isolating down-converter switching regulators" that receive the output of the converter and provide regulated output voltages.

Independent apparatus claims 1, 28 and 55 differ only in limitation (a). Limitation (a) of claim 55 requires only "*a rectified source of power that is a DC input, the DC input providing an input voltage*". Claims 1 and 28 are slightly narrower. Claim 1 specifies that the DC input "*varies over a range that is more than plus or minus a few percent....*" Claim 28, in turn, specifies that the DC input "*varies over a percentage range that is greater than a respective percentage range over which the regulated voltage of each regulated output varies....*"

Claims 78, 82 and 86 are method claims that correspond to apparatus claims 1, 28 and 55, respectively.

10

**2).    The Board erred by reversing Examiner rejections I-III.**

The Board erred reversing the Examiner's decision to reject claims 1-2, 28-29, 55, 69-76, 78, 82 and 86 over Cobos I in view of Pressman as evidenced by Jovanovic (Examiner Rejection I), claims 26, 27, 53, 54, 67, 68, 81, 85, and 89 under Examiner Rejection II, and claims 55, 69, 70, and 73-76 under Examiner Rejection III.  The Board reversed the Examiner based on its finding that the combination of Cobos I and Pressman would not meet the limitation of the independent claims reading "a non-regulating isolating step-down converter."  (Appx26-27).

The Board erred in two principal ways.  First, the Board erred as a matter of law in drawing the overall inference of obviousness, because the Board did not address the rejection as adopted by the Examiner, thereby ignoring key teachings of Jovanovic.  Second, the Board erred in finding that Cobos I taught a regulated converter, because no substantial evidence supports that finding.

Because the Board's first mistake was failing to address the Examiner's rejection, it is helpful to review that rejection at the outset.

### i).    *Overview of the Examiner's rejection*

The Examiner's rejection demonstrated that is was obvious to use a specific dc/dc converter from the Cobos I publication as a component in a system described by Pressman.  (Appx165-166; 114-125).  The resulting combination teaches all elements of the claims with motivation to combine.  (*Id.*; Appx1265-1301).

11

The Examiner's rejection is easiest to understand by beginning with the system of Pressman. Pressman is a 1977 textbook that was "[w]ritten for both design engineer and undergraduate with little or no knowledge of the power supply field…." (Appx762). Chapter 3 of Pressman, entitled "Building Block Assembly of Compound Regulating Systems" teaches multi-converter power systems. (Appx843-873). The beginning of Chapter 3 notes that:

> "The **usual** power supply or power supply system is composed of a **multiplicity of output voltages** each having its own output current requirements and line and load regulation."

(Appx843) (Emphasis added). Within this context, Pressman teaches that different applications have different requirements, and that:

> "All these requirements can be met with different combinations and permutations of the above basic building blocks. Systems can be devised with standard electrically and mechanically configured building blocks requiring only a minimum custom circuit change to fit a large variety of applications."

(Appx843). The remainder of Chapter 3 goes on to "show[] how the basic building blocks of the previous chapters may be assembled in various combinations to achieve most of the above objectives." (Appx843).

One such combination presented by Pressman is shown in Fig. 3-4(B) (Appx851), reproduced below, with dashed boxes added:

12



Pressman Fig. 3-4(B) is a power system architecture. The point of this architecture is to take a single AC power source, and to turn it into several DC power sources at different voltage levels. (Appx851-852; Appx844-845). To do so, Pressman Fig. 3-4(B) connects the original AC power source on the left side. (Appx851). The AC power is first *rectified* to provide DC power. (*Id.*). The DC power passes through a "dc preregulator" that constrains the variation in voltage. (Appx851; Appx845). The output of the dc preregulator is connected to the input of the "dc/ac converter with single secondary" (inside the blue-dashed box). The dc/ac converter converts the power back to AC, and then uses a transformer to convert the voltage to a different level (usually lower). (Appx851-852; Appx845). The lower-voltage AC power is then rectified again (to yield DC) and filtered. (*Id.*). The DC voltage is applied to plural switching postregulators on the right-hand side (red-

dashed box).  The switching regulators provide multiple different voltage outputs.

(Appx852).  Pressman introduces Fig. 3-4(B) as follows:

> "The schemes of Figs. 3-3 and 3-4 can be used with only one
> transformer secondary winding and one filter capacitor to generate a
> multiplicity of different output voltages at high efficiency as shown
> in Fig. 3-4B."

(Appx852).

As explained in the request for reexamination (Appx115-117), Figure 3-4(B)

of Pressman teaches the overall structure of the independent claims of the '702

patent.  Specifically, Pressman teaches the preamble, which reads *"[a] DC-DC*

*power converter system providing plural regulated DC outputs, each having a*

*regulated voltage.*"  (Appx115-116).  Furthermore, the two different converters of

the independent claims of the '702 patent match up with the two stages of Pressman

shown in blue- and red-dashed boxes, respectively.  (*Id.*).  Specifically, the blue-

dashed box corresponds to the "*non-regulating isolating step-down converter*" of

the independent claims.  (*Id.*; Appx1268-1269).  The red-dashed box contains the

"*plural non-isolating down-converter switching regulators, each receiving power*

*from the non-regulated, isolated DC output and each providing one of the regulated*

*DC outputs having a regulated voltage*."  (Appx1268-1269).

Much of the remainder of the claim relates to the arrangement *within* the blue-

dashed box, or the "*non-regulating isolating step-down converter*".  Pressman

teaches many, but not all of the required details.  (Appx115-116).  Cobos I, however,

14

teaches converters that are suitable for use in the non-regulating isolating stage of Pressman outlined in the blue-dashed box. (Appx1310-1315). For example, the converter in Cobos I, Fig. 6(b) is shown here, together with a graph of the secondary side voltage waveform[3] on the right side (Appx1312):



The converter of Fig. 6(b) of Cobos I meets all the requirements of the "*non-regulating isolating step-down converter*" of the claims. (Appx1265-1267; Appx114-115). Cobos also meets each variation of limitation (a) of the independent claims, because Cobos states that inputs can typically vary over the range of 40-60 Volts. (Appx1313; Appx1265; Appx1274; Appx1280).

The Examiner found that it would have been obvious to use Cobos I's converter as shown in Fig. 6(b) as the non-regulating isolating stage in the Pressman architecture. As depicted in the request for reexamination (Appx1118), the combination thus looks as follows:

---

[3] The "secondary side voltage waveform" (Vsec) is a plot of the voltage across the secondary winding of the transformer, as a function of time.



In the combination, the circuit of Cobos Fig. 6(b) is used to supply power to the downstream switching regulators. The Examiner found that this combination meets all elements of the challenged claims (Appx501-503).

The request for reexamination provided numerous reasons for the combination. (Appx118-121). The reasons were divided into two types: (a) reasons to use the converter of Cobos, and (a) reasons to make the first conversion stage unregulated. These reasons are discussed in the following §§(a) and (b).

### (a)    Reasons to use the converter of Cobos

The request for reexamination demonstrated that it was obvious to use the converter of Cobos I Fig. 6(b). First, the request demonstrated that Pressman's configurations were modular. As discussed *supra*, Pressman teaches that the systems shown in Chapter 3 (including Fig. 3-4) use building blocks that can be combined in various ways to meet a large variety of applications. (Appx118-119; Appx843).

16

Pressman's Fig. 3-4(B) uses a DC/AC converter with rectifiers and a filter (see excerpt from Pressman Fig. 3-4(b) at right). A DC/**AC** converter with a rectifier and filter is a DC/**DC** converter. (Appx844). Cobos I, in turn, teaches DC/DC converters that can be used as building blocks in Pressman's system. Cobos I is a survey article of DC/DC converter configurations. (Appx1310). Among the several different configurations taught by Cobos I, the implementation of Fig. 6(b) has a **single secondary** (just like Pressman), MOSFET synchronous **rectifiers** (Q1 and Q2) and (just like Pressman) a **filter** (the output capacitor). (Appx1312). In Fig. 6(b), below, the single secondary winding is shown with a red arrow, the MOSFET synchronous rectifiers are shown with blue arrows, and the output filter is shown with a green arrow.



(Appx1312). Cobos I teaches that this circuit provides "the best" circuit for telecom applications, where the voltage can vary over a wide range (e.g. 40V to 60V). (Appx1313).

### (b) Reasons to make the first conversion stage of Pressman unregulated

The request also demonstrated that it was obvious to make Pressman's first conversion stage unregulated. (Appx119-121). Specifically, Pressman's Fig. 3-4(B) has a "dc preregulator", shown in the excerpt at right. The dc preregulator is upstream of the dc/ac converter in Fig. 3-4(B), which means that it outputs a regulated voltage to the dc/ac converter. (Appx851).

The request demonstrated (and the Examiner agreed) that it would be obvious to substitute Cobos I's Fig. 6(b) converter for both dc preregulator, dc/ac converter and rectifier-filter components, as shown below:



18

In the combination, the upstream conversion is unregulated. The request for reexamination demonstrated the motivation to make the upstream conversion unregulated. First, Pressman makes clear that the upstream converter can be regulated or unregulated. Specifically, Fig. 3-3 shows an arrangement similar to Fig. 3-4(B), but with an "unregulated input converter". (Appx847-849). Figure 3-3 is shown here:



Fig. 3–3. Unregulated input converter with postregulated outputs.

Pressman states that regulation can be omitted in the input converter if switching regulators are used at each output. This is because the switching regulators already provide regulation. Because of this, the regulation in the input converter can be omitted. Pressman states:

> "If output switching regulators are used at all outputs, the scheme of Fig. 3-4A with its preregulator has little advantage over Fig. 3-3, for **each postregulator can give adequately constant voltage without preregulation** and the **cost and parts count of the preregulator can be saved**."

19

(Appx851-852) (Emphasis added).  Pressman also teaches that the technique used in

Fig. 3-4(B) can be applied to Fig. 3-3 or 3-4:

> "**The schemes of Figs. 3-3** and 3-4 can be used with only one
> transformer secondary winding and one filter capacitor to generate a
> multiplicity of different output voltages at high efficiency as shown
> in Fig. 3-4B."

(Appx852).  In Fig. 3-4(B), Pressman's suggestion was applied to Fig. 3-4(A).

However, Pressman's suggestion is also applicable to Fig. 3-3, which has no pre-

regulator.  As Pressman teaches, this would have saved the "cost and parts count of

the preregulator".  (Appx851-852).

The request provided additional support in the form of the Jovanovic article.

(Appx1316-1328).  The Jovanovic article, published in 1994, is a review of

"[v]arious distributed power systems".  (Appx1317).  Like Pressman, Jovanovic

teaches that converters can be combined in a variety of ways.  For example,

Jovanovic states that converters can be connected in parallel, can be connected in

a cascade (one after another), and can be split at the source or load.  (Appx1318-

1321).  These combinations are shown in Figure 1 of Jovanovic, reproduced

below.  Note that a "PPU" is a "Power Processing Unit", like a converter.

(Appx1318).



Figure 1.   Basic DPS structures: (a) paralleling; (b) cascading; (c) source splitting; (d) load splitting.

The cascade formation of Fig. 1(b) is like the power system of Pressman and the claims of the '702 patent, because it has an input converter that provides an output to a second converter.  Jovanovic teaches that the "cascade" formation is needed in most distributed power systems.  (Appx1319).  When cascaded, the power converters form an intermediate bus.  (Appx1319).  Jovanovic states:

> "Cascading of power processors is necessary in **most** DPS configurations to introduce an **intermediate bus** in the power system, as shown in Fig. 1(b)."

(Appx1319) (Emphasis added).  Jovanovic also expressly discusses whether bus voltages should be regulated (*i.e.* whether there is regulation in the upstream side). Jovanovic explains that there is an application-dependent trade-off involved. Specifically, if the bus voltage is regulated, then the downstream converters do not have to be designed to deal with a wide variation in input voltage, and can be

21

made more efficient.  However, to achieve regulation of the bus, the upstream converter needs to include a regulator, which also introduces inefficiency. Jovanovic states:

> "The regulation of the bus voltage has a serious impact on the power system components. A tightly-regulated bus allows optimization of the load converters for maximum efficiency. **To provide a tightly-regulated bus voltage, however, the front-end section must include a regulating stage, typically a DC/DC converter. As a result, the efficiency of the front-end section is reduced**. Hence, the bus voltage regulation must be specified based on the overall system performance after **careful consideration of the trade-offs involved**."

(Appx1321) (Emphasis added).

Thus, both Pressman and Jovanovic teach that it can be advantageous to omit an input regulator when building a system with two stages of power conversion.

### ii).    The Board's opinion

The Board reversed the Examiner's finding that the combination taught the elements of the claims.  Despite the undisputed fact that Fig. 6(b) of Cobos I does not include regulation circuitry (Appx1347, ¶87; Appx26), the Board relied on the testimony of SynQor's CEO that the disclosed converter was, in fact, regulated. (Appx25-27).

In so finding, the Board committed several reversible errors.  First, the Board erred as a matter of law in its overall determination of obviousness, because it did not address the rejection as adopted by the Examiner.  The adopted rejection

22

demonstrated that it was obvious to make Fig. 3-4(B) with an unregulated input converter—whether or not Cobos I's converter is regulated. (Appx119-121). The Board did not address this basis for obviousness.

The Board also erred in its finding that Fig. 6(b) of Cobos I was regulated. There is no substantial evidence to support that finding. It is undisputed that the circuit as depicted in Fig. 6(b) is not regulated, and there is no basis elsewhere in Cobos I to mandate regulation. The Board made several subsidiary errors of fact in reaching its conclusion.

### iii).  The Board erred by not addressing the proposed rejection

The Board first erred as a matter of law in its overall conclusion of obviousness, because it failed to address the complete rejection. Specifically, the Board failed to consider evidence that it was obvious to remove regulation from the input converter of Pressman Fig. 3-4(B). Thus, even if Dr. Schlecht's testimony were allowed to add regulation to Cobos I, it would have been obvious to omit that (hypothesized) regulation circuitry in the combination.

The Board clearly misapprehended the proposed rejection. The Board characterized the rejection as follows:

"According to the Requester, there is ample motivation to substitute the front end of Cobos I for the preregulator and the isolating, non-regulating step-down converter. This substitution would provide a specific circuit implementation for the isolating, non-regulating portion of the Pressman circuit, and remove the preregulator. Request, 20."

(Appx24). While this statement is accurate standing alone, it is incomplete. The proposed rejection adopted by the Examiner provided compelling evidence that regulation would have been considered optional in the input converter of Pressman. (Appx119-121). As discussed *supra*, the rationale for removing regulation was two-fold:

(1) The modifications leading to Fig. 3-4(B) of Pressman are also applicable to Fig. 3-3. Figure 3-3, in turn, has no input regulation, because the downstream regulators provide the regulation. (Appx119-120). This allows the designer to save the "cost and parts count of the preregulator". (Appx851-852).

(2) Jovanovic teaches that bus regulation was a known trade-off: regulation could make the downstream converters more efficient, but would require a regulator in the input converter, which would be less efficient. (Appx1321; Appx120).

The Board neglected to consider these arguments. (Appx22-27). Instead, the Board concluded that Cobos I was inherently regulated based on the testimony of SynQor's CEO.

24

The Board's incorrect characterization of Jovanovic indicates its erroneous understanding of the rejection. In the Board's words:

> "**Requester further pointed to Jovanovic as describing circuit components as modular building blocks**. Id. According to Pressman:
>
>> All these requirements can be met with different combinations and permutations of the above basic building blocks. Systems can be devised with standard electrically and mechanically configured building blocks requiring only a minimum custom circuit change to fit a large variety of applications.
>
> Pressman, 7 4 (omitted emphasis and parentheticals added by Requester)(cited by Req. 21 )."

(Appx24) (Emphasis added). This finding is clearly incorrect. The Board is confusing Jovanovic with Pressman. As the request noted, Pressman does teach the modularity of the components in its systems of Chapter 3 (including Fig. 3-4(B)). Jovanovic, however, was cited for its critical evidence that regulation of the input converter to a DC bus was an application-dependent choice, and required balancing tradeoffs. (Appx120-121). As discussed above, Jovanovic expressly states that when a DC bus is regulated, "the front-end section must include a regulating stage" and that "[a]s a result, the efficiency of the front-end section is reduced". (Appx1321). Jovanovic then counsels to consider the tradeoffs for particular applications. (Appx1321). When the prior art recommends that a person of skill consider *whether* to include a feature, the exclusion of that feature from a claim is not inventive.

25

The Board thus failed to properly address the evidence that removal of regulation in the input converter was obvious. Because it was obvious, the Board's finding that Cobos I included regulation was irrelevant, and the Board's reversal of the Examiner was incorrect as a matter of law.

### iv). *The Board erred by finding that Cobos I teaches regulation*

The Board also erred in its finding that Cobos I teaches regulation.

### (a)    Background of the argument

The circuit of Fig. 6(b) of Cobos I is shown below:



(Appx1312). There is no dispute that this circuit diagram does not show the necessary circuitry for regulation. (Appx1347, ¶87). Regulation requires a feedback signal. (Appx775). The feedback signal provides a measure of the output voltage back into the circuit, so that the circuit knows whether the output voltage is

26

too high or too low.  Such feedback signals are shown, for example, in the regulators of Pressman Fig. 3-4(B) (Appx851), below, where the feedback signals have been boxed in red.



To regulate the circuit of Cobos I Fig. 6(b), the circuit would need to measure the output voltage, and provide that information to a control circuit.  The control circuit could then drive the transistors $Q_A$ and $Q_M$.  For example, if the output voltage started to get too high, the ON time of transistor $Q_M$ could be reduced.  This would have the effect of reducing the duty cycle of the transformer, causing the output voltage to be reduced.  If regulated, Fig. 6(b) of Cobos would have included regulation circuitry as shown, e.g., below (with speculative portions added in red):

27



The Examiner correctly found that it was improper to assume such regulation circuitry was necessarily present:

> "[T]he Patent Owner's attempt to read additional teachings into Cohos [sic:Cobos] fails. Cohos simply does not show a regulated converter in Fig. 6(b). It is true that the Fig. 6(b) converter would be capable of providing a regulated output if so configured, but it is not true that the Fig. 6(b) converter must regulate the output voltage."

(Appx397).   Cobos I does not provide regulation circuitry, does not describe a modification to make Fig. 6(b) regulating, and does not say that Fig. 6(b) is regulated.

### (b)    The Board's finding

The Board, however, relied on the declaration testimony of SynQor's CEO (Dr. Schlecht) to find that Cobos I Fig. 6(b) inherently includes feedback regulation. (Appx25-27).  Dr. Schlecht's opinion is based on the description in Cobos I that Fig.

6(b) is a "PWM topology".  From the three-letter acronym PWM, Dr. Schlecht concludes:

> "**While Cobos does not illustrate the control circuit that would be used in PWM, such a design would have been inherent in the PWM architecture**. Thus, persons of ordinary skill in the art would have understood that the PWM circuit included a control circuit necessary to modulate the duty cycle to achieve regulation of the output voltage."

(Appx1347, ¶87) (Emphasis added).

The parties' positions are thus clear:  Vicor contends, and the Examiner found, that the description and circuit diagram of Cobos I do not teach regulation.  SynQor sought to add regulation to Cobos I Fig. 6(b), using the extrinsic testimony of its CEO.  By adding a new teaching to Cobos I, SynQor sought to exclude Cobos I from the claims, by using the negative limitation (b) of the independent claims.  That limitation requires in-part a "***non-regulating*** *isolating step-down converter*".

### (c)    Legal requirements for adding limitations to a reference via extrinsic testimony

This Court has addressed attempts to modify prior art references through extrinsic testimony on numerous occasions.  In the usual case, the party seeking invalidity attempts to fill a gap in a reference through testimony.  In those cases, this Court has held that:

> "'when the reference is silent about the asserted inherent characteristic, such gap in the reference may be filled with recourse to extrinsic evidence[; however, s]uch evidence *must make clear that the missing descriptive matter is necessarily present in the thing described in the reference*.'"

*Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1369 (Fed. Cir. 2003) (*quoting Cont'l Can Co. USA v. Monsanto Co.*, 948 F.2d 1264, 1268, (Fed. Cir. 1991) (edits and italics in original).

A similar rule has been adopted where there is a *negative* claim limitation, and the *patent owner* seeks, through testimony, to bring a prior art reference within the exclusion of the negative limitation. In *Prolitec, Inc. v. ScentAir Techs., Inc.*, this Court recently held that:

> "The Board therefore concluded that an 'optional inclusion' of a feature in the prior art anticipates a claim that excludes the feature. [citations omitted]. The Board's finding and conclusion were both correct. The disputed third opening in [the prior art] is explicitly described as optional. [citations omitted]. To counter [the prior art's] explicit disclosures, Prolitec relies on its expert to re-characterize [the prior art's] third opening as essential, not optional. We are not persuaded by Prolitec's arguments."

807 F.3d 1353, 1362 (Fed. Cir. 2015). Here, the issue is thus whether there was substantial evidence to conclude that regulation was inherently present in Cobos I Fig. 6(b).

The Examiner correctly rejected SynQor's argument. (Appx397-398). The Examiner reasoned that PWM indicates that the "conversion ratio"— the ratio of the input voltage to the output—can be changed, and thus regulation of the Fig. 6(b)

30

circuit is **possible**.  That, however, does not indicate that the conversion ratio *is* being changed in response to feedback, *in order to regulate* the output voltage.  In the Examiner's words:

> "It is true that the Fig. 6(b) converter would be capable of providing a regulated output if so configured, but it is not true that the Fig. 6(b) converter must regulate the output voltage. To see why, consider the relationship between duty cycle and output voltage. As understood by those of skill in the art, the duty cycle defines the ratio of input to output voltage.  For a fixed duty cycle (e.g., 50%), this ratio of input to output voltage is fixed, so variations in the input voltage yield proportional variations in the output voltage—i.e., an unregulated output. Changing the duty cycle (e.g., by modulating the pulse width) changes the relationship between input and output and, of course, this can be used to regulate the output, or can simply be used to change the conversion ratio. Nevertheless, nothing indicates that the Fig. 6(b) converter must operate at a variable duty cycle responsive to regulation feedback. In fact, Fig 6(b) does not show any of the control circuitry necessary for PWM operation. This reinforces the fact that Fig. 6(b) can operate at a fixed duty cycle to provide an unregulated output."

(Appx397).

> **(d)** **The Board could not have accepted Dr. Schlecht's biased and contradictory testimony in the face of Cobos I's clear disclosure**

The Board reversed the Examiner.  While acknowledging that SynQor's CEO's testimony was likely biased, the Board nonetheless found it persuasive.  (Appx26-27).  The Board did not have a substantial evidence basis to do so, however, given Cobos I's disclosure.

31

Dr. Schlecht's testimony about Cobos I cannot contradict Cobos I's actual disclosure. Dr. Schlecht testified the Cobos I's mention of "PWM" means that Fig. 6(b) of Cobos must inherently have additional, undisclosed control circuitry to adjust the "duty cycle" of the converter, and thus effect regulation. (Appx1347, ¶87). Cobos I, however, states that a PWM topology can have a constant (*i.e.* unchanging) duty cycle. (Appx1313-1314). If the duty cycle is unchanging, then Dr. Schlecht's hypothetical regulation is absent. This is because a drift in the output voltage, even if detected, could not be compensated by a change in the duty cycle. Cobos I states this directly, immediately following its discussion of the Fig. 6 converters:

> "Although the results obtained in the previous topologies are good, the rectification stage is not optimized in any of them. The optimum voltage waveform shown in figure 5.c may be obtained in an inverter structure (see figure 9) working at constant conditions: constant switching frequency and **constant duty cycle (50%)**. Half bridge structure is preferred for the lower stresses and the typical power levels of on board converters. In this approach [16], the driving waveform for the SRs is optimum and does not depend on input voltage or load. The problem is that **the output voltage cannot be controlled**."

(Appx1313-1314) (Emphasis added). Here, the "previous topologies" are the PWM topologies in Fig. 6. (Appx1313). Cobos I states that in a PWM topology, a constant duty cycle converter does not have a controlled (regulated) output voltage. This clearly contradicts Dr. Schlecht's testimony that Cobos I's converter inherently includes regulation.

32

While Cobos I states that the lack of regulation is a "problem", this problem is just motivation to add a separate regulator. (Appx1314). Cobos I provided the separate example of a pre-regulator, but the same "problem" teaching in Cobos I is also motivation to use the downstream regulation taught by Pressman's textbook in Fig. 3-4(B). (Appx1314).

Dr. Schlecht's declaration is also internally inconsistent. While he claims in ¶87 of his declaration that a PWM converter must be regulated, he claims in ¶119 that a PWM converter meets the "non-regulating isolating step-down converter" language of the claims. (Appx1359). He testified this way in an attempt to show praise of the claims of the '702 patent. Specifically, in ¶119, Dr. Schlecht swore that:

> "In 2004, International Rectifier **continued to promote the claimed unregulated IBA**, disparaging '[l]egacy system power architectures' for being 'poorly optimized' to handle many different load voltages and power levels, and explaining that because unregulated IBA does not need a 'tightly regulated intermediate bus voltage,' it can use a 'highly efficient isolated converter'…."

(Appx1359-1360). Note that SynQor argues that "Unregulated IBA" is a shorthand for the claims of its patents, and includes a "non-regulating isolating" converter called a "bus converter". (Appx241).

As support for his testimony shown above, Dr. Schlecht refers to the International Rectifier publication entitled "*Benefits of the DC Bus Converter in Distributed Power Architecture for Networking & Communications Systems*"

33

(Appx1375-1383).  That publication indeed describes an unregulated converter.  The publication states:

> "The IR2085S, a novel IC controller, was developed for **unregulated** isolated **DC bus converters** used in 48V two-stage on-board power distribution systems. The controller is optimized for performance, simplicity, and cost. It integrates a **50% duty cycle** oscillator with a 100V, 1A half-bridge driver IC into a single S0-8 package."

(Appx1379) (Emphasis added).   Dr. Schlecht in ¶119 notes that International Rectifier publication praises the converter because it "does not need a 'tightly regulated intermediate bus voltage,' [and therefore] it can use a 'highly efficient isolated converter'…."   (Appx1359-1360, ¶119).   This unregulated converter, however, is a *PWM* converter.  PWM technology is used to balance magnetic flux, not to achieve regulation.  The International Rectifier publication states:

> "The **pulse width** difference between the high side and low side is less than 25ns **to prevent magnetic flux imbalance**, which is the main concern in the bridge topology. The frequency and dead time between the low side and the high side pulses for halfbridge circuits can be adjusted based on an external timing capacitor to fit various applications, power levels, and switching devices."

(Appx1380) (Emphasis added).  Dr. Schlecht cannot claim that "PWM" necessarily means "regulation"—and therefore falls outside the scope of the claims—while simultaneously attempting to use statements about an unregulated PWM converter to show praise of the claims.

Dr. Schlecht's declaration also contradicts SynQor's arguments below. Before the Examiner, SynQor argued that the Barry article (Appx1384-1391) "continued to promote the Unregulated IBA". (Appx291-292). The bus converter described in the Barry article, however, is also a non-regulated *PWM* converter. Figure 1 of the Barry article is shown at right, with highlighting added. (Appx1385). The converter is unregulated in exactly the manner described by Cobos I: by having a constant duty cycle (fixed pulse width). Barry states:



Figure 1 Unregulated isolated dc-dc converter

> "The converter is unregulated by removing the regulation circuitry and forcing the pulse width to a maximum, the auxiliary switch is not used in this case. A schematic for the prototype is shown in Figure 7."

(Appx1388). The prototype in Fig. 7 mentioned above is reproduced below, with highlighting added to show the PWM circuitry (Appx1388):



Figure 7 Intermediate Bus Converter Schematic.

35

The Board could thus not have accepted the biased and inconsistent testimony of SynQor's CEO in the face of Cobos I's clear disclosure.

### (e)    The Board's additional reasoning committed reversible errors

On its path to finding that Cobos I inherently disclosed regulation, the Board made two additional, prejudicial errors.  First, the Board found that:

> "[w]e find it instructive that the output voltage in Cobos is generally regulated to 3.3 Volts.  See Cobos I, p. 1676, column 1, line 3."

(Appx26).  The cited passage of Cobos I, however, states:

> "The high power densities required by small DC/DC On Board Converters (OBC) in Distributed Power Systems (DPS) combined with the low output voltage (3.3V) required by the load, complicates the design of these kind of converters."

(Appx1310).  This passage does not mention regulation, and certainly does not say that regulation circuitry is inherent in every converter circuit discussed in the article.  Thus, there was no substantial evidence to support the Board's finding that Cobos I's converters are "generally *regulated* to 3.3 volts".

Second, the Board also erred as a matter of law and fact in finding that:

> "[T]he arguments made by the Requester are inconsistent with the position taken in the initial Request that because of the active clamp in Cobos I, the duty cycle of the converter could be greater than 50%, which might imply a form of regulation."

(Appx26).  This finding demonstrates an error of law, because the Board here finds only that it "might imply a form of regulation".  Finding that Cobos I "might imply a form of regulation" is, however, insufficient to show that Cobos I inherently

36

requires regulation. *See Prolitec*, 807 F.3d at 1362. Rather, it is an express finding that regulation is not necessarily present (or in the words of *Prolitec*: optional). *See id*.

The finding also lacks substantial evidence support. A duty cycle of greater than 50% does not imply regulation. As discussed above, regulation requires a feedback loop that *changes* the duty cycle to counteract undesired changes in the output voltage. *See* pages 26-31, *supra*. As expressly stated in Cobos I, a *constant* duty cycle (at any percentage) cannot regulate a circuit. (Appx1313-1314).

The Board's decision to reverse the Examiner's rejections I through III was based on legal error and unsupported by substantial evidence.

### v). *The secondary evidence demonstrates obviousness*

The Board did not address secondary considerations while reaching its decision on Grounds I-III. (Appx22-27). Even if considered, however, the secondary evidence shows that the claims of the '702 patent were obvious. This will be explained in §I.B.3).i), *infra*. The secondary evidence does not overcome, and in fact supports, the case of obviousness over the references in proposed rejections I-III. *See Leapfrog Enters. v. Fisher-Price, Inc.*, 485 F.3d 1157 (Fed. Cir. 2007) (Evidence of commercial success, praise, and long-felt need might not overcome a strong prima facie obviousness showing).

### 3).    The Board erred by reversing the Examiner's rejections VII and VIII

The Board likewise erred by reversing the Examiner's rejection of claims 1-3, 12-14, 17-20, 23, 26, 28-30, 39-41, 44-47, 50, 53, 55, 56, 64, 67, 69, 70, 73-76, 78, 80-82, 84-86, 88 and 89 over Pressman and Kassakian (Examiner rejection VII) and claims 15, 16, 42, 43, 71 and 72 over Pressman, Kassakian and Uceda (Examiner rejection VIII). (Appx44-48).

The Board erred as a matter of law in its overall determination of obviousness and in its application of secondary evidence.  The Board also made several factual findings that were not supported by substantial evidence.

### (a)    Overview of the proposed rejection

The proposed rejection (VII) is a combination of Pressman and the Kassakian article.  (Appx1659-1676; Appx131).  As discussed *supra* beginning on page 11, Pressman Fig. 3-4(B) teaches nearly all elements of the independent claims on its own.  There are essentially two elements that might prevent Pressman Fig. 3-4(B) from anticipating.

First, as discussed above, Pressman Fig. 3-4(B) does not include the "controlled rectifier" limitations of the independent claims.  In proposed rejection VII, these are taught by the Kassakian article.  (Appx1665-1676).

Second, Pressman Fig. 3-4(B) includes a "preregulator". (Appx851). The preregulator regulates the voltage input to the "non-regulating isolating step-down converter". The claims specify, however, that "power from the DC input flows" through the non-regulating isolating step-down converter" "before flowing through any regulation stage". This negative limitation might exclude a system that has a preregulator.

Pressman, however, teaches that preregulators are optional when used in a power system that also includes switching postregulators. Pressman states:

> "If output switching regulators are used at all outputs, the scheme of Fig. 3-4A with its preregulator has little advantage over Fig. 3-3, for **each postregulator can give adequately constant voltage without preregulation** and the **cost and parts count of the preregulator can be saved**."

(Appx851-852) (Emphasis added).

The quote above discusses Figs. 3-4(A) and Fig. 3-3. Figure 3-4(A) is the precursor to Fig. 3-4(B). (Appx851-852). That is, certain modifications are made to Fig. 3-4(A) to arrive at Fig. 3-4(B). Pressman states:

> "**The schemes of Figs. 3-3 and 3-4 can be used with only one transformer secondary winding and one filter capacitor** to **generate a multiplicity of different output voltages at high efficiency as shown in Fig. 3-4(B). This becomes possible by the use of switching postregulators**. The single rectified dc output voltage is made higher (at least 10%) than highest dc output voltage. Then each switching postregulator is operated at its own ratio of closed-switch/open-switch time (Sect. 1.2) to yield the required separate output voltages."

(Appx852) (Emphasis added). There are three modifications described: using a single secondary, using a single filter, and using switching regulators. If these changes are applied to Fig. 3-4(A), the result is Fig. 3-4(B),[4] as shown in the following (with red arrows and notes added):



As the Board expressly found:

---

[4] Fig. 3-4(B) also leaves off the ac input and corresponding RFI line filter (first box on the left). As SynQor noted below, the ac input is implied in Fig. 3-4(B). (Appx554).

"Figure 3-4(B) is a modified version of Figure 3-4(A), but instead of multiple secondary windings shown in Figure 3-4(A), only one secondary winding and filter capacitor are used. *Id.* at 27-28."

(Appx47).

The same Fig. 3-4(B) modification, however, is also applicable to Fig. 3-3. Pressman states this expressly as quoted above ("The schemes of Figs. 3-3 **and** 3-4 can be used with…") (Emphases added). The modified version of Fig. 3-3 is not shown in a Figure (it would presumably be Fig. 3-3(B)), but it is taught by a straightforward application of Pressman's text relating to Fig. 3-4(B). The starting point for the modification, Figure 3-3, is reproduced here:



Fig. 3-3. Unregulated input converter with postregulated outputs.

(Appx848). Pressman teaches that Fig. 3-3 can be modified to have "only one transformer secondary winding and one filter capacitor", and to use switching postregulators. (Appx852). With a single secondary, a single filter and switching regulator outputs, the result is as follows (taken from the request for reexamination (Appx1662):

41



Fig. 3-3                                    Fig. 3-4(B)

This modification of Fig. 3-3 based on Fig. 3-4(B), described in Pressman's text but not shown in a figure, is the starting point for the Examiner's rejection. (Id.; Appx504). When this architecture is used with the synchronous rectification of Kassakian, it meets all the elements of the challenged claims. (Appx1659-1763; Appx1812-1819).

The Board, when it reversed the Examiner, erred for three reasons. These reasons will be addressed in sections (b)-(d), below.

### (b)    Pressman teaches a modification of Fig. 3-3

The Board first erred as a matter of law by finding that "Pressman does not suggest the Requester's starting point for the combination of references". (Appx47). In other words, the Board concluded that Pressman does not teach the absence of a

pre-regulator in a circuit that—like Fig. 3-4(B)—also includes an isolation stage with a single output that feeds multiple regulators, as required by the claims. This is an error of law because the error resides in the overall conclusion of non-obviousness. The *facts* actually found by the Board support the conclusion that the claims are obvious.

Specifically, the Board correctly found that:

> "Figure 3-4(B) is a modified version of Figure 3-4(A), but instead of multiple secondary windings shown in Figure 3-4(A), only one secondary winding and filter capacitor are used. *Id.* at 27-28."

(Appx47). Vicor agrees that Fig. 3-4(B) is a modified version of Fig. 3-4(A) that has only one secondary winding and filter. The Board's finding, however, provides no support for the Board's conclusion that "Pressman does not suggest the starting point" for the Examiner's rejection. (Appx47). The Examiner's rejection did not use Fig. 3-4(B) alone as a starting point. Instead, the rejection is based on the modification shown by Fig. 3-4(B), as applied to Fig. 3-3. (Appx1660-1662). Pressman expressly teaches that this modification can be made. (Appx852) ("The schemes of **Figs. 3-3** and 3-4 **can be used with only one transformer secondary winding and one filter capacitor** to generate a multiplicity of different output voltages at high efficiency as shown in Fig. 3-4B. **This becomes possible by the use of switching postregulators**.") (Emphasis added).

SynQor argued below that Pressman's use of the phrase "as shown in Fig. 3-4B" means that Pressman was *combining* Figs. 3-3 and 3-4(**A**), to arrive at Fig. 3-4(**B**). (Appx554). In other words, SynQor argued that Pressman's "single secondary" modification does not apply *separately* to Figs. 3-3 and 3-4A.

The Board, however, found that Fig. 3-4(B) is a modification of Fig. 3-4(A), and not a *combination* of Figs. 3-3 and 3-4(A). This finding is correct and supported by more than substantial evidence. First, there is the simple fact that the modification in Fig. 3-4(B) is part "B" of a two-part figure that begins with part "A". This arrangement conveys that part B is an extension of part A, as the Board found. (Appx851-852). The figure's caption also indicates that Figure 3-4(B) is a modification of 3-4(A). (Appx851).

Second, the modifications made to Fig. 3-4(A) to arrive at Fig. 3-4(B) are directly visible by comparing the figures. As shown above in the diagram on page 40, *supra*, Fig. 3-4(A) can be changed into Fig. 3-4(B) by applying exactly the changes described in the text of Pressman: using a single secondary with a single filter, and using switching postregulators. (Appx852). The ac input and its filter were also removed, but as SynQor noted below, the ac input and rfi line filter are implied. (Appx554) ("Comparison of Fig. 3-4(B) with all of the preceding figures makes it clear that the AC input and rfi line filter were omitted for simplicity."). Thus, there is no need to combine Fig. 3-3 and Fig. 3-4(A) to reach Fig. 3-4(B).

44

SynQor argued below that Fig. 3-4(B) used switching regulators, that switching regulators could only have come from Fig. 3-3, that Fig. 3-4(B) must therefore be a combination of Fig. 3-3 and Fig. 3-4(A), and in turn that there can be no other modification of Fig. 3-3 intended by Pressman. (Appx554-555). This chain of argumentation fails, however, for two reasons. First, Pressman makes clear that switching regulators were contemplated for both Fig. 3-3 and Fig. 3-4(A). For example, *in the section describing Fig. 3-4(A)*, Pressman states:

> "If the larger component count of a **switching postregulator** (Sect. 1.2) is acceptable, even higher efficiencies can be achieved."

(Appx850) (Emphasis added). Pressman even compares Figs. 3-3 and 3-4(A), and states that switching regulators can be used in both:

> "**If output switching regulators are used at all outputs, the scheme of Fig. 3-4A** with its preregulator has little advantage over Fig. 3-3, for each postregulator can give adequately constant voltage without preregulation and the cost and parts count of the preregulator can be saved. One advantage as discussed in Sect 3.1.3 is that with a preregulator a two-transistor push-pull dc/ac converter can be used. Without the preregulator, either very high voltage transistors or a transistor bridge inverter must be used."

(Appx851-852) (Emphasis added). Thus, Pressman expressly contemplated that the "postregulators" of Fig. 3-4(A) could be switching regulators, and there was no need to inherit these components from Fig. 3-3.

Second, the language in Pressman that proposes the modification of Fig. 3-3 and of Fig. 3-4(A) expressly states that switching regulators should be used.

(Appx852) ("This becomes possible by the use of switching postregulators.").  Thus, the switching regulators do not need to be inherited from Fig. 3-3.  Rather, their use is expressly required by the modification language in Pressman.  (Appx852).

Therefore, the Board's finding that Fig. 3-4(B) is a modification of Fig. 3-4(A) was correct and supported by extensive evidence in Pressman.  This finding, however, supports the fact that Pressman proposes a modification for Fig. 3-3, upon which the Examiner's rejection was based.  The Board did not address this rejection, and therefore erred as a matter of law.

### (c)    Using synchronous rectifiers with Pressman was well within ordinary skill in 1997

The Board also erred in crediting SynQor's CEO's testimony that it would not have been within ordinary skill to implement synchronous rectification with Pressman's square-wave converter, based on Kassakian.  (Appx47-48).  The Board erred in two ways.

First, as a matter of law, the obviousness combination does not require a "bodily incorporation" of Kassakian's circuits into Pressman.  *See In re Keller*, 642 F.2d 413, 425 (CCPA 1981).  SynQor does not dispute that Kassakian suggests using synchronous rectification with power MOSFETs.  For example, Kassakian states that synchronous rectifiers increase efficiency.  (Appx2022) ("The need for high efficiency makes the use of synchronous rectifiers almost necessary.").  For that reason, the relevant question is whether synchronous rectification was within

ordinary skill, not whether the specific configurations of Kassakian could be used in Pressman.

Second, the Board erred because synchronous rectification *was* within ordinary skill, as shown by overwhelming evidence. This is true whether the question is the application of synchronous rectification *generally* to Pressman, or the use of Kassakian's resonant circuits *specifically* with Pressman.

The Board credited SynQor's argument (Appx47) concerning the complexity of synchronous rectification, which was (although the Board did not cite to it) ultimately based on the testimony of Dr. Schlecht, SynQor's CEO. (Appx555). Dr. Schlecht testified that it was beyond ordinary skill to take Kassakian's suggestion to use synchronous rectification and apply it to Pressman's converters. (Appx1344-1346).

To the extent the Board relied on the testimony of SynQor's CEO, it could not have been credited by a reasonable factfinder, because Dr. Schlecht has an interest in the outcome (Appx26) and previously made the opposite case to a district court. (Appx1169). Specifically, while serving as an expert witness in a 1998 patent litigation, Dr. Schlecht submitted a technology tutorial. (Appx1149). In that tutorial, Dr. Schlecht told the district court:

> "**Synchronous rectification,** *i.e.* using MOSFET in place of diode is not new idea. It **has been** discussed and **used in the power electronic community for at least 15-20 years.** However, in the early years it was not economical to use synchronous rectifiers. More

recently (starting in the early 1990s) the MOSFETs we have available are much better than those before this time. That is, for given amount of money, we can buy MOSFET with much smaller value of on-state resistance. At the same time, the output voltages of our DC/DC converters have become lower and lower while the output currents have become larger and larger. This condition exacerbates the shortcomings of the diode and set the stage for the diode to be replaced by synchronous rectifier. As a result, **synchronous rectification has recently become more prevalent**, although it was **well understood and anticipated for nearly two decades**."

(Appx1169) (Emphasis added).  In this passage, Dr. Schlecht detailed that synchronous rectification had been "discussed **and used** in the power electronic community for at least 15-20 years" (*i.e.* back as far as 1978).  (Emphasis added). Dr. Schlecht recounts that synchronous rectification had been "well understood" as early as the late 1970s, but became more prevalent starting in the "early 1990s" because of commercial forces not related to SynQor's '702 patent.  These pre-litigation admissions reveal Dr. Schlecht's later, post-litigation declaration testimony to be false.  As the Examiner found, "from Dr. Schlecht's own words, synchronous rectification had been in actual use for 15-20 years prior to 1998." (Appx500).

Dr. Schlecht's testimony also contradicts his own patent.  Specifically, the '702 patent states in its Background that:

"In order to reduce this conduction loss, the **diodes are sometimes replaced with transistors** whose on-state voltages are much smaller. **These transistors, called synchronous rectifiers, are typically power MOSFETs** for converters switching in the 100 kHz and higher range."

(Appx77, 1:44-49) (Emphasis added).  In discussing Fig. 2, the '702 patent states:

"**<u>In a well-known manner</u> the regulation stage can be modified** by providing higher order filters at its input and output, **by replacing the diode with a <u>synchronous rectifier</u>, by adding resonant elements to create a '<u>multi-resonant</u>' converter** and the like."

(Appx78, 4:58-62) (Emphases added).  This statement admits that it was within ordinary skill to convert a diode rectifier to a synchronous rectifier.  The statement also admits that it was within ordinary skill to do this in a resonant circuit ("'multi-resonant' converter").  The '702 patent does note that synchronous rectification can be *improved*, but this is a far cry from claiming that the basic technique is beyond ordinary skill.  *See Velander v. Garner*, 348 F.3d 1359, 1367-68 (Fed. Cir. 2005).

Even if a high level of skill had been required to implement synchronous rectification in Pressman, SynQor has repeatedly argued that the level of skill in the art *was* high.  For example, SynQor argued in the '190 patent reexam that the relevant art was a "highly competitive industry of highly skilled engineers".  (Appx2052).  SynQor has made similar arguments on numerous occasions.  (Appx288) ("Artesyn's highly skilled power designers….").

Moreover, the Kassakian article itself is dated in 1988—a decade before the earliest possible filing date for the '702 patent.  Yet even it states that, in 1988,

synchronous rectification was "not a new idea" although it was "seldom used". (Appx2021). This demonstrates that synchronous rectifiers were *in fact being used*—albeit infrequently—a decade before the earliest possible benefit date of the '702 patent. (*Id.*). And although the Kassakian article reports that the gate drive was complex before 1988, the article then provides a design in which "rectifiers can be **simply and accurately** driven by cross coupling their gates to opposite transformers…." (Appx2023) (Emphasis added).

Other prior art before the Board demonstrates that synchronous rectification was well within ordinary skill in 1994. Cobos I for example reviews a number of synchronous rectification techniques available in the literature by 1994 (Appx1310), and shows the actual results of testing of those techniques. (Appx1313). Cobos I notes that diode rectification had been compared to MOSFET-based rectification (*i.e.* synchronous rectification, Appx1311), and that:

> "A comparison between diodes and MOSFET used as rectifiers has been carried out in [1] and [2]. The advantage of using MOSFET has been demonstrated in several works. The improvement in the efficiency depends on the driving method and the topology used ([3]-[17])."

(Appx1310). In other words, Cobos I in 1994 cited 15 references ([3]-[17]) teaching various driving methods and topologies for synchronous rectification. (Appx1310; Appx1315). Cobos I also provides both resonant and non-resonant circuits. (Appx1311-1312). The Cobos I article later discusses several specific methods of

50

synchronous rectification in detail.  (Appx1312-1315).  *See In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995) (Content of the prior art can determine the level of ordinary skill).

Like Kassakian's 1988 article, Cobos I states that self-driven (cross-coupled) synchronous rectification is simple, and notes "the excellent results obtained in the self-driven approach." (Appx1312).  "Cross-coupling" means that the output of one secondary-side transformer winding is connected to the gate of the synchronous rectifier at another output of a secondary-side transformer winding.  This sort of cross-coupling arrangement is used in the '702 patent.  In other words, ***the '702 patent bases its own enablement on the same circuit concept disclosed by Kassakian in 1988 and again by Cobos I in 1994***.  Shown side-by-side below are the relevant circuits from Kassakian, Cobos I and the '702 patent, where the Appellant has highlighted the cross-coupling in red (note that each transformer winding is labeled "s" or "sec" for "secondary"):



Kassakian, Fig. 24(a)    Cobos, Fig. 5(b)    '702 patent, Fig. 4 (rotated)

The fact that the '702 patent relies on the same circuit arrangements used in the prior art concedes that synchronous rectification was within ordinary skill when the first SynQor application was filed. The Board thus reversibly erred in finding that it was beyond ordinary skill to use synchronous rectification with Pressman in 1997.

### (d)    The Board committed reversible error in its consideration of secondary evidence

The Board also relied on commercial success to reverse the Examiner's rejections VII and VIII. (Appx47). In so doing, the Board erred in several ways.

### i).    *The secondary considerations demonstrate obviousness*

Evidence of secondary considerations may be submitted by either side, and may support non-obviousness *or* obviousness. *See Graham v. John Deere Co*., 383 U.S. 1, 17-18 (1966). When secondary evidence is present, it must be weighed

together with the primary evidence of obviousness to reach a judgment on the issue of obviousness. *See In re GPAC Inc.,* 57 F.3d 1573, 1580 (Fed. Cir. 1995). That ultimate judgment concerning obviousness an issue of law, reviewed *de novo*. *See id.* at 1577 (Fed. Cir. 1995).

The Board reversed the Examiner rejections VII and VIII, finding (by referring back to its decision on rejection V) that "the evidence of commercial success outweighs any case of obviousness…." (Appx43; Appx47). In two separate decisions, however, the same panel of the Board affirmed the rejection of all claims of the related '190 patent and '021 patents—*over the same evidence of secondary considerations*. *Vicor Corp. v. SynQor, Inc.*, 2016 Pat. App. LEXIS 1944, *10-12 (PTAB May 2, 2016); *Vicor Corp. v. SynQor, Inc.,* 2015 Pat. App. LEXIS 4252, *13 (PTAB May 5, 2015) ("[T]he presented evidence relates principally to features of the independent claims rejected under an anticipation rejection and does not overcome the case of obviousness for these dependent claims by providing the requisite nexus to the dependent claim features.").

Had the Board properly weighed the secondary considerations evidence, it would have reached the same conclusion it ultimately reached for the '190 and '021 patents: that the alleged commercial success does not justify a conclusion of non-obviousness.

The Board made three principal errors in its analysis.  First, the Board erred as a matter of law by applying the wrong standard for nexus, thereby failing to require SynQor to prove a nexus to the merits of the invention.  The "merits of the invention" were disclosed in the prior art.  The prior art not only anticipates certain claims of the "substantially identical" '190 patent, but also discloses the "Intermediate Bus Architecture" upon which SynQor bases its secondary considerations case.   Second, although SynQor claims to have revealed a non-obvious invention and thereby spurred industry growth, it is clear from the evidence that the industry was moved by factors unrelated to SynQor's patents.   Third, SynQor watched the market developing before changing its claims to target IBA.  The industry was not following SynQor; SynQor's patent lawyers were following the industry.  For these reasons, discussed in §§(a) – (c) *infra*, the Board reversibly erred by failing to conclude that the claims were *obvious*.

### (a)    The Board erred by applying the wrong standard for nexus.

The Board erred in its finding of nexus.  Nexus is a finding of fact reviewed for substantial evidence.  Failure to apply the correct legal test, however, is an issue of law reviewed *de novo.  See Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2012); *C.f. IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1142 (Fed. Cir. 2005); 5 U.S.C. § 706(2)(A).

In this case, the Board erred as a matter of both law and fact.

First, the Board failed to apply the correct legal test for nexus, because it failed to require SynQor's evidence to be a direct result of the "merits of the invention" or the "unique characteristic" of the claims. As this Court held recently in *Sightsound Techs., LLC v. Apple Inc.*:

> "To establish a proper nexus between a claimed invention and the commercial success of a product, a patent owner must offer 'proof that the sales were a **direct result of the unique characteristics of the claimed invention**—as opposed to other economic and commercial factors unrelated to the quality of the patented subject matter.' [cite omitted]."

809 F.3d 1307, 1348-49 (Fed. Cir. 2015) (Emphasis added). *See also Vicor Corp. v. SynQor, Inc.*, 603 Fed. Appx. 969, 975 (Fed. Cir. 2015).

Here, SynQor did not offer proof that its secondary considerations were a direct result of the unique characteristics of the claimed invention, *i.e.*, what differentiated the invention from known prior art techniques. In fact, SynQor *argued the opposite*: that the secondary considerations *cannot* be traced to any particular element(s) of the claims of *any of its patents* in litigation. Because a number of these claims in the related '190 patent are *anticipated* by Steigerwald '090, there are no "unique characteristics" of the claimed invention.

Specifically, as SynQor argued and the Board found in a related proceeding, the claims of SynQor's related '702, '021 and '290 patents are substantially identical to the claims of U.S. Pat. No. 7,072,190. (Appx1213-1215). The '190 patent was at issue in this Court's prior decision in *Vicor Corp. v. SynQor, Inc.*, 603 Fed. Appx.

969 (Fed. Cir. 2015).  There, this Court held that Steigerwald '090 anticipated claims 20-23, 27, 29, 30, 32, and 33 of the '190 patent.

On remand from this Court in the '190 patent reexam, the Board held all claims of the '190 patent unpatentable over combinations of Steigerwald, Cobos and Pressman—even in view of the secondary considerations.  *See Vicor Corp. v. SynQor, Inc.*, 2016 Pat. App. LEXIS 1944, *10 (PTAB May 2, 2016).  SynQor elected to re-open prosecution, and the claims are currently pending before the Examiner.

SynQor has already admitted that its secondary considerations evidence applies to all claims in the '190 and '702 patents in the same way.  For example, SynQor argued in a related proceeding that:

> "Vicor cannot now distance the invention recited in the '290 patent from that of the '190 patent and related family member…. **At no point** in the district court, CAFC or in any related concurrent inter partes reexamination proceeding, **has any entity or third party attempted to parse the secondary consideration evidence between or among the related patents."**

(Appx1214-1215) (Emphasis added).  There is only one way the same secondary considerations can apply to every claim of SynQor's related patents:  if every claim requires the same nucleus of limitations that give rise to the secondary considerations.  Indeed, that is what SynQor contends.  As the Board found in a related proceeding:

> "Patent Owner counters that the architecture claimed in the '290 patent involved in the present proceeding is substantially identical to that claimed in the '190, '702 and '021 patents, and as a consequence, the secondary considerations evidence applies equally."

*Vicor Corp. v. SynQor, Inc.,* 2016 Pat. App. LEXIS 1947, (21-*23 (PTAB May 2, 2016).

Certain claims directed to the "substantially identical" architecture, however, are anticipated by Steigerwald '090. Pressman and Jovanovic also teach the basic concept of IBA, as discussed supra beginning on page 11. SynQor has not contended that there is any patentable distinction between the anticipated claims and the non-anticipated claims, nor any nexus to claim elements not disclosed in Pressman.

On rehearing, the Board addressed this Court's intervening 2015 decision in the following way:

> "We, however, exercised discretion and declined to extend the Federal Circuit's issue resolution to the facts and record of this particular proceeding, where the issues are not as closely related as the '637 ['021 patent] reexamination proceeding. We determined that the issue had not been adequately raised and developed on this record."

(Appx10). The Board's reasoning is erroneous as a matter of law for two reasons. First, Vicor *did* argue below that SynQor failed to show nexus to the portions of the claims not disclosed in the closest prior art. (Appx597-Appx600; Appx357-368). Second, SynQor never even attempted to show a nexus to the "merits of the invention"—instead, it argued that each claim in each of its related patents must be

treated the same way. (Appx241; Appx1213-1215). Certain of SynQor's "substantially identical" claims are held anticipated in a *final* decision of this Court, and given SynQor's admissions, it matters not whether that holding was over Steigerwald '090 or some other prior art.

Because SynQor has admitted that the claims of the '702 patent relate to its secondary considerations in the same way as the *anticipated* claims of the '190 patent, SynQor *cannot* prove nexus to the unique characteristics of the invention. The Board thus erred by finding nexus.

> **(b)    The timing of industry events was dictated by commercial factors unrelated to SynQor**

Not only was IBA available in the prior art as shown by this Court's 2015 decision and Pressman, the evidence makes clear that the industry events upon which SynQor bases its secondary considerations arguments were driven by factors unrelated to SynQor. SynQor implies that the industry would have used IBA earlier, if the invention had been obvious. The evidence below clearly demonstrated this inference to be incorrect. Not only was IBA available in the prior art (as discussed *supra* in the preceding section), factors unrelated to SynQor determined the timing of the growth in popularity of IBA. These factors included a higher demand for multiple voltage outputs combined with the decreasing cost of so-called "POL" regulators.

The timing of commercial events in the marketplace can be highly relevant to the question of obviousness.  As Learned Hand observed in *Ruben Condenser Co. v. Aerovox Corp.*:

> "While it is always the safest course to test a putative invention by what went before and what came after, it is easy to be misled. Nothing is less reliable than uncritically to accept its welcome by the art, even though it displace what went before.  If the machine or composition appears shortly after some obstacle to its creation, technical or economic, has been removed, we should scrutinize its success jealously; if at about the same time others begin the same experiments in the same or nearby fields, or if these come to fruition soon after the patentee's, the same is true."

*Ruben Condenser Co. v. Aerovox Corp.*, 77 F.2d 266, 268 (2d Cir. 1935).

In this case, events unrelated to SynQor drove the increase in popularity of IBA.  Vicor provided compelling, objective evidence that there were two factors: First, in the early 2000s, industry applications began requiring power for a multiplicity of load voltages, which is precisely what IBA is designed to do. Second, the cost of a key IBA component, the "point-of-load" regulator (or "POL") came down.   In Pressman's Fig. 3-4(B) (Appx852), for example (reproduced below) the POLs are the regulators at the outputs, shown below by added arrows:



The influence of POL cost on the popularity of IBA was explained by third-party Bob White in 2003.  (Appx749-754).  White explained that:

> "The name Intermediate Bus Architecture most often means a two level distributed power system like that illustrated in Figure 2.  The second level of distribution is called the Intermediate Bus. This use of this architecture has increased greatly in the last two years [6]. **The drivers for the wide adoption of the Intermediate Bus Architecture are**:
>
> • The **large number of supply voltages needed in systems and on individual circuit cards in today's systems** and  ¶• The **rapidly decreasing cost** of nonisolated, point-of-load **(POL) dc-dc converters**."

(Appx751-752) (Emphasis added).  Notably, White does not say that IBA came about because SynQor conceived of something non-obvious.[5]  Rather, White states

---

[5]   In fact, White credits one of his competitors, Brian Narveson, for the creation of IBA.  (Appx751).

that the driving factors for the increased use of IBA were increasing numbers of supply voltages needed and the decreasing cost of POLs to supply those voltages. (Appx751-752).  SynQor does not contend to have had anything to do with reducing the cost of POLs.

Bob White's assessment of the situation is confirmed by numerous additional references.  A 2003 DATEL application note, for example, stated:

> "The concept [of IBA] is not new; however, it is rapidly becoming affordable—compellingly so—as more vendors announce related products."

(Appx2089).    A December 2002 SynQor Product Roadmap likewise links the usefulness of IBA to the cost of the POL.  (Appx2098-2129).  The SynQor Product Roadmap states that IBA makes sense:

> "When costs of designing and implementing POL nonisolated converters are less than standard brick solution [sic]."

(Appx2126).  Thus, SynQor's own internal documents demonstrated that, for IBA to "make sense", the cost of the POL converters had to be lower.

Finally, in 2004—seven years *after* the earliest possible benefit date of the '702 patent—Dr. Schlecht published an article about IBA. (Appx2153-2155). The article compared IBA with older "DPA" ("Distributed Power Architecture") solutions.  In the article, Dr. Schlecht concluded that it was very difficult to say whether IBA was better than a "traditional" solution (DPA):

"Intermediate Bus Architecture (IBA) or traditional Distributed Power Architecture (DPA); which one do you choose? It would be nice if one approach were so much better than the other that you could answer this question definitively for all scenarios. But that is not the case. Instead, often the two approaches are quite close to each other in performance, and even the definition of 'better' is at best complex."

(Appx2153). The article presented a case study, in the context of which Dr. Schlecht again concluded (consistent with the 2002 SynQor Product Roadmap) that the overall cost of POLs was a key consideration in whether IBA would be useful:

"Overall, the savings the engineers first associated with designing / building their own POLs disappeared once they considered the total cost of ownership. As it turned out, the decision was made to use the DPA approach in this case."

(Appx2154).

The evidence shows both that IBA was known in the prior art, and that it became more popular when the cost of a key component—the POL regulator—sank to economical levels. This history does not give rise to an inference of non-obviousness as SynQor contends. Rather, it shows that the industry was able to pick up old technology when market forces made it worthwhile to do so.

### (c) The nature of events concerning alleged secondary considerations does not support an inference of non-obviousness

Although the Board noted that SynQor had argued "long-felt need", "praise", "proceeding against the conventional wisdom", the Board did not adopt these arguments. (Appx41-43). The Board was correct to do so: these additional

arguments carry no weight, because the nature of the underlying events does not lead to an inference of non-obviousness. The evidence is unequivocal that SynQor did not appreciate or claim IBA as proprietary until *after* it observed IBA becoming more popular in the industry. As the development of IBA gained momentum, SynQor re-tasked its claims to target IBA. This allowed SynQor to retroactively describe events in the industry as if they had been prompted by SynQor. This conduct—while it might be permitted—does not demonstrate that the claims are *non-obvious*.

Specifically, until 2005, SynQor made no claim to have originated IBA—even in the place where one might most expect such a claim: the '702 patent specification itself. The '702 patent claims the benefit of a chain of applications going back to 1997, each of which shares a materially identical specification. That specification is directed to a design for a DC/DC "brick" converter, and focuses on "improvements" for synchronous rectification circuits. (Appx77, 1:49-2:4). Figures 1-10 are directed to single output systems that reverse the order of isolation and regulation recited in the claims. (Appx70-76). The '702 patent specification does not mention IBA (by any name), and certainly does not discuss the advantages of IBA. *Compare* the descriptions of IBA provided at Appx751-752 and Appx2089.

63

In 2004, seven years after that filing and well after certain industry members had adopted IBA, SynQor and Dr. Schlecht were still coming to grips with it. Dr. Schlecht's 2004 article (described *supra*) compares IBA and acknowledged prior art DPA. Dr. Schlecht concludes that it is difficult to say which technique is better. (Appx2153)("often the two approaches are quite close to each other in performance, and even the definition of 'better' is at best complex."). He also makes no claim to having invented or patented IBA. (Appx2153-2155).

In June of 2005, however, something changed. In that year, SynQor went back to the patent office, where the sixth application in a chain of applications was still pending. SynQor canceled then-active claims directed to its synchronous rectification circuit. Then, eight years after its first patent application had been filed, SynQor introduced its very first claims directed to a system having an isolating, non-regulating stage feeding multiple regulating, non-isolating outputs.[6] The application issued as the '190 patent in 2006, and SynQor filed suit on the '190 patent in 2007.[7]

With this context, SynQor's claims to secondary considerations must be seen in a very different light. Because SynQor did not appreciate the value of IBA as late as 2004, SynQor was likely not encouraging the industry to adopt IBA. Especially

---

[6] *See* U.S. App. Ser. No. 10/812,314, Amendment of June 13, 2005. *See also* Appx2162, 25:2-13.

[7] *SynQor, Inc. v. Artesyn Techs., Inc.*, *et al.*, Case No. 2-07-cv-00497 (E.D. Tex.), filed Nov. 13, 2007.

because IBA was already known, it is far more likely that the industry started using IBA when it became economical. The timing was dictated by the market, not by the industry's inability to conceive of IBA without help from SynQor. Thus, no inference can be drawn that IBA was non-obvious. Furthermore, any inference that could be drawn from a jury's finding of infringement looks very different when one understands that SynQor first drafted claims found to have been infringed after being able to observe IBA in practice in the marketplace for years. *See EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907-08 (Fed. Cir. 1985) (the court should take into account the full context when addressing commercial success arguments).

Along these lines, SynQor's argument concerning "praise" would fail. The alleged praise was not praise of Dr. Schlecht or SynQor. SynQor does not cite a single article crediting Dr. Schlecht with having invented IBA, nor with having improved IBA with any allegedly "unique characteristic" recited in the '290 patent claims. *See Sightsound Techs.*, 809 F.3d at 1348-49 (secondary considerations must be "a direct result of the unique characteristics of the invention").

The Board noted SynQor's argument related to a specific email by an Artesyn employee. (Appx42). SynQor argued that the email showed the employee perceiving an unregulated bus converter as "a whopper in terms of a technical challenge". (*Id.*). The email, however, does not specify with any particularity what the technical challenge might be. (Appx2200-2201). Moreover, the email is dated

in 2002, years after SynQor's patent application was published.  (*Id.*) SynQor argued

below that this particular Artesyn employee was operating *with SynQor's patent*

*specification in-hand*.  Specifically, SynQor argued below (referring to the very

same email, PTX135) that:

> "[C]onfidential documents revealed at Trial in SynQor I
> demonstrated that experienced engineers were amazed by SynQor's
> technology (Ex. 49, PTX l35 at 1-2), and had difficulty implementing
> it **even with access to SynQor's** products/datasheet/**patent**."

(Appx206) (Emphasis added).

If Artesyn's "experienced engineer" could not implement something with

SynQor's patent specification in-hand, then the only reasonable conclusion is that

the engineer was expecting difficulty with an aspect of the technology not disclosed

in the patent.  This does not support an inference of non-obviousness.  *See In re*

*GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995).

The Board also noted that SynQor argued "long-felt need" based on an article

by Balogh.  (Appx41-42).  According to SynQor, the Balogh article called the design

of multiple-output converters "a remarkable challenge."  (*Id.*).  This finding is

irrelevant, however, because there is no evidence that the design was beyond

ordinary skill.  Indeed, the Balogh article itself notes that there were numerous

multiple-output converter designs in use, and that its own prototype proved to be

effective and beneficial.  (Appx2202; Appx2224).  Furthermore, Pressman teaches

that, even in 1977—twenty years before the earliest possible benefit date of '702

patent—"[t]he **usual** power supply or power supply system is composed of a **multiplicity of output voltages**." (Appx843) (Emphasis added). There could not have been a long-felt need for multiple-output technology in 19**97**, if the *usual* power supply system had multiple outputs twenty years earlier.

Lastly, the Board noted SynQor's argument that "processing power through two stages was thought of as being inefficient". (Appx42-43). This argument also fails in light of the prior art. Pressman devotes an entire chapter of his 1977 undergraduate textbook to multi-stage power processing, which is advantageous when there are multiple outputs. (Appx843-873). Likewise, Jovanovic in 1994 explained that dividing power conversion into two consecutive stages (*i.e.* "cascading") to form an intermediate bus was a standard technique years before the earliest possible effective date of the '702 patent. Jovanovic states:

> "**Cascading of power processors is necessary in most DPS** configurations to introduce an **intermediate bus** in the power system, as shown in Fig. 1(b)."

(Appx1319) (Emphasis added). Jovanovic's Fig. 1 is reproduced below, and shows the division into two stages in 1(b):



Figure 1.   Basic DPS structures: (*a*) paralleling; (*b*) cascading; (*c*) source splitting; (*d*) load splitting.

(Appx1318). As with the "failure of others" argument, it would be improper to find non-obvious a standard technique used in "most" prior art distributed power systems.

The Board thus erred in drawing an inference of non-obviousness from the evidence of record. The architecture of the claims of the '702 patent was available from the prior art, and the industry began using it more frequently when it became more economical. SynQor's other arguments for secondary considerations were based on its late-claiming of known prior art IBA, in full view of industry developments to which SynQor did not contribute. The Board's overall judgment on obviousness should therefore be reversed.

## VIII.  **CONCLUSION**

Vicor respectfully requests that this Court reverse the Board's decision and hold claims 1-3, 12-14, 17-20, 23, 26-30, 39-41, 44-47, 50, 53-56, 64, 67-76, 78, 80-86 and 88-89 of the '702 patent unpatentable.

Date:  October 28, 2016                    TURNER BOYD LLP

                                             */s/ Matthew A. Smith*
                                             Matthew A. Smith
                                             702 Marshall Street, Suite 640
                                             Redwood City, CA 94063
                                             Telephone:  (650) 265-6109
                                             Facsimile:  (650) 521-5931
                                             Email:       smith@turnerboyd.com

                                             *Attorneys    for    Requester-Appellant*
                                             *Vicor Corporation.*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that, on October 28, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered users.

I further certify that, upon acceptance and request from the Court, the required paper copies of the foregoing will be deposited with United Parcel Service for delivery to the Clerk, UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT, 717 Madison Place, N.W., Washington, D.C. 20439.

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Melissa A. Dockery
Melissa A. Dockery
GIBSON MOORE APPELLATE SERVICES
P.O. Box 1460
Richmond, VA  23218
(804) 249-7770
melissa@gibsonmoore.net

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P.
        32(a)(7)(B) because:

        this brief contains <u>13,893</u> words, excluding the parts of the brief
        exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P.
        32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

        this brief has been prepared in a proportionally spaced typeface using
        <u>Microsoft Word</u> in <u>14 point Times New Roman</u>.

Dated October 28, 2016                    <u>/s/ Matthew A. Smith          </u>
                                          Matthew A. Smith



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**U.S. Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO./ CONTROL NO. | FILING DATE | FIRST NAMED INVENTOR / PATENT IN REEXAMINATION | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 95/001,853 | 12/14/2011 | 7,564,702 | |

GREENBLUM & BERNSTEIN, P.L.C.
1950 ROLAND CLARKE PLACE
RESTON, VA 20191

| EXAMINER |
|---|
| Menefee, James |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 05/02/2016 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

MOD PTOL-90A (Rev.06/08)

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

VICOR CORPORATION
Requester

v.

SYNQOR, INC.
Patent Owner and Appellant

---

Appeal 2014-007362
Reexamination Control 95/001,853[1]
Patent No. US 7,564,702 B2[2]
Technology Center 3900

---

Before JAMES T. MOORE, STEPHEN C. SIU, and
DENISE M. POTHIER, *Administrative Patent Judges.*

MOORE, *Administrative Patent Judge.*

### DECISION ON REHEARING

### STATEMENT OF THE CASE

Requester Vicor Corporation ("Vicor" or "Requester") requests on
May 20, 2015 reconsideration of our decision on appeal dated April 20,
2015 (the Decision). That appeal was filed under 35 U.S.C. §§ 134(b) and

---

[1] Filed by Vicor Corporation on December 14, 2011.
[2] Issued July 21, 2009 to Martin Schlecht and assigned to SynQor, Inc. (the
"'702 patent"). The '702 patent issued from Application 11/901,263, filed
September 14, 2007.

315(a) (2002) from the rejection of claims 1–3, 12–20, 23, 26–30, 38–47,

50–56, 64, 67–76, 78, 80–82, 84–86, 88, and 89 as set forth in the Right of

Appeal Notice mailed March 11, 2013. In that decision, we reversed all of

the rejections of record.

Requester asserts two grounds for reconsideration in the Request for

Rehearing ("Reh'g. Req."). First, Requester asserts that that the panel may

have overlooked the decision related to U.S. Patent No. 7,072,190 (the "'190

Patent) of our reviewing court in *Vicor Corporation v. SynQor, Inc.*, 603 F.

App'x. 969 (Fed. Cir. 2015) ("CAFC '190 Patent Decision"). Reh'g. Req. 3.

Second, Requester asserts that the panel overlooked the testimony of Dr.

Steigerwald and prior art documents relating to his work, referred to as the

"Steigerwald Evidence." *Id.*

Requests for rehearing are governed by 37 CFR § 41.79 (b) which

recites, in pertinent part:

> (b) (1) The request for rehearing must state with particularity
> the points believed to have been misapprehended or overlooked in
> rendering the Board's opinion reflecting its decision. Arguments not
> raised in the briefs before the Board and evidence not previously
> relied upon in the briefs are not permitted in the request for rehearing
> except as permitted by paragraphs (b)(2) and (b)(3) of this section.

> (2) Upon a showing of good cause, appellant and/or respondent
> may present a new argument based upon a recent relevant decision of
> either the Board or a Federal Court.

We grant the request for rehearing to the extent that we have

reconsidered the decision and concerning the first point raised by the

Requester, but deny the request in all other respects.

Appeal 2014-007362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

### The CAFC '190 Patent Decision

Requester urges that we reconsider our April 20, 2015 decision in light of the CAFC '190 Patent Decision, asserting that "[t]he CAFC '190 Patent Decision affects both the panel's consideration of secondary evidence under all rejections, as well as SynQor's motivation to combine arguments in the Steigerwald-based rejections." Req. Reh'g at 4.

The thrust of the argument is that, as the Federal Circuit found certain claims of the '190 patent anticipated, and remanded for a renewed consideration of obviousness rejections based upon that prior art anticipating certain claims, we should reconsider our decision. Reh'g Req. 6-7. The central part of the argument is that

> SynQor has *never* made a showing that its secondary evidence has a nexus to the features of the '702 patent that are *different from* the anticipated claims in the '190 patent. In fact, SynQor has repeatedly made the opposite case: that *the very same secondary considerations* are attributable to *claim elements common to every claim of all of its patents*.

Req. Reh'g 7.

The problem with this position is that the panel was aware of the '190 Patent Decision, and did not overlook it. "To the extent the evidence relied upon during litigation and decisions of the District Courts and Federal Circuit are informative, we have considered them as such." Dec. 2. Accordingly, for this reason alone, the requested relief is denied.

However, we also observe that even had the panel overlooked the CAFC '190 Patent Decision, the Federal Circuit decision is not directly related to the central issues raised, argued, and briefed in the record of this reexamination proceeding, and the record of the present appeal. The Court's

3

**Appx00004**

Appeal 2014-007362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

holding specifically related to an embodiment the Court found produced as a result of the incorporation by reference of U.S. Patent No. 5,274,539 (filed Dec. 4, 1991) ("Steigerwald '539") into U.S. Patent No. 5,377,090 (filed Jan. 19, 1993) ("Steigerwald '090"). *Vicor*, 603 F. App'x at 971.

Steigerwald '090 teaches a converter that has a single isolation stage followed by a plurality of regulation stages. These regulation stages allow Steigerwald '090 to provide multiple output voltages. The isolation stage uses diodes as rectifiers, and Steigerwald '090 does not disclose using controlled rectifiers in place of the diodes. *Id.*

Based in large part upon the identity of the figures and a common numeral 20 missing from a description in the '090 Patent[3], the Federal Circuit determined that Steigerwald '090 incorporates by reference at least those teachings of Steigerwald '539 that relate to its capacitance-multiplying converter 20. *Id.* at 974–75. The incorporated teachings include Steigerwald '539's alternative embodiment, which teaches a substitution of synchronous rectifiers for diodes in the isolation stage. *Id.* at 975. That alternative embodiment was a central feature of the 95/001,733 reexamination proceeding.

In reversing the Board's decision regarding the anticipation rejection and remanding to consider the obviousness issues in the 95/001,733 reexamination proceeding, the Federal Circuit noted that

> the teachings of the combined Steigerwald reference may be relevant to any objective evidence of nonobviousness. For example,

---

[3] We are unable to locate in the record where the issue of the missing description of numeral 20 was raised or briefed in either the 95/001,733 reexamination proceeding or subsequent Board appeal.

4

Appeal 2014-007362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

> commercial success is evidence of obviousness only when there is a
> 'nexus ... between the merits of the claimed invention and evidence of
> commercial success.' *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392
> F.3d 1317, 1324 (Fed.Cir. 2004). Vicor should have the opportunity to
> argue that SynQor's evidence of commercial success is attributable not
> to the claimed invention, but to the prior art converter taught by the
> combined Steigerwald references.

*Id.* at 975–76.

The Requester points us towards the Board's recent decision in reexamination proceeding 95/001,637, concerning U.S. Patent 7,272,021 ("the PTAB '021 Patent Decision"). Req. Reh'g. 5–6. In that decision, the Board determined that the Federal Circuit's decision had a direct bearing on the outcome of the case. It involved precisely the same art, the same positions on interpretation of the art, and the same parties. Specifically, on page 8, we determined that:

> The Court was presented with this precise issue as to whether the
> embodiments of the different Steigerwald references could be
> combined into a single embodiment as Requester and the Examiner
> have done here.

The '021 Patent Dec. 8.

Accordingly, we exercised our discretion and found the Federal Circuit's decision persuasive on (1) whether the Steigerwald references could be combined into a single embodiment, (2) the issue of the embodiment anticipating certain claims, and (3) the decision's impact on certain secondary considerations.

In the present reexamination proceeding, the rejections involve some of the same art as in the '190 patent. However, none of the rejections reversed by the Board relies upon the combined example found to exist by

5

Appeal 2014-007362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

the Federal Circuit in the Federal Circuit's '190 Patent decision.  Nor are the
claims of this proceeding the same as the '021 or '190 patent.  Consequently,
the issue as to whether the instant claims are rendered *prima facie* obvious
by the art as applied in this proceeding is, in our view, not significantly
influenced by the Federal Circuit's decision in the related reexamination
concerning anticipation of different claims by a differently applied
reference.

There are several *prima facie* rejections, which include either of the
Steigerwald references.  We discuss each such *prima facie* case below in
relation to the Court's determination in the '190 Patent.

II. *The rejection of Claims 26, 27, 53, 54, 67, 68, 81, 85, and 89
under 35 U.S.C. § 103(a) over Cobos I, Pressman, Steigerwald '090, and
Jovanovic.*[4]

This rejection was adopted from the Request, page 25 and Exhibit 21.
RAN 10; Reexam Order January 19, 2012, pages 10–11.  Steigerwald '090
was relied upon for the proposition that it was "notoriously well known" to
"use multiple singled-ended forward converter transformers, operating with
complementary duty cycles, in order to [] achieve a substantially
uninterrupted flow of power."  Req. 25.

The *prima facie* case of obviousness is therefore unrelated to the
Federal Circuit's holding in the '190 Patent decision.

V. *The rejection of Claims 1, 26–28, 53, 54, 78, 81, 82, and 85 under
35 U.S.C. § 103(a) over Steigerwald '090, Cobos I, Kassakian Textbook,
and Pressman.*

---

[4] Section designations from the Decision are reused herein to avoid
confusion.

6

Appeal 2014-007362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

The 95/001,406 Reexamination Proceeding's original Request is the source of this rejection, adopted by the Examiner in this proceeding. *See* Dec. 16. It states, that Steigerwald '090 teaches a power converter system including a first transformer Tl and a second transformer T2, as shown in the sole Figure of Steigerwald '090. '406 Reexamination's Request 66. The first transformer Tl includes primary winding 22 and secondary winding 24, and the second transformer T2 includes primary winding 26 and secondary winding 28. Diode rectifiers $C_{Rap}$ and $C_{Rbp}$ are coupled to the transformers Tl and T2, respectively. *Id.*

This initial *prima facie* case is, therefore, also unrelated to the Federal Circuit's holding in the '190 Patent decision.

*VI. The rejection of Claims 2, 29, 55, 67-76, 86, and 89 under 35 U.S.C. § 103(a) over Steigerwald '090, Cobos I, Kassakian Textbook, Pressman, and Sutton.*

The issues concerning this rejection are the same as Rejection V, immediately preceding, and therefore unrelated to the Federal Circuit's holding in the '190 Patent decision.

IX. *The rejection of Claims 1-3, 12, 13, 15-20, 26, 78, 80 and 81 under 35 U.S.C. § 103(a) over JP '446, Steigerwald '539, Kassakian Textbook, Kassakian Article, and Ji.*

Steigerwald '539 was relied upon in this rejection for the concept of replacing the diodes of JP '446 with the synchronous rectifiers SRa and SRb of Steigerwald '539. '406 Request at 440, *cited in* Dec. 34. Doing so, as suggested in Steigerwald '539, we determined it would have improved the efficiency of the rectifying system of JP '446 as was well known by those of ordinary skill in the art as admitted in the '702 patent. *Id.*

7

This prima facie case thus is also unrelated to the Federal Circuit's holding in the '190 Patent decision.

X. *The rejection of Claims 28, 29, 53, 55, 69, 73-76, 82, 85, 86 and 89 under 35 U.S.C. § 103(a) over JP '446, Steigerwald '539, Kassakian Textbook, and Kassakian Article.*

The issues concerning this rejection are the same as Rejection IX, immediately preceding, and therefore also substantially unrelated to the Federal Circuit's holding in the '190 Patent decision.

XI. *The rejection of Claims 38, 51, 52 and 65-67 under 35 U.S.C.§ 103(a) over JP '446, Steigerwald '539, Kassakian Textbook, Kassakian Article, and Cobos II.*

The issues concerning this rejection are the same as Rejection IX, above, and therefore also unrelated to the Federal Circuit's holding in the '190 Patent decision.

XII. *The rejection of Claims 41 and 70 under 35 U.S.C. § 103(a) over JP '446, Steigerwald '539, Kassakian Textbook, Kassakian Article, and Cruz.*

The issues concerning this rejection are the same as Rejection IX, above, and therefore also substantially unrelated to the Federal Circuit's holding in the '190 Patent decision.

*Secondary Considerations*

We previously weighed the evidence of secondary considerations (Dec. 21–28) and determined that it overcame the prima facie case of obviousness. The Requester on rehearing now takes the position that "SynQor has never made a showing that its secondary evidence has a nexus to the features of the '702 patent that are different from the anticipated claims in the '190 patent." Req. Reh'g 7 (emphasis omitted). Requester

8

Appeal 2014-007362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

also urges that the findings of the Federal Circuit undercut the secondary considerations generally. *Id.*

We are not persuaded by this argument.

The Requester made certain arguments in the related '190 Patent reexamination proceeding and appeal concerning an embodiment in the Steigerwald '090 reference. Those arguments were ultimately successful upon its appeal to the Federal Circuit. We then determined that certain factual determinations the Federal Circuit made in its non precedential '190 Patent decision should govern the outcome of that precise issue in an another related 95/001,637 reexamination proceeding appeal, because the issue was identical, the parties were identical, and the issue was adequately raised and thoroughly developed.

We, however, exercised discretion and declined to extend the Federal Circuit's issue resolution to the facts and record of this particular proceeding, where the issues are not as closely related as the '637 reexamination proceeding. We determined that the issue had not been adequately raised and developed on this record.

As the Patent Owner observed, Requester was aware of and had ample opportunity to advance the underlying theory that Steigerwald '090 included another embodiment and secondary considerations should be viewed in light of that prior art. To permit Requester to introduce new theories at this time, which theories could have been raised in the initial Reexamination Request and fully developed and potentially rebutted on the record during the prosecution in this proceeding, would unfairly allow the introduction of new

9

Appeal 2014-007362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

arguments in this case after the record has been closed. *See, e.g.*, PO
Comments on Req. Reh'g, 3.

We agree, and observe that it is eminently unfair to require Patent
Owner to have provided evidence at this stage in the proceeding, and
against an issue that had not been raised in this proceeding.

Accordingly, we decline the request's invitation to permit the
importation of new, additional, arguments from the '190 patent
reexamination proceeding.

### The Steigerwald Evidence

Requester's second position on rehearing urges that the Board
overlooked the Steigerwald Evidence, which consisted of a prior art
publication and deposition transcript. Req. Reh'g. 13. The Steigerwald
Evidence was submitted in a Notice of Concurrent Proceedings dated
November 18, 2013 and filed by Patent Owner. *Id.*

Patent Owner addresses the Steigerwald evidence on the merits
beginning at page 11 of its Comments on the Request for Rehearing.
Request Rch'g 11.

Both parties misapprehend the status of the Steigerwald Evidence.

Patent Office rules strictly govern what may be placed into the record
in an *inter partes* reexamination proceeding at both the examination and the
appeal stage.

For the examination stage and the appeal stage, 37 CFR § 1.985
provides as follows:

> § 1.985 Notification of prior or concurrent proceedings in
> inter partes reexamination.

10

**Appx00011**

Appeal 2014-007362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

> (a) In any inter partes reexamination proceeding, the patent owner shall call the attention of the Office to any prior or concurrent proceedings in which the patent is or was involved, including but not limited to interference or trial before the Patent Trial and Appeal Board, reissue, reexamination, or litigation and the results of such proceedings.

> (b) Notwithstanding any provision of the rules, any person at any time may file a paper in an inter partes reexamination proceeding notifying the Office of a prior or concurrent proceeding in which the same patent is or was involved, including but not limited to interference or trial before the Patent Trial and Appeal Board, reissue, reexamination, or litigation and the results of such proceedings. Such paper must be limited to merely providing notice of the other proceeding without discussion of issues of the current inter partes reexamination proceeding.

Rule 985 (b) states that the paper notifying the Office of concurrent proceedings should simply notify the Office of the proceeding and the results.   Including the deposition transcript in the notice was improper and consequently an unauthorized paper.

37 CFR § 1.939 (a) provides that, as regards unauthorized papers in inter partes reexaminations, "[i]f an unauthorized paper is filed by any party at any time during the inter partes reexamination proceeding it will not be considered and may be returned."

We deem the "Steigerwald Evidence" to be unauthorized papers and accordingly they were not, and will not, be considered at this stage of the proceedings.

Moreover, at the appeal and rehearing stage, submission of the deposition transcript and prior art publication as a Notice of Concurrent

11

Appeal 2014-007362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

Proceeding violates multiple Board rules. 37 CFR § 41.63 (c) provides that
"[a]ffidavits or other evidence filed after the date of filing an appeal
pursuant to § 41.61 will not be admitted except as permitted by reopening
prosecution under § 41.77(b)(1)." This evidence therefore is improper and
excluded from the record, and from consideration in the instant proceeding.

Finally, for an issue to be raised on rehearing, it must have been
adequately raised before the Board in the briefs. 37 CFR § 41.79(b),
completely reproduced above, provides in part that that:

> **Arguments not raised in the briefs before the Board and evidence
> not previously relied upon in the briefs are not permitted in the
> request for rehearing except as permitted by paragraphs (b)(2)
> and (b)(3) of this section.**

37 CFR § 41.79(b)(1) (emphasis added).

The Steigerwald Evidence and any argument pertaining to it was not
raised in any of the previous briefing before the Board. Nor was it in
response to a recent decision of the Federal Circuit or in response to a new
ground of rejection. Accordingly, this Request for Rehearing contains
impermissible argument.

We therefore decline to consider the Steigerwald Evidence.

## CONCLUSION

We have carefully considered the request for rehearing, but decline to
modify our previous decision for the reasons noted above.

## ORDER

The Request for Rehearing is granted insofar as we have considered
the first argument raised by the Requester, but denied in all other respects.

12

Appeal 2014-007362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

DENIED

Patent Owner:

Greenblum & Bernstein, PLC
1950 Roland Clarke Place
Reston, VA 20191

Third Party Requester:

Turner Boyd, LLP
2570 West Camino Real
Suite 380
Mountain View, CA 94040

13

UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/001,853 | 12/14/2011 | 7,564,702 | X43640 | 8516 |

7055        7590        04/20/2015
GREENBLUM & BERNSTEIN, P.L.C.
1950 ROLAND CLARKE PLACE
RESTON, VA 20191

| EXAMINER |
|---|
| HEYMAN, JOHN S |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 04/20/2015 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

VICOR CORPORATION
Requester

v.

SYNQOR, INC.
Patent Owner and Appellant

———————————

Appeal 2014-007362
Reexamination Control 95/001,853[1]
Patent No. US 7,564,702 B2[2]
Technology Center 3900

———————————

Before JAMES T. MOORE, STEPHEN C. SIU, and
DENISE M. POTHIER, *Administrative Patent Judges*.

MOORE, *Administrative Patent Judge*.

DECISION ON APPEAL

STATEMENT OF THE CASE

Patent Owner SynQor appeals under 35 U.S.C. §§ 134(b) and 315(a)

(2002) from the rejection of claims 1-3, 12-20, 23, 26-30, 38-47, 50-56, 64,

67-76, 78, 80-82, 84-86, 88, and 89 as set forth in the Right of Appeal

---

[1] Filed by Vicor Corporation on December 14, 2011.
[2] Issued July 21, 2009 to Martin Schlecht and assigned to SynQor, Inc. (the "'702 patent"). The '702 patent issued from Application 11/901,263, filed September 14, 2007.

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

Notice ("RAN") mailed March 11, 2013.  Patent Owner filed an Appeal

Brief June 10, 2013.  Requester Vicor Corporation filed a Respondent Brief

on July 10, 2013.  The Examiner mailed an Examiner's Answer on

July 26, 2013, which incorporated the RAN by reference and maintained all

rejections.  Patent Owner filed a Rebuttal Brief on August 26, 2013.  Oral

argument was conducted before a panel of this Board on October 15, 2014 in

Reexamination Proceeding Appeals 2014-007362 and 2014- 007587

(Reexamination Control 95/ 001,637) and a transcript of the proceedings is

of record.  We have jurisdiction under 35 U.S.C. §§ 134 and 315.

We REVERSE.

According to Patent Owner, U.S. Patent No. 7,564,702 was asserted in

*SynQor, Inc. v. Artesyn Technologies, Inc. et al.*, Case No. 2:07-CV-497

(E.D. Tex.)("SynQor I") and in *SynQor, Inc. v. Ericson, Inc.*, Case No. 2:11-

CV-00054-TJW-CE (E.D. Tex) ("SynQor II.")  Br. 1.  SynQor I was

appealed to the Federal Circuit and affirmed.  Br. 1.  SynQor II remains

pending and, apparently, has been severed into a first proceeding against

Cisco Systems (Case No. 2:14-CV-286) and a second proceeding against

Vicor Corporation (Case No. 2:14-CV-287) by order dated March 31, 2014,

in the Eastern District of Texas.

To the extent the evidence relied upon during litigation and decisions

of the District Courts and Federal Circuit are informative, we have

considered them as such.

The '702 Patent concerns power conversion.  The claims generally

describe a two-stage direct current to direct current power conversion system

that has two separate stages – one for isolation and one for the actual voltage

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

conversions needed.  The combination of these separate stages is said to
provide improved efficiency, size, and cost.  '702 Patent, col. 17:2–39.  The
patent itself asserts that the conversion is "nearly lossless."   Abstract.

Claim 1 is representative, and reproduced below, with paragraphing
added for the sake of clarity.

1. A DC-DC power converter system providing plural regulated
DC outputs, each having a regulated voltage, comprising:

a) a DC input providing an input voltage that varies over a
range that is more than plus or minus a few percent;

b) a non-regulating isolating step-down converter through
which power from the DC input flows first before flowing through
any regulation stage, the non-regulating isolating step-down converter
providing a non-regulated, isolated DC output having a non-regulated
voltage and comprising:

i) at least one transformer that is not driven into saturation, the
at least one transformer having plural windings including at least one
primary winding and at least one secondary winding;

ii) plural power MOSFET switches in circuit with the at least
one primary winding, the plural power MOSFET switches causing
power to flow into the at least one primary winding;

iii) control circuitry coupled to the plural MOSFET switches,
the control circuitry determining when the power MOSFET switches
are turned on and off in a switching cycle at a switching frequency;
and

iv) plural controlled rectifiers in circuit with the at least one
secondary winding, each having a parallel uncontrolled rectifier, each
controlled rectifier being turned on for an on-state time and off for an
off-state time in synchronization with a voltage waveform of the at
least one primary winding to provide the non-regulated, isolated DC

3

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

output, the voltage waveform of the at least one primary winding having a fixed duty cycle and transition times which are short relative to the on-state and the off-state times of the controlled rectifiers; and

c) plural non-isolating down-converter switching regulators, each receiving power from the non-regulated, isolated DC output and each providing one of the regulated DC outputs having a regulated voltage.

'702 Patent, col:17:2–39.

EVIDENCE OF RECORD

The Examiner relies upon the following prior art in rejecting the claims on appeal:

| | | |
|---|---|---|
| Sutton | US 4,586,119 | April 29, 1986 |
| Steigerwald (Steigerwald '539) | US 5,274,539 | December 28, 1993 |
| Steigerwald (Steigerwald '090) | US 5,377,090 | December 27, 1994 |
| Schlecht | US 5,999,417 | December 7, 1999 |

Japanese Patent Application
Publication No. H05-64446 ("JP '466")                    March 12, 1993

Japanese Patent Application
Publication No. 2004-254393 ("JP '393")                    September 9, 2004

Abraham I. Pressman, <u>Switching and Linear Power Supply, Power Converter Design</u> (1977). ("Pressman")

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

John G. Kassakian & Martin F. Schlecht, "High-Frequency High-Density Converters for Distributed Power Supply Systems" 76 Proc. of the IEEE (1988). ("Kassakian II").

John G. Kassakian et al., <u>Principles of Power Electronics</u> (1991). ("Kassakian  Textbook").

J.A. Cobos *et. al.*, "Study of the Applicability of Self-Driven Synchronous Rectification of Resonant Topologies," 23rd Annual IEEE Power Electronics Conf. 933–940 (1992).  ("Cobos II").

Enrique de la Cruz et al., "Analysis of Suitable PWM Topologies to Meet Very High Efficiency Requirements for on Board DC/DC Converters in Future Telecom Systems," 15th Annual Telecommunications Energy Conference 207-214 (1993).

H. K. Ji & H. J. Kim, "Active Clamp Forward Converter with MOSFET Synchronous Rectification" 25th Annual IEEE Power Electronics Specialists Conference 895- 901 (1994).

J.A. Cobos & J. Uceda, "Low Output Voltage DC/DC Conversion*,*" 20th International Conference On Industrial Electronics, Control, and Instrumentation 1676-1681 (1994).  ("Cobos I").

Milan M. Jovanovic et al., "Distributed Power Systems – Benefits and Challenges," 77 Int. J. Electronics 601-612 (1994).

J. Uceda & J.A. Cobbs, "Supplying Power at Low Voltage (3.3V),"  Proc. of the 1995 First IEEE International Caracas Conference on Devices, Circuits, and Systems 244-251 (1995).


THE REJECTIONS

I.  Claims 1, 2, 28, 29, 55, 69–76, 78, 82, and 86 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over Cobos I, Pressman, and Jovanovic.

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

II.  Claims 26, 27, 53, 54, 67, 68, 81, 85, and 89 stand rejected under 35 U.S.C. § 103(a) over Cobos I, Pressman, Steigerwald '090, and Jovanovic.

III. Claims 55, 69, 70, and 73-76 stand rejected under 35 U.S.C. § 103(a) over Cobos I and Pressman.

IV. Claims 1, 2, 26-29, 53-55, 67-76, 78, 81, 82, 85, 86 and 89 stand rejected under 35 U.S.C. § 103(a) over JP '393 and Schlecht (also called the '417 patent).

V. Claims 1, 26–28, 53, 54, 78, 81, 82, and 85 stand rejected under 35 U.S.C. § 103(a) over Steigerwald '090,  Cobos I,  Kassakian Textbook, and Pressman.

VI. Claims 2, 29, 55, 67-76, 86, and 89 stand rejected under 35 U.S.C. § 103(a) over Steigerwald '090, Cobos I, Kassakian Textbook, Pressman, and Sutton.

VII. Claims 1-3,12-14,17-20, 23, 26, 28-30, 39-41, 44-47, 50, 53, 55, 56, 64, 67, 69, 70, 73-76, 78, 80-82, 84-86, 88 and 89 stand rejected under 35 U.S.C. §103(a) over Pressman and Kassakian Article.

VIII. Claims 15, 16, 42, 43, 71 and 72 stand rejected under 35 U.S.C. § 103(a) over Pressman, Kassakian Article, and Uceda.

IX. Claims 1-3, 12, 13, 15-20, 26, 78, 80 and 81 stand rejected under 35 U.S.C. § 103(a) over JP '446, Steigerwald '539,  Kassakian Textbook, Kassakian Article, and Ji.

X. Claims 28, 29, 53, 55, 69, 73-76, 82, 85, 86 and 89 stand rejected under 35 U.S.C. § 103(a) over JP '446 in view of Steigerwald '539, Kassakian Textbook, and Kassakian Article.

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

XI.  Claims 38, 51, 52 and 65-67 stand rejected under

35 U.S.C. § 103(a) over JP '446, Steigerwald '539, Kassakian Textbook,

Kassakian Article, and Cobos II.

XII.  Claims 41 and 70 stand rejected under 35 U.S.C. § 103(a) over

JP '446, Steigerwald '539,  Kassakian Textbook, Kassakian Article, and

Cruz.

RAN 10–13.

I. *The Rejection of Claims 1, 2, 28, 29, 55, 69–76, 78, 82, and 86
under 35 U.S.C. § 103(a) as being unpatentable over Cobos I, Pressman,
and Jovanovic.*

This rejection was adopted from the Request, pages 17-24, and

Exhibit 20.  RAN 10; Reexam Order January 19, 2012, page 10.

According to the Examiner and Requester, Cobos I and Pressman, taken

together, teach every element of the claims, while Jovanovic provides

additional motivation to make the combination.  *Id.*

According to Requester, Cobos I is directed to low-voltage DC/DC

power converters with synchronous rectifiers.  Cobos I generally describes a

converter which includes a transformer with a primary winding and

secondary winding.  The converter isolates the converter's input from its

output and steps it down. Importantly, the Requester asserts that the front-

end converter does not provide feedback that ties the output voltage to the

input voltage.  Therefore, according to the Requester, the output of the front-

end converter is unregulated.  Request, 17.

The Request further notes that the converter is "well balanced" with a

duty cycle of about 50% and not driven into saturation.  *Id.*  The Requester

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

goes on to note that because of the active clamp, the duty cycle could be greater than 50% without causing saturation. *Id.* at 17-18.

Figure 6(b) of Cobos is reproduced below.



Fig. 6(b) is a circuit diagram and graphically plotted waveform.

MOSFET switches are said to be coupled to the primary winding, and have short transitions between on- and off-states. The diodes D1 and D2 are said to be parallel uncontrolled rectifiers. Request, 18.

According to the Requester, Cobos I therefore describes all of the elements of claim 1 except for the non-isolating down-converter switching regulators. *Id.*

Pressman is said to teach multiple non-isolating down-converter switching regulators coupled to a front-end converter. *Id.*

Pressman's Figure 3–4(B) describes a preregulated converter with postregulated outputs.



Appx00023

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

Fig. 3–4(B) is a flow chart of Pressman's power regulator.

According to the Requester, there is ample motivation to substitute the front end of Cobos I for the preregulator and the isolating, non-regulating step-down converter. This substitution would provide a specific circuit implementation for the isolating, non-regulating portion of the Pressman circuit, and remove the preregulator. Request, 20.

Requester further pointed to Jovanovic as describing circuit components as modular building blocks. *Id.* According to Pressman:

> All these requirements can be met with different combinations and permutations of the above basic building blocks. Systems can be devised with standard electrically and mechanically configured building blocks requiring only a minimum custom circuit change to fit a large variety of applications.

Pressman, 74 (omitted emphasis and parentheticals added by Requester) (cited by Req. 21).

Patent Owner asserts that the Requester has erroneously interpreted Cobos I, and that the output of the DC converter in Cobos I is accomplished by self-driven synchronous rectification, which employs pulse-width modulation, and the Cobos I's regulator is therefore a regulated step-down converter. App. Br. 16.

Requester counters that Cobos I does not teach regulation. Requester admits that the Cobos' converter in Figure 6(b) could provide a regulated output, but urges that it need not do so. Resp. Br. 13.

Patent Owner responds that Figure 6(b) of Cobos I is described in the section of Cobos I entitled "SDSR in PWM topologies" (Cobos I, p. 1679). According to Patent Owner, the acronym SDSR is explicitly defined as

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

"self-driven synchronous rectification" (*Id.*).   Patent Owner further asserts
that the acronym "PWM" is commonly known in the pertinent art as pulse-
width modulation and indicates regulation to the skilled worker.  Reb. Br.
10.

FAC, as used to describe Figure 6(b), is a "forward converter with
active clamp."  Cobos I, p. 1679.  Patent Owner asserts that one having
ordinary skill in the art would assume that feedback control circuitry is
present because the output voltage of a PWM is regulated in Cobos I to
3.3 volts.  Reb. Br. 10.  Patent Owner provides Dr. Schlecht's testimony:

> While Cobos [I] does not illustrate the control circuit that would be
> used in PWM, such a design would have been inherent in the PWM
> architecture. Thus, persons of ordinary skill in the art would have
> understood that the PWM circuit included a control circuit necessary
> to modulate the duty cycle to achieve regulation of the output voltage.

Schlecht Dec. ¶ 87 (App. Br., Appendix A).

Dr. Schlecht asserts that "persons of ordinary skill would understand
that Cobos [I's] Figure 6(b) illustrates a fully regulated converter, not an
unregulated converter." *Id.* at ¶ 88.

Patent Owner's position is that if pulse width modulation were
employed, a control circuit would be needed to modulate the duty cycle. *Id.*
at ¶ 87.  If, as Dr. Schlecht contends, Cobos I's Figure 6(b) reflects a single
stage regulation and isolation using pulse width modulation (*id.* at ¶ 92),
then the combination cannot reflect the subject matter of instant claim 1.

The Requester asserts that Dr. Schlecht's testimony is "litigation-
fueled."  Resp. Br. 13.  Requester asserts that pulse width modulation can be
done without regulation in various scenarios. *Id.*

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

Requester also argues that Cobos I emphasizes using converters at a fixed duty cycle, and a 50% duty cycle would be unregulated.  Resp. Br. 14. Requester also asserts that Dr. Schlecht "conjured up" the requirement for regulation in Figure 6(b) of Cobos.  *Id.*

We are provided with no independent analysis from the Examiner, who states only that he "agrees with the reasoning of the TPR [Requester] and adopts [the] same herein."  RAN 15.  We therefore must assume that the Examiner has considered, but discounted or discredited, the testimony of Dr. Schlecht.

Cobos I is not explicit as to whether there is a regulated output in Figure 6(b).   We find it instructive that the output voltage in Cobos is generally regulated to 3.3 volts. *See* Cobos I, p. 1676, column 1, line 3.  We also observe that the arguments made by Requester are inconsistent with the position taken in the initial Request that because of the active clamp in Cobos I, the duty cycle of the converter could be greater than 50 percent, which might imply a form of regulation.  Req. 17-18.  Finally, although we understand that there is likely inherent bias in the testimony of Dr. Schlecht, his testimony is both reasonable and largely unrefuted by persuasive evidence.

We have carefully considered the underlying factual basis, including the arguments provided by both Patent Owner and Requester, and considered the Examiner's concurrence with the Requester.  We are of the opinion that a preponderance of the evidence of record supports the Patent Owner.  As such, we conclude that the Examiner erred in discounting the credible testimony of Dr. Schlecht, and the other evidence of record, in

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

finding that Cobos I describes a "non-regulating isolating step-down converter" as required by element (b) of claim 1.

We therefore reverse this rejection.


II. *The rejection of Claims 26, 27, 53, 54, 67, 68, 81, 85, and 89 under 35 U.S.C. § 103(a) over Cobos I, Pressman, Steigerwald '090, and Jovanovic.*

This rejection was adopted from the Request, page 25 and Exhibit 21. RAN 10; Reexam Order January 19, 2012, pages 10–11. According to the Examiner, these claims are described in Cobos I, Pressman, and Steigerwald '090, with Jovanovic providing additional evidence of the motivation to make the combination. *Id.*

This rejection depends from the combination of references discussed above, and accordingly, we reverse this rejection for the same reasons as discussed above.


III. *The Rejection of Claims 55, 69–70, and 73-76 under 35 U.S.C. § 103(a) over Cobos I and Pressman.*

This rejection was adopted from the Request, page 26–28 and Exhibit 20. RAN 10; Reexam Order January 12, 2012, page 11.

According to the Examiner, this rejection was adopted for the same reasons as Rejection I. *Id.*

This rejection depends from the combination of references discussed above, and accordingly, we reverse this rejection for the same reasons as discussed above.

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2


   *IV. The rejection of Claims 1, 2, 26-29, 53-55, 67-76, 78, 81, 82, 85-86 and 89 under 35 U.S.C. § 103(a) over JP '393 and Schlecht (also called the '417 patent).*

   This rejection was adopted from the Request, Exhibits 22 and 23. RAN 11, Reexam Order January 12, 2012, page 11. According to the Examiner, these claims are rendered obvious by JP '393 and Schlecht '417. *Id.*

   One prefatory issue arises. Are these references prior art? Requester asserts that the instant '702 patent is entitled only to its filing date of September 14, 2007, and is not entitled to the filing date of any of its predecessor applications in its chain of priority, including U.S. Application No. 09/012,475, filed January 23, 1999, and issued as U.S. Patent No. 5,999,417 (the '417 Patent). Request, 12–15 and 33. If that is true, then JP '393, which published in 2004, is available as a reference.

   The Examiner states only that in a "careful review of the both positions, the Examiner agrees with the analysis of the TPR and adopts [the] same herein." RAN 7.

   We therefore look to the positions of the Patent Owner and Requester.

   Requester states that each of the independent claims of the '702 patent (claims 1, 28, 55, 76, 82 and 89) require a version of the element of "a non-regulating isolating step-down converter through which power from the DC input flows first before flowing through any regulation stage ...." Request, 13. According to the Requester, the preceding applications make no mention of the absence of regulation. *Id.*

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

The Patent Owner asserts that it is clear to one of ordinary skill in the art that another embodiment for a two-stage converter was contemplated in the parent application (i.e., the '417 Patent). Patent Owner concludes that the '417 Patent also teaches a two-stage DC-DC converter in which the isolation stage is first and the regulation stage second, citing us to Figure 1 and its associated description.  App. Br. 14.

The description for Figure 1 is as follows:

FIG. 1 shows a block diagram of a DC-DC converter that represents one embodiment of the invention.  It shows a two stage converter structure where the power first flows though one stage and then through the next.  One stage provides the regulation function and the other provides the electrical isolation and/or step-down (or step-up) function.  In this embodiment the regulation stage is situated before the isolation stage, but this ordering is not necessary for the invention.

The '417 Patent 4:24-33.

Figure 1 is reproduced below:



FIG. 1

Fig. 1 is a block diagram of a circuit embodiment

The Patent Owner also points to column 14, line 44-49 of the '417 patent as describing the claimed subject matter:

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

> In some situations, it may be desirable to place the isolation stage first
> in the power flow, and to have the regulation stage follow.  For
> example, when there are many outputs sharing the total power, the
> circuit might be configured as one isolation/step-down (or step-up)
> stage followed by several DC-DC switching or linear regulators.

The '417 Patent 14:44-49.

We read the above description as providing adequate support for the claimed subject matter.  We are persuaded that the '417 Patent describes the claimed subject matter of a two-stage DC-DC converter, when the power "first" flows through one stage and then through another, and the first stage is an isolating stage, and the second stage is a regulating stage.

Specifically, we find that the '417 Patent describes a non-regulating isolating step-down converter through which power from the DC input flows first before flowing through any regulation stage.  We find that this description is sufficient to show the inventor of the '702 Patent, which is addressed by this reexamination proceeding and claims priority to the '417 Patent, had possession of the claimed subject matter as of the filing date of the '417 Patent.

Accordingly, this rejection, which depends on a reference which is an intervening reference (i.e., JP '393) to the filing date of the '417 Patent, cannot be sustained, and is reversed.

V. *The rejection of Claims 1, 26, 27, 28, 53, 54, 78, 81, 82, and 85 under 35 U.S.C. § 103(a) over Steigerwald '090, Cobos I, Kassakian Textbook, and Pressman.*

15

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

According to the Examiner, these claims, excluding claims 27 and 54, have "already been found unpatentable over this combination of references by Examiner Heyman in the [95/001,]406 Reexamination Proceeding. *See* '406 Reexamination Proc., Nov. 28, 2011 Action Closing Prosecution, at p. 11 (Issue A);" RAN 11 (citing Exhibit 5). The rejection was incorporated by reference.

The basis for rejecting claims 27 and 54 is said to be provided by Exhibit 23 of the Request. *Id.*

The underlying rejections in the '406 Reexamination have been reversed.[3] During oral argument, we discussed with the parties to this reexamination appeal the likely effect of that reversal on the current rejections. Requester is of the position that as differing arguments were raised in this proceeding, they should be individually considered. Transcript of Oral Argument, October 15, 2014, 1–4.

Given the differing parties and evidence, we consider the arguments in this appeal separately from those in the '406 Reexamination.

The rejection as stated by the Examiner in Reexamination Proceeding 95/001,406 is as follows:

> Issue A
> Claims 1, 12-20, 23, 26, 28, 39-47, 50, 53, 78, 80-82, 84 and 85 are rejected under 35 U.S.C. § 103(A) as being unpatentable over Steigerwald '090 in view of Cobos I, Kassakian Textbook, and Pressman as proposed by the third party Requester on pages 66-158 of the Request in an item matching chart with explanation for reexamination of these claims. These rejections are adopted for the

---

[3] *Murata Manufacturing Co., LTD v. Synqor*, Appeal No. 2013-008869, 2014 WL 1477644 (PTAB, April 14, 2014).

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

> reasons set forth therein, and, are hereby incorporated herein by
> reference.

'406 Reexamination's RAN, 11.

The '406 Rexamination Proceeding's Request states that
Steigerwald '090 teaches a power converter system including a first
transformer Tl and a second transformer T2, as shown in the sole Figure of
Steigerwald '090.  The first transformer Tl includes primary winding 22 and
secondary winding 24, and the second transformer T2 includes primary
winding 26 and secondary winding 28.  Diode rectifiers $C_{Rap}$, $C_{Rbp}$ are
coupled to the transformers Tl, T2, respectively.  The power converter
system of Steigerwald '090 includes a plurality of separate output voltage
lines having various output values of +Vl, +V2, ... , +Vn, as shown in the
Figure and as described in Column 2, Lines 41 and 42; each of the
transistors on these output voltage lines receives a specific unregulated
voltage through the transformers Tl, T2 and the diode rectifiers CRap, CRbp
and then is regulated by series regulators 50,51, to provide multiple positive
voltages, as described in Column 1, Lines 53 and 54 and Column 2, Lines 41
and 42 of Steigerwald '090.  '406 Reexamination's Request at 66.

The cited figure is reproduced below with annotation by the Requester
included.

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2



The '406 Request states that Steigerwald '090 is silent as to the input DC voltage range, but Cobos I teaches that the input voltage can vary over the range of 40 V to 60 V, which is more than plus or minus a few percent and which is similar to the input voltage range of 36 V to 75 V disclosed in the '702 patent. '406 Reexamination's Request at 76.

The '406 Request then states that it would have been obvious to one of ordinary skill in the art at the time of filing the '702 patent to provide a DC input that varies over any input voltage range, including the 36 V to 75 V voltage range that varies more than plus or minus a few percent as taught by Cobos I, to ensure that the system of Steigerwald '090 works in multiple applications. Column 2, Lines 11-13 of Steigerwald '090 states, "[I]t is to be understood that the power supply is suitable for any application having distributed pulsed loads."

18

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

The '406 Request then also states that providing a DC input that varies over a particular input voltage range merely required an obvious matter of design choice well within the ability of one having ordinary skill in the art as of filing date of the '702 patent and would have involved nothing more than the obvious selection of a known appropriate input voltage range. '406 Reexamination Request at 76.

We note the instant Examiner adopted the '406 Reexamination Examiner's adoption of these proposed rejections. Accordingly, we deem them to be findings and conclusions of the Examiner in the instant reexamination proceeding, despite incorporation by reference to a different proceeding.

Patent Owner challenges this rejection on several grounds. First, Patent Owner argues the rejection relies on impermissible hindsight. Patent Owner asserts that the Examiner impermissibly uses the claims of the '702 patent as a roadmap to piece together incompatible teachings from four disparate references, including two textbooks, to formulate the asserted rejection. App. Br. 23.

The Patent Owner asserts that Steigerwald '090 is non-analogous art in that it discloses a pulsed power converter for providing pulse power to radar modules, which is not in the same field of endeavor as SynQor's high efficiency power converter, and is not reasonably pertinent to the problem of developing a high efficiency power converter. *Id.*

The Patent Owner also asserts that this rejection is factually flawed in that Steigerwald '090's linear regulators are not switching regulators. According to the Patent Owner, such switching regulators would introduce

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

an unacceptable amount of series inductance in the path to the load.
Steigerwald '090 is argued to teach away from any modification that would
introduce added series inductance, which would render it unfit for its
intended purpose by adversely affecting the pulse response. *Id.* at 23–24.

The Patent Owner continues its criticism of the rejection. According
to the Patent Owner, Steigerwald '090 and Cobos I cannot be properly
combined because they are highly incompatible. Patent Owner urges that
substituting a series inductor in the output path of the rectifier circuit of
Steigerwald '090 would cause an unacceptable voltage drop because of the
impedance introduced by including the inductors to implement the
controlled rectifiers. App. Br. 24 (citing Schlecht's lst Declaration, ¶ 128).

Additional criticism includes the observation that Cobos I's MOSFET
controlled rectifier behaves like a resistor when it is on, causing a voltage
drop proportional to the current between the energy storage capacitor and the
output. According to Patent Owner, that would interfere with the
capacitance-multiplying effect of Steigerwald '090. App. Br. 24.

Patent Owner further alleges that, at the high voltage level present at
the output of the capacitance multiplier of Steigerwald '090, using
MOSFETs of any type would be less efficient because of the increased on
state resistance of the MOSFETs rated for this higher voltage. Thus, an
increase in efficiency cannot be the basis for a motivation to combine the
references. *Id.*

Furthermore, the Patent Owner argues that the topologies of
Steigerwald '090 and Cobos I are constrained to distinctly different and
incompatible particular frequency ranges. According to the Patent Owner,

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

"[p]ersons having ordinary skill in the art would not have been able to combine the teaching Steigerwald '090 with Cobos I due to the incompatible switching frequencies of the two circuits." App. Br. 25 (citing Schlecht's lst Dec. ¶ 41).

Requester urges that SynQor's attempts to limit Steigerwald '090 must fail because Steigerwald '090 has no teaching to support "SynQor's suggested limitation," and is only supported by the attorney argument in the prosecution history of Steigerwald '090. Moreover, Requester urges that Steigerwald '090 expressly contemplates having non-pulsed bias outputs. Resp. Br. 17.

Requester also urges that SynQor's arguments regarding switching frequencies are spurious. According to Requester, Steigerwald '090 does not limit itself to any particular frequency, and SynQor's argument that Steigerwald '090 is constrained to a high frequency is based on SynQor's erroneous belief that Steigerwald '090 is limited to pulsed voltages. *Id.*

We agree with the Patent Owner that there are incompatibilities in frequency between the references and there is evidence to support the undesirability of the introduction of a voltage drop, which lessen the strength of the case for a conclusion of obviousness. The Examiner and Requester do not address how one of ordinary skill would have dealt with these incompatibilities sufficiently, instead principally arguing that they are nonexistent or spurious.

A complete review of the Examiner's decision also requires that we review the proffered evidence of secondary considerations.

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

In deciding questions of obviousness, we consider all four *Graham*[4] factors including objective evidence of non-obviousness. A *prima facie* case made by the Examiner is not a conclusion on the ultimate issue of obviousness. The ultimate conclusion of obviousness is a legal conclusion to be reached after weighing all of the evidence on both sides. *Apple Inc. v. Int'l Trade Comm'n*, 725 F.3d 1356, 1365 (Fed. Cir. 2013).

The Examiner appears not to have considered at least some of the evidence of secondary considerations. The rationale is reproduced below:

> By not following the USPTO procedures, the litigation evidence is rendered "unreliable" (not that the various people testifying at the trial are unreliable, as erroneously suggested by the PO that the ACP is inferring on page 2 of the Brief).
>
> Thus, it is deemed acceptable to not consider such procedurally unreliable litigation evidence because it falls outside the scope of the fact finding reexamination procedures and mission of the USPTO as it relates to the claim rejections involving the prior art.

RAN 4.

However, at pages 30 and 31of the RAN the Examiner appears to consider arguments based upon the secondary considerations from both the Requester and the Patent Owner. Consequently it is unclear as to which evidence the Examiner refused to consider or why.

Continuing the trend of incorporating by reference, the Patent Owner references the March 19, 2012 response to the non-final action for a discussion of the secondary considerations. App. Br. 8. Requester states

---

[4] *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966).

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

that the bulk citation to this is insufficient and all such arguments are waived.  Resp. Br. 3.

We disagree with the blanket statement of the Examiner that this evidence cannot constitute informative or persuasive evidence.  We also disagree with the Requester that the Patent Owner referencing the evidence in its brief, without repeating the secondary considerations argument in its entirety on appeal, constitutes waiver of those arguments.  Such incorporation by reference may be a violation of the brief page limitations contained in our regulations.  However, we do not deem such a breach of our regulations to be a waiver in light of the Examiner's statement of non-consideration of the evidence when originally presented.

At pages 8 and 9 of Patent Owner's brief, the following indicia of commercial success are mentioned, along with an array of citations:  nexus; number of infringing units sold proves commercial success; infringing products constitute substantially entire market; infringing bus converters used in infringing unregulated intermediate bus architecture ("IBA") systems are commensurate with scope of the claims; defendants' advertising materials prominently feature the claimed invention, establishing nexus; commercial success was derived from benefits of the claimed invention; long felt need; praise by others; the invention was against conventional wisdom; the invention provided unexpected results; and evidence of pervasive copying; all of which demonstrates non-obviousness.

We have considered the voluminous evidence and find it compelling. We address certain portions of the evidence herein for emphasis.

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

*Nexus*

At page 74 of the March 19, 2012 Response to Non-Final Action, SynQor references Exhibits 131-137 as mapping the infringement contentions of the accused products against the claims in the related litigation.

As an example, Claim 1 in Exhibit 131 is said to be met by Artesyn bus converters that are specifically designed for use in DC-DC power converter systems providing plural regulated DC outputs, each having a regulated voltage. Products included: IBC25AET4812 DC-to-DC Converter; IBC32AEN4896J DC-to-DC Converter; IBC38AQT4812 DC-to-DC Converter; IBC60AQN4896 DC-to-DC Converter; and TQN20A48S12 DC-to-DC Converter; TQN25A48S12 DC-to-DC Converter (hereafter Artesyn's Ar-A through Ar-F bus converters respectively). Each are said to accept an input DC voltage that varies. Exh. 131 pages 1–2.

In the finished products into which Artesyn's Ar-A through Ar-F bus converters are incorporated, the Artesyn Ar-A through Ar-F bus converters were all contended to be non-regulating, isolating step-down converters through which power from the DC input flows to provide a non-regulated, isolated DC output having a non-regulated voltage. *Id*.

The Artesyn Ar-A through Ar-F bus converters were contended to have a transformer that is not driven into saturation, the transformer having plural windings including one primary winding and one secondary winding. *Id*. at 3.

The Artesyn Ar-A through Ar-F bus converters were contended to have plural power MOSFET switches in circuit with a primary winding, the

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

plural power MOSFET switches causing power to flow into the primary winding. *Id.* at 4.

The Artesyn Ar-A through Ar-F bus converters were also contended to have control circuitry coupled to the plural MOSFET switches, the control circuitry determining when the power MOSFET switches are turned on and off in a switching cycle at a switching frequency. *Id.*

The Artesyn Ar-A through Ar-F bus converters were contended to have controlled rectifiers in circuit with the secondary winding, each having a parallel uncontrolled rectifier. Each of the controlled rectifiers was contended to be turned on for an on-state time and off for an off-state time in synchronization with a voltage waveform of the primary winding to provide the non-regulated, isolated DC output. *Id.* at 6.

In the Artesyn converters, it was contended that each primary winding has a fixed duty cycle and transition times which are short relative to the on-state and the off-state times of the controlled rectifiers. Transition times between a positive value and a negative value were contended to be short compared to the rest of the period. *Id* at 7.

In bus converters Ar-A through Ar-F, the duty cycle of the voltage waveform across a primary winding WI was contended to be fixed, as demonstrated by test results for exemplary bus converter. *Id* at 8.

Lastly, it was contended that Artesyn's point of load converters are non-isolating down-converter switching regulators, each receiving power from the non-regulated, isolated DC output and each providing one of the regulated DC outputs having a regulated voltage. Customers who use Artesyn's Ar-A through Ar-F bus converters in an Intermediate Bus

25

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

Architecture of the claimed invention use Point-of-Load converters that meet the limitations of this claim element, whether they are made by Artesyn or someone else. *Id.*at 9.

These converters track the claims under reexamination closely.

Exhibit 18 is the Jury Verdict form for the litigation. At page 10 and at several locations thereafter, the jury indicated that Artesyn induced infringement of claims 56 and 71 of the '702 patent, and other parties products did as well. Claims 56 and 57 have essentially the same limitations as claim 1.

*Commercial Success*

According to the Patent Owner, the infringing products were substantially 100% of market share, displacing prior distributed power architecture ("DPA") and fully regulated power converters in the relevant applications and accounting for millions of infringing products due exclusively to the principal benefits that result from the invention as claimed and not due to advertising. March 19, 2012 Response to Non-Final Action, page 86. The number of infringing products numbered in the millions. *Id.* at 89, *citing* Schlect Declaration, ¶ 11. A commercially successful product in this field might have hundreds of thousands in sales. *Id.* at 90. One manufacturer has as much as 80% of the relevant market. *Id* at 91. There is evidence in the record that the commercial success in the market was due to the claimed limitations. *Id.*at 95–103.

*Long-Felt Need*

According to the Patent Owner, the design of efficient power supplies for multiple voltage systems was considered a challenge in 1997 when the

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

application for the '417 Patent was filed. *Id.* at 108. As indicated earlier, the '702 Patent claims priority to the '417 Patent.

In support, for example, Patent Owner observes that in 1997, an employee of Unitrode/Texas Instruments, Laszlo Balogh, presented a paper describing "the most common solutions used in multiple output power supply designs." (Balogh, p. 1, Abstract). According to Balogh, "[d]esigning multi-output converters presents a remarkable challenge for the power supply designer." March 19, 2012 Response to Non-Final Action at 108.

### Evidence of Praise

Patent Owner points to an email between Artesyn employees discussing SynQor's unregulated bus converter . *Id.* at 115 (citing Ex. 49). According to Patent Owner, even Artesyn's highly skilled power designers perceived it as a "whopper in terms of a technical challenge" to implement in the real world, requiring a significant "technical development" to figure out how to make it. Ex. 49, page 1. Other examples of praise are provided as well for the "new class" of DC-DC power converters. March 19, 2012 Response at 116.

### Against Conventional Wisdom

Dr. Schlecht testified that processing power through two stages was thought of as being inefficient. March 12, 2012 Response at 128 (citing Ex. 99 at 20:3-23). Dr. Dickens, SynQor's expert witness, testified that there was skepticism as to the two stage approach. *Id.*

Requester takes a different view, that Dr. Schlecht's patent attorneys were following the industry. Reb. Br. 5. We are pointed to a 2004 article

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

authored by Dr. Schlecht where he is quoted stating the performance between intermediate bus and distributed power architecture can be quite close. *Id.* Requester also urges that the praise was for regulated as well as unregulated bus architecture. *Id.* at 8. Requester also urges that the drivers for success were in the need for large numbers of voltages and decreasing costs of components. *Id.* at 11.

Considering the case of obviousness presented in the Request against the evidence of relevant commercial success and other secondary considerations (and the Requester's criticism thereof) we come to the conclusion that the evidence of commercial success outweighs any case of obviousness which may exist in this instance, and as a consequence, the Examiner erred in rejecting the claims.

We therefore reverse the obviousness rejection based on Steigerwald '090, Cobos I, Kassakian Textbook, and Pressman.

*VI. The rejection of Claims 2, 29, 55, 67-76, 86, and 89 under 35 U.S.C. § 103(a) over Steigerwald '090, Cobos I, Kassakian Textbook, Pressman, and Sutton.*

According to the Examiner, these claims, excluding claim 68, have "already been found unpatentable over this combination of references by Examiner Heyman in the '406 Reexamination. *See* '406 Reexamination, Nov. 28, 2011 Action Closing Prosecution, p. 11 (Issue B)." RAN 12. The rejection was incorporated by reference.

The basis for rejecting claim 68 is said to be provided by Exhibit 24. RAN 12.

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

As we have reversed the rejection of claims 1, 26, 27, 28, 53, 54, 78, 81, 82, and 85 under 35 U.S.C. § 103(a) over Steigerwald '090, Cobos I, Kassakian Textbook, and Pressman, we reverse this rejection as well for the reasons set forth above. Exhibit 24 does not cure the deficiencies of the underlying rejection.

VII. *The rejection of Claims 1-3, 12-14, 17-20, 23, 26, 28-30, 39-41, 44-47, 50, 53, 55, 56, 64, 67, 69, 70, 73-76, 78, 80-82, 84-86, 88 and 89 under 35 U.S.C. §103(a)over Pressman and Kassakian Article.*

According to the Examiner, these claims have "already been found unpatentable over this combination of references by Examiner Heyman in the '406 Reexamination. *See* '406 Reexamination, Nov. 28, 2011 Action Closing Prosecution, p. 12 (Issue E)." RAN 12. The rejection was incorporated by reference from pages 267-371 of the '406 Reeexamination's Request. *Id.*

As noted in the Request, Pressman is a text book for undergraduate electrical engineers and power system designers. Pressman explains that various building blocks can be combined together to create a power converter system to satisfy a specific application's requirements. '406 Request, 111. The Requester then annotates Figure 3-4(B), a step block diagram, which follows, to illustrate the elements of the instant claims.

Annotated Figures 3-3 and 3-4(B) of Pressman are shown below:

29

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2



Fig. 3–3. Unregulated input converter with postregulated outputs.



Fig. 3–4. (A) Preregulated converter with postregulated outputs. (B)
With switching postregulators, a single secondary-rectified filter can
supply all postregulators.

Appx00045

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

The Requester fashioned a drawing depicting an embodiment combining portions of Pressman Figure 3-3 and 3-4(B), reproduced below.



Fig. 3-3                    Fig. 3-4(B)

The above-illustrated combined embodiment includes a leftmost block corresponding to the first two blocks of Pressman Figure 3-3, a central block corresponding to a portion of Pressman Figure 3-3 and a rightmost block corresponding to the rightmost portion of Pressman Figure 3-4(B). Kassakian is relied upon for the description of synchronous rectifiers, which are said to be a known substitute for transistors. '406 Request, 281.

The Patent Owner challenges this combination.

According to the Patent Owner, Pressman drew on elements from Figures 3-3 and 3-4(A) to create Fig. 3-4(B), replacing multiple transformer

31

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

secondaries with a single secondary, citing Pressman at 83.  Moreover, the Patent Owner asserts that Pressman states the configuration is only possible with a single secondary winding, and that Pressman cannot make obvious that which it expressly excludes. App. Br. 27.

As noted by the Patent Owner, Pressman describes that after modifications to include only one transformer secondary, the result is the circuit of Figure 3-4(B).  Figure 3-4(B) is a modified version of Figure 3-4(A), but instead of multiple secondary windings shown in Figure 3-4(A), only one secondary winding and filter capacitor are used.  *Id.* at 27–28.  We therefore agree that Pressman does not suggest the Requester's starting point for the combination of references.

Furthermore, it is argued that Kassakian teaches the use of synchronous rectifiers only in a resonant topology.  The Patent Owner points out that there is significant complexity in adapting such synchronous rectifiers to a square wave system, such as described in Pressman.  *Id.* at 29.

We find that neither the Examiner nor the Requester have adequately explained how the particular modifications required to combine Pressman and Kassakian would fall within the skill of one of ordinary skill in the art.

As a result, we conclude that the evidence of record does not establish a *prima facie* case for the obviousness of the claims so rejected.  Even if a case has been established on the evidence of record, the evidence of secondary considerations, as discussed above, would overcome that case.

We therefore reverse this rejection.

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

VIII. *The rejection of Claims 15, 16, 42, 43, 71 and 72 under 35 U.S.C. § 103(a) over Pressman, Kassakian Article, and Uceda.*

According to the Examiner, these claims have "already been found unpatentable over this combination of references by Examiner Heyman in the '406 Reexamination. *See* '406 Reexamination, Nov. 28, 2011 Action Closing Prosecution, p. 12 (Issue H)." RAN 12. The rejection was incorporated by reference. *Id.*

As we have reversed the rejection of claims 1-3, 12-14, 17-20, 23, 26, 28-30, 39-41, 44-47, 50, 53, 55, 56, 64, 67, 69, 70, 73-76, 78, 80-82, 84-86, 88 and 89 under 35 U.S.C. §103(a) over Pressman and Kassakian Article, we reverse this rejection for the same reasons. Uceda does not cure the deficiencies of this combination.

IX. *The rejection of Claims 1-3, 12, 13, 15-20, 26, 78, 80 and 81 under 35 U.S.C. § 103(a) over JP '446, Steigerwald '539, Kassakian Textbook, Kassakian Article, and Ji.*

According to the Examiner, these claims have "already been found unpatentable over this combination of references by Examiner Heyman in the '406 Reexamination. *See* '406 Reexamination, Nov. 28, 2011 Action Closing Prosecution, at p. 13 (Issue I)." RAN 12–13. The rejection was then incorporated by reference from the '406 Reexamination's Request pages 427-615.

According to the Request, JP '446 discloses an efficient and low noise power supply system including a transformer Tl connected to a DC power supply 1. The transformer Tl of JP '446 includes a primary winding and a

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

secondary winding. JP '446 discloses that a rectifier circuit 7 including a plurality of rectifying diodes is connected to the secondary winding of the transformer Tl, as shown in Figs. 5 and 6 and discussed in Paragraphs [0013] and [0014]. JP '446 also discloses that the output of the rectifier circuit 7 is connected to respective DC/DC converters 31-35, as shown in Fig. 1 and described in Paragraphs [0002] and [0003]. The DC/DC converters 31-35 of JP '446 function as non-isolating regulators. '406 Request at 427.

The Request further urges that replacing the diodes of JP '446 with the synchronous rectifiers $S_{Ra}$ and $S_{Rb}$ of Steigerwald '539, as suggested in Steigerwald '539, would have improved the efficiency of the rectifying system of JP '446 as was well known by those of ordinary skill in the art as admitted in the '702 patent. Thus, it would have been obvious at the time of filing of the '702 patent for one of ordinary skill in the art to have replaced the diode rectifiers of JP '446 with the synchronous rectifiers $S_{Ra}$ and $S_{Rb}$ of Steigerwald '539 to provide a rectifying system with improved efficiency as suggested by Steigerwald '539. '406 Request at 440.

The Request also urges that it would have been obvious to one of ordinary skill in the art at the time of filing of the '702 patent to have used the down converting switching regulator of Kassakian Article as the DC/DC converters 31-35 of JP '446 to provide a power converter that achieves a higher frequencies and smaller size device. *Id.* at 441.

According to the Patent Owner, neither JP '446 nor Steigerwald '539 teaches short transitions for the voltage across the primary winding. In contrast, the waveforms taught by JP '446 and Steigerwald '539 (including Steigerwald's Figs. 10d-10f) have long relative transitions. According to the

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

Patent Owner, the illustrated transition times are clearly longer than 20 percent of a half cycle, and therefore cannot meet the claim element of short transitions.  App. Br. 29-31.

Patent Owner also takes exception to the combination of references. It is urged that the proposed modification of JP '446 would change its principle of operation and render it unfit for its intended purpose due to the introduction of noise. JP '446 repeatedly states that resonant operation (for both the voltage and the current) is necessary to avoid excess noise. For example, paragraph [0016] states "the voltage and current waveforms to a sine wave shape, so that the conversion operation can be expected with little line noise, radiation noise, and the like." This citation makes it clear that JP '446 considers it important to have both the "current resonance mode" and the "voltage resonance mode" so that both the current and voltage waveforms will have a sinusoidal shape, and therefore cause the converter to have low noise.  App. Br. 31.

JP '446 is said to forbid noise introduction as "it is particularly difficult to reduce the bulk line noise." *Id. citing* JP '446 at ¶ 3.

Additionally, it is urged that JP '446 teaches away from the asserted substitution by dismissing square-wave converters due to unacceptable bulk noise that is difficult to remove. Rather, it is said that to achieve the low noise goal, JP '446 requires that both the voltage and current be resonant sine waves at approximately the same frequency. *Id. citing* JP '446 at ¶ 12.

As a consequence, it is argued that JP '446 teaches that short transitions would introduce unacceptable noise, thus rendering it unfit for its intended purpose.

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

Requester urges that the Patent Owner has mischaracterized the rejection as incorporating the waveforms of Steigerwald '539 into the system of JP '446.  Reb. Br. 20.

We have carefully considered the positions of both the Requester (adopted by the Examiner in the '406 Reexamination, and as adopted by the instant Examiner in this proceeding).  We do not think that the Patent Owner has mischaracterized the rejection.  Rather, the Patent Owner has pointed out that two references (i.e., JP '446 and Steigerwald '539) have distinct modes of operation depending on different types of waveforms.  The Request relies heavily on the substitution of equivalents for justification for combining the references.  The distinct waveform needs of JP '446 cut directly against that simple substitution argument.

As a result, we conclude that the evidence of record does not establish a *prima facie* case for the obviousness of the claims so rejected.  Even were a case to have been established on the evidence of record, the evidence of secondary considerations, as discussed above, would have overcome that case.

We therefore reverse this rejection.


X. *The rejection of Claims 28, 29, 53, 55, 69, 73-76, 82, 85, 86 and 89 under 35 U.S.C. § 103(a) over JP '446, Steigerwald '539, Kassakian Textbook, and Kassakian Article.*

According to the Examiner, these claims have "already been found unpatentable over this combination of references by Examiner Heyman in the '406 Reexamination.  *See* '406 Reexamination, Nov. 28, 2011 Action

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

Closing Prosecution, at p. 13 (Issue L)." RAN 13. The rejection was
incorporated by reference. *Id.*

As we have already reversed the rejection of claims 1-3, 12, 13, 15-
20, 26, 78, 80 and 81 under 35 U.S.C. § 103(a) over JP '446,
Steigerwald '539, Kassakian Textbook, Kassakian Article, and Ji above, we
reverse this rejection as well for the reasons set forth above.

> XI. *The rejection of Claims 38, 51, 52 and 65-67 under*
> *35 U.S.C.§ 103(a) over JP '446, Steigerwald '539, Kassakian Textbook,*
> *Kassakian Article, and Cobos II.*

According to the Examiner, these claims have "already been found
unpatentable over this combination of references by Examiner Heyman in
the '406 Reexamination. *See* '406 Reexamination, Nov. 28, 2011 Action
Closing Prosecution, at p. 14 (Issue M)." RAN 13. The rejection was
incorporated by reference. *Id.*

As we have already reversed the rejection of claims 1-3, 12, 13, 15-
20, 26, 78, 80 and 81 under 35 U.S.C. § 103(a) over JP '446,
Steigerwald '539, Kassakian Textbook, Kassakian Article, and Ji above, we
reverse this rejection as well for the reasons set forth above.

> XII. *The rejection of Claims 41 and 70 under 35 U.S.C. § 103(a) over*
> *JP '446, Steigerwald '539, Kassakian Textbook, Kassakian Article, and*
> *Cruz.*

According to the Examiner, these claims have "already been found
unpatentable over this combination of references by Examiner Heyman in
the '406 Reexamination. *See* '406 Reexamination, Nov. 28, 2011 Action

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

Closing Prosecution, at p. 14 (Issue N)." RAN 13. The rejection was incorporated by reference. *Id.*

As we have already reversed the rejection of claims 1-3, 12, 13, 15-20, 26, 78, 80 and 81 under 35 U.S.C. § 103(a) over JP '446, Steigerwald '539,  Kassakian Textbook, Kassakian Article, and Ji above, we reverse this rejection as well for the reasons set forth above.


CONCLUSION

We have carefully considered the evidence of record, including that of secondary considerations submitted by the Patent Owner.  We also have considered the evidence submitted by the Requester and the findings and conclusions of the Examiner. We conclude that a nexus exists between the claims under reexamination and the evidence of the infringing products in the litigation.

The weight of the objective evidence, combined with the technical difficulties in implementing the proposed combinations of references adopted from the Request by the Examiner, lead us to the conclusion that the claims at issue would not have been obvious to one of only ordinary skill in the art at the time the invention was made.

The record does not establish that the presently reexamined claims would have been obvious to one of ordinary skill in the relevant art at the time of the effective date of the '702 Patent invention.

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

We, therefore, do not sustain any of the obviousness rejections of these claims.

## ORDER

I.  The rejection of claims 1, 2, 28, 29, 55, 69–76, 78, 82, and 86 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over Cobos I, Pressman, and Jovanovic is reversed.

II.  The Rejection of claims 26, 27, 53, 54, 67, 68, 81, 85, and 89 under 35 U.S.C. § 103(a) over Cobos I, Pressman, Steigerwald '090, and Jovanovic is reversed.

III. The rejection of claims 55, 69–70, and 73-76 under 35 U.S.C. § 103(a) over Cobos I and Pressman is reversed.

IV. The rejection of claims 1-2, 26-29, 53-55, 67-76, 78, 81-82, 85-86 and 89 under 35 U.S.C. § 103(a) over JP '393 and Schlecht (also called the '417 patent) is reversed.

V. The rejection of claims 1, 26, 27, 28, 53, 54, 78, 81, 82, and 85 under 35 U.S.C. § 103(a) over Steigerwald '090,  Cobos I,  Kassakian Textbook, and Pressman is reversed.

VI. The rejection of claims 2, 29, 55, 67-76, 86, and 89 under 35 U.S.C. § 103(a) over Steigerwald '090, Cobos I, Kassakian Textbook, Pressman, and Sutton is reversed.

VII. The rejection of claims 1-3, 12-14, 17-20 ,23, 26, 28-30, 39-41, 44-47, 50, 53, 55,  56,  64,  67, 69, 70, 73-76, 78, 80-82, 84-86, 88 and 89 under 35 U.S.C. §103(a)over Pressman and Kassakian Article is reversed.

VIII. The rejection of claims 15, 16, 42, 43, 71 and 72 under 35 U.S.C. § 103(a) over Pressman, Kassakian Article, and Uceda is reversed.

Appeal 2014-07362
Reexamination Control 95/001,853
Patent No. 7,564,702 B2

IX. The rejection of claims 1-3, 12, 13, 15-20, 26, 78, 80 and 81 under
35 U.S.C. § 103(a) over JP '446, Steigerwald '539,  Kassakian Textbook,
Kassakian Article, and Ji is reversed.

X. The rejection of claims 28, 29, 53, 55, 69, 73-76, 82, 85, 86 and 89
under 35 U.S.C. § 103(a) over JP '446 in view of Steigerwald '539,
Kassakian Textbook, and Kassakian Article is reversed.

XI.  The rejection of claims 38, 51, 52 and 65-67 under
35 U.S.C. § 103(a) over JP '446, Steigerwald '539, Kassakian Textbook,
Kassakian Article, and Cobos II is reversed.

XII.  The rejection of claims 41 and 70 under 35 U.S.C. § 103(a) over
JP '446, Steigerwald '539,  Kassakian Textbook, Kassakian Article, and
Cruz is reversed.

<u>REVERSED</u>

Greenblum & Bernstein, PLC
1950 Roland Clarke Place
Reston, VA 20191

Third Party Requester:

Turner Boyd, LLP
2570 West Camino Real
Suite 380
Mountain View, CA 94040

US007564702B2

(12) **United States Patent**
Schlecht

(10) **Patent No.:**     **US 7,564,702 B2**
(45) **Date of Patent:**          **Jul. 21, 2009**

(54) **HIGH EFFICIENCY POWER CONVERTER**

(75) Inventor: **Martin F. Schlecht**, Lexington, MA (US)

(73) Assignee: **SynQor, Inc.**, Boxborough, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **11/901,263**

(22) Filed: **Sep. 14, 2007**

(65) **Prior Publication Data**

US 2008/0151580 A1     Jun. 26, 2008

**Related U.S. Application Data**

(60) Continuation of application No. 11/390,494, filed on Mar. 27, 2006, now Pat. No. 7,272,023, which is a continuation of application No. 10/812,314, filed on Mar. 29, 2004, now Pat. No. 7,072,190, which is a continuation of application No. 10/359,457, filed on Feb. 5, 2003, now Pat. No. 6,731,520, which is a continuation of application No. 09/821,655, filed on Mar. 29, 2001, now Pat. No. 6,594,159, which is a division of application No. 09/417,867, filed on Oct. 13, 1999, now Pat. No. 6,222,742, which is a division of application No. 09/012,475, filed on Jan. 23, 1998, now Pat. No. 5,999,417.

(60) Provisional application No. 60/036,245, filed on Jan. 24, 1997.

(51) **Int. Cl.**
*H02M 3/335*     (2006.01)
*G05F 1/40*      (2006.01)

(52) **U.S. Cl.** .................................................. **363/21.06**

(58) **Field of Classification Search** ............. 363/15–17, 363/21.06, 21.14, 56.01, 56.02, 95, 97, 98, 363/131, 132

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

1,181,803  A     5/1916  Sargent

(Continued)

FOREIGN PATENT DOCUMENTS

CA          1 181 803     1/1985

(Continued)

OTHER PUBLICATIONS

Defendant Artesyn Technologies, Inc.'s Invalidty Contentions and associated exhibits contained in binders, vols. 1-3, filed in *Synqor, Inc. v. Artesyn Technologies, Inc., et al.*, Civil Action No. 2:07-CV-497-TJW-CE (E.D. Tex.), on Jul. 15, 2008.

(Continued)

*Primary Examiner*—Matthew V Nguyen
(74) *Attorney, Agent, or Firm*—Hamilton, Brook, Smith & Reynolds, P.C.

(57)                    **ABSTRACT**

A power converter nearly losslessly delivers energy and recovers energy from capacitors associated with controlled rectifiers in a secondary winding circuit, each controlled rectifier having a parallel uncontrolled rectifier. First and second primary switches in series with first and second primary windings, respectively, are turned on for a fixed duty cycle, each for approximately one half of the switching cycle. Switched transition times are short relative to the on-state and off-state times of the controlled rectifiers. The control inputs to the controlled rectifiers are cross-coupled from opposite secondary transformer windings.

**89 Claims, 7 Drawing Sheets**



US 7,564,702 B2

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,042,274 A | 5/1936 | Pollock |
| 2,497,534 A | 2/1950 | Campbell |
| 2,852,730 A | 9/1958 | Magnuski |
| 2,902,862 A | 9/1959 | Twiford et al. |
| 2,953,738 A | 6/1960 | Bright |
| 3,008,068 A | 11/1961 | Wilting et al. |
| 3,029,398 A | 4/1962 | McComb |
| 3,083,328 A | 3/1963 | Mallery et al. |
| 3,141,140 A | 7/1964 | Rich |
| 3,146,406 A | 8/1964 | Wilting |
| 3,161,837 A | 12/1964 | Lloyd |
| 3,174,042 A | 3/1965 | White |
| 3,229,111 A | 1/1966 | Schumacher et al. |
| 3,241,035 A | 3/1966 | Rhyne, Jr. |
| 3,295,042 A | 12/1966 | Evalds et al. |
| 3,307,073 A | 2/1967 | McLaughlin |
| 3,313,996 A | 4/1967 | Lingle |
| 3,343,073 A | 9/1967 | Mesenhimer |
| 3,400,325 A | 9/1968 | Webb |
| 3,435,375 A | 3/1969 | Miller, Jr. |
| 3,443,194 A | 5/1969 | Cielo |
| 3,448,370 A | 6/1969 | Harrigan |
| 3,454,853 A | 7/1969 | Hintz et al. |
| 3,458,798 A | 7/1969 | Fang et al. |
| 3,459,957 A | 8/1969 | Kelley |
| 3,471,747 A | 10/1969 | Gershen |
| 3,495,157 A | 2/1970 | Nercessian |
| 3,506,908 A | 4/1970 | Resch |
| 3,514,692 A | 5/1970 | Lingle |
| 3,517,301 A | 6/1970 | Huber |
| 3,553,428 A | 1/1971 | McGhee |
| 3,564,393 A | 2/1971 | Williamson |
| 3,569,818 A | 3/1971 | Dahlinger |
| 3,573,483 A | 4/1971 | White |
| 3,573,494 A | 4/1971 | Houpt et al. |
| 3,573,508 A | 4/1971 | Harris |
| 3,573,544 A | 4/1971 | Zonis et al. |
| 3,573,597 A | 4/1971 | Genuit et al. |
| 3,579,026 A | 5/1971 | Paget |
| 3,581,186 A | 5/1971 | Weinberger |
| 3,582,754 A | 6/1971 | Hollmann et al. |
| 3,582,758 A | 6/1971 | Gunn |
| 3,584,289 A | 6/1971 | Bishop et al. |
| 3,588,595 A | 6/1971 | Silvers |
| 3,599,073 A | 8/1971 | Wilson et al. |
| 3,604,920 A | 9/1971 | Niles |
| 3,619,713 A | 11/1971 | Biega et al. |
| 3,629,648 A | 12/1971 | Brown et al. |
| 3,629,725 A | 12/1971 | Chun |
| 3,638,099 A | 1/1972 | Centala |
| 3,643,152 A | 2/1972 | Matsumura et al. |
| 3,646,395 A | 2/1972 | Pratti |
| 3,657,631 A | 4/1972 | Martens et al. |
| 3,660,672 A | 5/1972 | Berger et al. |
| 3,663,941 A | 5/1972 | Pasciutti |
| 3,665,203 A | 5/1972 | Barnett et al. |
| 3,668,508 A | 6/1972 | Archer et al. |
| 3,684,891 A | 8/1972 | Sieron |
| 3,696,286 A | 10/1972 | Ule |
| 3,704,381 A | 11/1972 | Nercessian |
| 3,710,231 A | 1/1973 | Baker |
| 3,714,545 A | 1/1973 | Chiffert |
| 3,733,538 A | 5/1973 | Kernick et al. |
| 3,735,235 A | 5/1973 | Hamilton et al. |
| 3,737,755 A | 6/1973 | Calkin et al. |
| 3,742,242 A | 6/1973 | Morio et al. |
| 3,743,861 A | 7/1973 | Bolmgren |
| 3,751,676 A | 8/1973 | Igarashi et al. |
| 3,753,071 A | 8/1973 | Engel et al. |
| 3,753,076 A | 8/1973 | Zelina |
| 3,754,177 A | 8/1973 | O'Reilly |

| | | | |
|---|---|---|---|
| 3,757,195 A | 9/1973 | Sklaroof |
| 3,769,545 A | 10/1973 | Crane |
| 3,771,040 A | 11/1973 | Fletcher et al. |
| 3,781,505 A | 12/1973 | Steigerwald |
| 3,781,638 A | 12/1973 | Anderson et al. |
| 3,787,730 A | 1/1974 | Ray et al. |
| 3,805,094 A | 4/1974 | Orlando |
| 3,816,810 A | 6/1974 | Friedman et al. |
| 3,818,237 A | 6/1974 | Straus |
| 3,818,312 A | 6/1974 | Luursema et al. |
| 3,820,008 A | 6/1974 | Guarnaschelli |
| 3,824,450 A | 7/1974 | Johnson et al. |
| 3,845,404 A | 10/1974 | Trilling |
| 3,848,175 A | 11/1974 | Demarest |
| 3,851,240 A | 11/1974 | Park et al. |
| 3,851,278 A | 11/1974 | Isono |
| 3,859,638 A | 1/1975 | Hume, Jr. |
| 3,873,846 A | 3/1975 | Morio et al. |
| 3,879,647 A | 4/1975 | Hamilton et al. |
| 3,879,652 A | 4/1975 | Billings |
| 3,904,950 A | 9/1975 | Judd et al. |
| 3,909,695 A | 9/1975 | Peck |
| 3,909,700 A | 9/1975 | Ferro |
| 3,912,940 A | 10/1975 | Vince |
| 3,913,002 A | 10/1975 | Steigerwald et al. |
| 3,913,036 A | 10/1975 | Hook |
| 3,916,289 A | 10/1975 | Lynch |
| 3,919,656 A | 11/1975 | Sokal et al. |
| 3,927,363 A | 12/1975 | Mitchell et al. |
| 3,930,196 A | 12/1975 | Park et al. |
| 3,932,764 A | 1/1976 | Corey |
| 3,938,024 A | 2/1976 | Clarke |
| 3,940,682 A | 2/1976 | Park et al. |
| 3,949,238 A | 4/1976 | Brookes |
| 3,959,716 A | 5/1976 | Gilbert, Jr. et al. |
| 3,974,397 A | 8/1976 | Killough, Jr. |
| 3,976,932 A | 8/1976 | Collins |
| 3,986,052 A | 10/1976 | Hunter |
| 3,986,097 A | 10/1976 | Woods |
| 3,989,995 A | 11/1976 | Peterson |
| 3,991,319 A | 11/1976 | Servos et al. |
| 4,005,335 A | 1/1977 | Perper |
| 4,007,413 A | 2/1977 | Fisher et al. |
| 4,010,381 A | 3/1977 | Fickenscher et al. |
| 4,011,518 A | 3/1977 | Irvine et al. |
| 4,017,746 A | 4/1977 | Miller |
| 4,017,783 A | 4/1977 | Assow et al. |
| 4,017,784 A | 4/1977 | Simmons et al. |
| 4,027,228 A | 5/1977 | Collins |
| 4,037,271 A | 7/1977 | Keller |
| 4,044,268 A | 8/1977 | Hammel et al. |
| 4,060,757 A | 11/1977 | McMurray |
| 4,066,945 A | 1/1978 | Korte, Jr. |
| 4,074,182 A | 2/1978 | Weischedel |
| 4,078,247 A | 3/1978 | Albrecht |
| 4,104,539 A | 8/1978 | Hase |
| 4,106,084 A | 8/1978 | Gibert |
| 4,109,192 A | 8/1978 | Burbank et al. |
| 4,114,048 A | 9/1978 | Hull et al. |
| 4,115,704 A | 9/1978 | Hannemann et al. |
| 4,122,359 A | 10/1978 | Breikss |
| 4,126,793 A | 11/1978 | de Vries |
| 4,128,868 A | 12/1978 | Gamble |
| 4,131,860 A | 12/1978 | Fyot |
| 4,140,959 A | 2/1979 | Powell |
| 4,150,423 A | 4/1979 | Boschert |
| 4,177,389 A | 12/1979 | Schott |
| 4,184,197 A | 1/1980 | Čuk et al. |
| 4,187,458 A | 2/1980 | Milberger et al. |
| 4,194,147 A | 3/1980 | Payne et al. |
| 4,205,368 A | 5/1980 | Erehe et al. |
| 4,207,475 A | 6/1980 | Nercessian |
| 4,208,594 A | 6/1980 | Guicheteau |

**US 7,564,702 B2**

Page 3

| | | | | | | |
|---|---|---|---|---|---|---|
| 4,208,706 | A | 6/1980 | Suzuki et al. | 4,449,173 | A | 5/1984 | Nishino et al. |
| 4,209,710 | A | 6/1980 | Quarton | 4,449,174 | A | 5/1984 | Ziesse |
| 4,210,858 | A | 7/1980 | Ford et al. | 4,449,175 | A | 5/1984 | Ishii et al. |
| 4,210,958 | A | 7/1980 | Ikenoue et al. | 4,451,743 | A | 5/1984 | Suzuki et al. |
| 4,238,690 | A | 12/1980 | Clarke | 4,451,876 | A | 5/1984 | Ogata |
| 4,238,691 | A | 12/1980 | Ebert, Jr. | 4,465,966 | A | 8/1984 | Long et al. |
| 4,241,261 | A | 12/1980 | Ebert, Jr. | 4,471,289 | A | 9/1984 | Duley et al. |
| 4,245,194 | A | 1/1981 | Fahlen et al. | 4,473,756 | A | 9/1984 | Brigden et al. |
| 4,245,286 | A | 1/1981 | Paulkovich et al. | 4,476,399 | A | 10/1984 | Yoshida et al. |
| 4,251,857 | A | 2/1981 | Shelly | 4,479,175 | A | 10/1984 | Gille et al. |
| 4,253,136 | A | 2/1981 | Nanko | 4,484,084 | A | 11/1984 | Cheffer |
| 4,254,459 | A | 3/1981 | Belson | 4,499,531 | A | 2/1985 | Bray |
| 4,257,087 | A | 3/1981 | Cuk | 4,504,895 | A | 3/1985 | Steigerwald |
| 4,257,089 | A | 3/1981 | Ravis | 4,519,024 | A | 5/1985 | Federico et al. |
| 4,262,214 | A | 4/1981 | Patel | 4,520,296 | A | 5/1985 | Lepper et al. |
| 4,270,164 | A | 5/1981 | Wyman et al. | 4,523,265 | A | 6/1985 | Deprez |
| 4,270,165 | A | 5/1981 | Carpenter et al. | 4,524,411 | A | 6/1985 | Willis |
| 4,272,806 | A | 6/1981 | Metzger | 4,524,413 | A | 6/1985 | Ikenoue et al. |
| 4,274,133 | A | 6/1981 | Cuk et al. | 4,527,228 | A | 7/1985 | Chi Yu |
| 4,275,317 | A | 6/1981 | Laudenslager et al. | 4,528,459 | A | 7/1985 | Wiegel |
| 4,276,594 | A | 6/1981 | Morley | 4,533,986 | A | 8/1985 | Jones |
| 4,277,726 | A | 7/1981 | Burke | 4,535,399 | A | 8/1985 | Szepesi |
| 4,277,728 | A | 7/1981 | Stevens | 4,536,700 | A | 8/1985 | Bello et al. |
| 4,288,739 | A | 9/1981 | Nercessian | 4,538,073 | A | 8/1985 | Freige et al. |
| 4,288,865 | A | 9/1981 | Graham | 4,539,487 | A | 9/1985 | Ishii |
| 4,292,581 | A | 9/1981 | Tan | 4,546,421 | A | 10/1985 | Bello et al. |
| 4,293,904 | A | 10/1981 | Brooks et al. | 4,553,039 | A | 11/1985 | Stifter |
| 4,297,590 | A | 10/1981 | Vail | 4,556,802 | A | 12/1985 | Harada et al. |
| 4,300,191 | A | 11/1981 | Baranowski et al. | 4,561,046 | A | 12/1985 | Kuster |
| 4,301,496 | A | 11/1981 | Schwarz | 4,562,522 | A | 12/1985 | Adams et al. |
| 4,302,803 | A | 11/1981 | Shelly | 4,564,800 | A | 1/1986 | Jurjans |
| 4,307,441 | A | 12/1981 | Bello | 4,566,059 | A | 1/1986 | Gallios et al. |
| 4,310,771 | A | 1/1982 | Wyatt et al. | 4,571,551 | A | 2/1986 | Trager |
| 4,313,060 | A | 1/1982 | Fickenscher et al. | 4,575,640 | A | 3/1986 | Martin |
| 4,315,207 | A | 2/1982 | Apfel | 4,578,631 | A | 3/1986 | Smith |
| 4,316,097 | A | 2/1982 | Reynolds | 4,584,635 | A | 4/1986 | MacInnis |
| 4,317,056 | A | 2/1982 | Alberts | 4,586,119 | A | 4/1986 | Sutton |
| 4,318,007 | A | 3/1982 | Rizzi | 4,587,604 | A | 5/1986 | Nerone |
| 4,318,164 | A | 3/1982 | Onodera et al. | 4,591,782 | A | 5/1986 | Germer |
| 4,322,817 | A | 3/1982 | Kuster | 4,593,213 | A | 6/1986 | Vesce et al. |
| 4,323,787 | A | 4/1982 | Sato et al. | 4,605,999 | A | 8/1986 | Bowman et al. |
| 4,323,788 | A | 4/1982 | Smith | 4,607,195 | A | 8/1986 | Valkestijin et al. |
| 4,323,962 | A | 4/1982 | Steigerwald | 4,607,323 | A | 8/1986 | Sokal et al. |
| 4,325,017 | A | 4/1982 | Schade, Jr. | 4,618,919 | A | 10/1986 | Martin, Jr. |
| 4,327,298 | A | 4/1982 | Burgin | 4,621,313 | A | 11/1986 | Kiteley |
| 4,328,482 | A | 5/1982 | Belcher et al. | 4,622,511 | A | 11/1986 | Moore |
| 4,330,816 | A | 5/1982 | Imazeki et al. | 4,622,629 | A | 11/1986 | Glennon |
| 4,334,263 | A | 6/1982 | Adachi | 4,626,982 | A | 12/1986 | Huber |
| 4,336,587 | A | 6/1982 | Boettcher, Jr. et al. | 4,628,426 | A | 12/1986 | Steigerwald |
| 4,344,122 | A | 8/1982 | Jones | 4,635,179 | A | 1/1987 | Carsten |
| 4,344,124 | A | 8/1982 | Panicali | 4,638,175 | A | 1/1987 | Bradford et al. |
| 4,346,342 | A | 8/1982 | Carollo | 4,642,475 | A | 2/1987 | Fischer et al. |
| 4,347,558 | A | 8/1982 | Kalinsky | 4,642,743 | A | 2/1987 | Radcliffe |
| 4,353,113 | A | 10/1982 | Billings | 4,644,440 | A | 2/1987 | Kenny et al. |
| 4,355,884 | A | 10/1982 | Honda et al. | 4,648,017 | A | 3/1987 | Nerone |
| 4,356,541 | A | 10/1982 | Ikenoue et al. | 4,651,020 | A | 3/1987 | Kenny et al. |
| 4,357,654 | A | 11/1982 | Ikenoue et al. | 4,652,769 | A | 3/1987 | Smith et al. |
| 4,368,409 | A | 1/1983 | Sivanesan et al. | 4,659,942 | A | 4/1987 | Volp |
| 4,371,919 | A | 2/1983 | Andrews et al. | 4,663,699 | A | 5/1987 | Wilkinson |
| 4,381,457 | A | 4/1983 | Wiles | 4,670,661 | A | 6/1987 | Ishikawa |
| 4,386,394 | A | 5/1983 | Kocher et al. | 4,672,517 | A | 6/1987 | Mandelcorn |
| 4,393,316 | A | 7/1983 | Brown | 4,672,518 | A | 6/1987 | Murdock |
| 4,395,639 | A | 7/1983 | Bring | 4,672,528 | A | 6/1987 | Park et al. |
| 4,398,156 | A | 8/1983 | Aaland | 4,674,019 | A | 6/1987 | Martinelli |
| 4,399,499 | A | 8/1983 | Butcher et al. | 4,675,796 | A | 6/1987 | Gautherin et al. |
| 4,403,269 | A | 9/1983 | Carroll | 4,677,311 | A | 6/1987 | Morita |
| 4,415,960 | A | 11/1983 | Clark, Jr. | 4,677,534 | A | 6/1987 | Okochi |
| 4,423,341 | A | 12/1983 | Shelly | 4,680,688 | A | 7/1987 | Inou et al. |
| 4,427,899 | A | 1/1984 | Bruns | 4,680,689 | A | 7/1987 | Payne et al. |
| 4,438,411 | A | 3/1984 | Rubin et al. | 4,683,528 | A | 7/1987 | Snow et al. |
| 4,441,070 | A | 4/1984 | Davies et al. | 4,685,039 | A | 8/1987 | Inou et al. |
| 4,442,339 | A | 4/1984 | Mizuno et al. | 4,688,160 | A | 8/1987 | Fraidlin |
| 4,443,840 | A | 4/1984 | Geissler et al. | 4,691,273 | A | 9/1987 | Kuwata et al. |

**US 7,564,702 B2**

Page 4

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 4,694,384 | A | 9/1987 | Steigerwald et al. | 4,896,092 | A | 1/1990 | Flynn |
| 4,694,386 | A | 9/1987 | de Sartre | 4,899,271 | A | 2/1990 | Seiersen |
| 4,695,935 | A | 9/1987 | Oen et al. | 4,900,885 | A | 2/1990 | Inumada |
| 4,697,136 | A | 9/1987 | Ishikawa | 4,903,183 | A | 2/1990 | Noguchi et al. |
| 4,698,738 | A | 10/1987 | Miller et al. | 4,903,189 | A | 2/1990 | Ngo et al. |
| 4,706,177 | A | 11/1987 | Josephson | 4,908,857 | A | 3/1990 | Burns et al. |
| 4,709,316 | A | 11/1987 | Ngo et al. | 4,916,599 | A | 4/1990 | Traxler et al. |
| 4,709,318 | A | 11/1987 | Gephart et al. | 4,920,470 | A | 4/1990 | Clements |
| 4,716,514 | A | 12/1987 | Patel | 4,922,397 | A | 5/1990 | Heyman |
| 4,717,833 | A | 1/1988 | Small | 4,922,404 | A | 5/1990 | Ludwig et al. |
| 4,727,308 | A | 2/1988 | Huljak et al. | 4,924,170 | A | 5/1990 | Henze |
| 4,727,469 | A | 2/1988 | Kammiller | 4,926,303 | A | 5/1990 | Sturgeon |
| 4,730,242 | A | 3/1988 | Divan | 4,931,918 | A | 6/1990 | Inou et al. |
| 4,733,102 | A | 3/1988 | Nakayama et al. | 4,935,857 | A | 6/1990 | Nguyen et al. |
| 4,734,839 | A | 3/1988 | Barthold | 4,937,468 | A | 6/1990 | Shekhawat et al. |
| 4,734,844 | A | 3/1988 | Rhoads | 4,952,849 | A | 8/1990 | Fellows et al. |
| 4,734,924 | A | 3/1988 | Yahata et al. | 4,953,068 | A | 8/1990 | Henze |
| 4,745,299 | A | 5/1988 | Eng et al. | 4,958,268 | A | 9/1990 | Nagagata et al. |
| 4,745,538 | A | 5/1988 | Cross et al. | 4,959,764 | A | 9/1990 | Bassett |
| 4,747,034 | A | 5/1988 | Dickey | 4,959,766 | A | 9/1990 | Jain |
| 4,748,550 | A | 5/1988 | Okado | 4,961,128 | A | 10/1990 | Bloom |
| 4,754,160 | A | 6/1988 | Ely | 4,975,823 | A | 12/1990 | Rilly et al. |
| 4,754,161 | A | 6/1988 | Fox | 4,982,149 | A | 1/1991 | Shimanuki |
| 4,760,276 | A | 7/1988 | Lethellier | 5,001,318 | A | 3/1991 | Noda |
| 4,763,237 | A | 8/1988 | Wieczorek | 5,006,782 | A | 4/1991 | Pelly |
| 4,768,141 | A | 8/1988 | Hubertus et al. | 5,008,795 | A | 4/1991 | Parsley et al. |
| 4,772,994 | A | 9/1988 | Harada et al. | 5,010,261 | A | 4/1991 | Steigerwald |
| 4,777,382 | A | 10/1988 | Reingold | 5,012,401 | A | 4/1991 | Barlage |
| 4,777,575 | A | 10/1988 | Yamato et al. | 5,013,980 | A | 5/1991 | Stephens et al. |
| 4,779,185 | A | 10/1988 | Musil | 5,016,245 | A | 5/1991 | Lobjinski et al. |
| 4,782,241 | A | 11/1988 | Baker et al. | 5,017,800 | A | 5/1991 | Divan |
| 4,783,728 | A | 11/1988 | Hoffman | 5,019,717 | A | 5/1991 | McCurry et al. |
| 4,785,387 | A | 11/1988 | Lee et al. | 5,019,719 | A | 5/1991 | King |
| 4,788,450 | A | 11/1988 | Wagner | 5,019,954 | A | 5/1991 | Bourgeault et al. |
| 4,788,634 | A | 11/1988 | Schlecht et al. | 5,023,766 | A | 6/1991 | Laidler |
| 4,794,506 | A | 12/1988 | Hino et al. | 5,027,002 | A | 6/1991 | Thornton |
| 4,796,173 | A | 1/1989 | Steigerwald | 5,027,264 | A | 6/1991 | DeDoncker et al. |
| 4,800,479 | A | 1/1989 | Bupp | 5,029,062 | A | 7/1991 | Capel |
| 4,805,078 | A | 2/1989 | Munz | 5,036,452 | A | 7/1991 | Loftus |
| 4,809,148 | A | 2/1989 | Barn | 5,038,264 | A | 8/1991 | Steigerwald |
| 4,811,191 | A | 3/1989 | Miller | 5,038,265 | A | 8/1991 | Paladel |
| 4,812,672 | A | 3/1989 | Cowan et al. | 5,038,266 | A | 8/1991 | Callen et al. |
| 4,814,962 | A | 3/1989 | Magalhaes et al. | 5,041,777 | A | 8/1991 | Riedger |
| 4,814,965 | A | 3/1989 | Petersen | 5,043,859 | A | 8/1991 | Korman et al. |
| 4,823,249 | A | 4/1989 | Garcia, II | 5,047,911 | A | 9/1991 | Sperzel et al. |
| 4,825,348 | A | 4/1989 | Steigerwald et al. | 5,055,722 | A | 10/1991 | Latos et al. |
| 4,829,216 | A | 5/1989 | Rodriguez-Cavazos | 5,057,698 | A | 10/1991 | Widener et al. |
| 4,841,160 | A | 6/1989 | Yon et al. | 5,057,986 | A | 10/1991 | Henze et al. |
| 4,853,832 | A | 8/1989 | Stuart | 5,063,338 | A | 11/1991 | Capel et al. |
| 4,853,837 | A | 8/1989 | Gulczynski | 5,063,489 | A | 11/1991 | Inaba |
| 4,855,888 | A | 8/1989 | Henze et al. | 5,066,900 | A | 11/1991 | Bassett |
| 4,860,184 | A | 8/1989 | Tabisz et al. | 5,073,848 | A | 12/1991 | Steigerwald et al. |
| 4,860,185 | A | 8/1989 | Brewer et al. | 5,077,486 | A | 12/1991 | Marson et al. |
| 4,860,188 | A | 8/1989 | Bailey et al. | 5,079,686 | A | 1/1992 | Vinciarelli |
| 4,860,189 | A | 8/1989 | Hitchcock | 5,097,403 | A | 3/1992 | Smith |
| 4,864,479 | A | 9/1989 | Steigerwald et al. | 5,099,406 | A | 3/1992 | Harada et al. |
| 4,864,483 | A | 9/1989 | Divan | 5,101,336 | A | 3/1992 | Willocx et al. |
| 4,866,588 | A | 9/1989 | Rene | 5,103,110 | A | 4/1992 | Housworth et al. |
| 4,866,589 | A | 9/1989 | Satoo et al. | 5,103,387 | A | 4/1992 | Rosenbaum et al. |
| 4,868,729 | A | 9/1989 | Suzuki | 5,105,351 | A | 4/1992 | Harada et al. |
| 4,870,555 | A | 9/1989 | White | 5,111,372 | A | 5/1992 | Kameyama et al. |
| 4,873,616 | A | 10/1989 | Fredrick et al. | 5,111,374 | A | 5/1992 | Lai et al. |
| 4,873,618 | A | 10/1989 | Fredrick et al. | 5,113,334 | A | 5/1992 | Tuson et al. |
| 4,877,972 | A | 10/1989 | Sobhani et al. | 5,113,337 | A | 5/1992 | Steigerwald |
| 4,881,014 | A | 11/1989 | Okochi | 5,119,013 | A | 6/1992 | Sabroff |
| 4,882,646 | A | 11/1989 | Genuit | 5,119,283 | A | 6/1992 | Steigerwald et al. |
| 4,882,664 | A | 11/1989 | Pennington | 5,119,284 | A | 6/1992 | Fisher et al. |
| 4,882,665 | A | 11/1989 | Choi et al. | 5,122,726 | A | 6/1992 | Elliott et al. |
| 4,885,674 | A | 12/1989 | Varga et al. | 5,122,945 | A | 6/1992 | Marawi |
| 4,890,210 | A | 12/1989 | Myers | 5,126,651 | A | 6/1992 | Gauen |
| 4,890,214 | A | 12/1989 | Yamamoto | 5,128,603 | A | 7/1992 | Wölfel |
| 4,893,227 | A | 1/1990 | Gallios et al. | 5,132,888 | A | 7/1992 | Lo et al. |
| 4,893,228 | A | 1/1990 | Orrick et al. | 5,132,889 | A | 7/1992 | Hitchcock et al. |

US 7,564,702 B2

| | | | | | | |
|---|---|---|---|---|---|---|
| 5,138,184 | A | 8/1992 | Keefe | 5,537,021 | A | 7/1996 | Weinberg et al. |
| 5,138,249 | A | 8/1992 | Capel | 5,539,630 | A | 7/1996 | Pietkiewicz et al. |
| 5,140,509 | A | 8/1992 | Murugan | 5,541,827 | A | 7/1996 | Allfather |
| 5,140,512 | A | 8/1992 | O'Sullivan | 5,552,695 | A | 9/1996 | Schwartz |
| 5,140,514 | A | 8/1992 | Tuusa et al. | 5,559,423 | A | 9/1996 | Harman |
| 5,144,547 | A | 9/1992 | Masamoto | 5,559,682 | A | 9/1996 | Kanouda et al. |
| 5,146,394 | A | 9/1992 | Ishii et al. | 5,570,276 | A | 10/1996 | Cuk et al. |
| 5,157,269 | A | 10/1992 | Jordan et al. | 5,576,940 | A | 11/1996 | Steigerwald et al. |
| 5,159,541 | A | 10/1992 | Jain | 5,590,032 | A | 12/1996 | Bowman et al. |
| 5,161,241 | A | 11/1992 | Kanai | 5,594,629 | A | 1/1997 | Steigerwald |
| 5,162,663 | A | 11/1992 | Combs et al. | 5,621,621 | A | 4/1997 | Lilliestrale |
| 5,164,609 | A | 11/1992 | Poppe et al. | 5,625,541 | A | 4/1997 | Rozman |
| 5,168,435 | A | 12/1992 | Kobayashi et al. | 5,635,826 | A | 6/1997 | Sugawara |
| 5,173,846 | A | 12/1992 | Smith | 5,636,107 | A | 6/1997 | Lu et al. |
| 5,177,675 | A | 1/1993 | Archer | 5,636,116 | A | 6/1997 | Milavec et al. |
| 5,179,512 | A | 1/1993 | Fisher et al. | 5,663,876 | A | 9/1997 | Newton et al. |
| 5,206,800 | A | 4/1993 | Smith | 5,663,877 | A | 9/1997 | Dittli et al. |
| 5,208,740 | A | 5/1993 | Ehsani | 5,663,887 | A | 9/1997 | Warn et al. |
| 5,216,351 | A | 6/1993 | Shimoda | 5,691,870 | A | 11/1997 | Gebara |
| 5,218,522 | A | 6/1993 | Phelps et al. | 5,708,571 | A | 1/1998 | Shinada |
| 5,221,887 | A | 6/1993 | Gulczynski | 5,719,754 | A | 2/1998 | Fraidlin et al. |
| 5,224,025 | A | 6/1993 | Divan et al. | 5,726,869 | A | 3/1998 | Yamashita et al. |
| 5,233,509 | A | 8/1993 | Ghotbi | 5,729,444 | A | 3/1998 | Perol |
| 5,235,502 | A | 8/1993 | Vinciarelli et al. | 5,734,563 | A | 3/1998 | Shinada |
| 5,237,208 | A | 8/1993 | Tominaga et al. | 5,742,491 | A | 4/1998 | Bowman et al. |
| 5,237,606 | A | 8/1993 | Ziermann | 5,757,625 | A | 5/1998 | Schoofs |
| 5,254,930 | A | 10/1993 | Daly | 5,757,627 | A | 5/1998 | Faulk |
| 5,255,174 | A | 10/1993 | Murugan | 5,768,118 | A | 6/1998 | Faulk et al. |
| 5,264,736 | A | 11/1993 | Jacobson | 5,771,160 | A | 6/1998 | Seong |
| 5,267,135 | A | 11/1993 | Tezuka et al. | 5,774,350 | A | 6/1998 | Notaro et al. |
| 5,267,137 | A | 11/1993 | Goebel | 5,781,420 | A | 7/1998 | Xia et al. |
| 5,268,830 | A | 12/1993 | Loftus, Jr. | 5,781,421 | A | 7/1998 | Steigerwald et al. |
| 5,272,612 | A | 12/1993 | Harada et al. | 5,784,266 | A | 7/1998 | Chen |
| 5,272,613 | A | 12/1993 | Büthker | 5,805,432 | A | 9/1998 | Zaitsu et al. |
| 5,274,539 | A | 12/1993 | Steigerwald et al. | 5,818,704 | A | 10/1998 | Martinez |
| 5,274,543 | A | 12/1993 | Loftus, Jr. | 5,831,839 | A | 11/1998 | Pansier |
| 5,289,364 | A | 2/1994 | Sakurai | 5,841,641 | A | 11/1998 | Faulk |
| 5,303,138 | A | 4/1994 | Rozman | 5,841,643 | A | 11/1998 | Schenkel |
| 5,304,875 | A | 4/1994 | Smith | 5,870,299 | A | 2/1999 | Rozman |
| 5,305,191 | A | 4/1994 | Loftus, Jr. | 5,872,705 | A | 2/1999 | Loftus, Jr. et al. |
| 5,305,192 | A | 4/1994 | Bonte et al. | 5,880,939 | A | 3/1999 | Sardat |
| 5,343,383 | A | 8/1994 | Shinada et al. | 5,880,949 | A | 3/1999 | Melhem et al. |
| 5,353,212 | A | 10/1994 | Loftus, Jr. | 5,894,412 | A | 4/1999 | Faulk |
| 5,355,293 | A | 10/1994 | Carlstedt | 5,901,052 | A | 5/1999 | Strijker |
| 5,355,294 | A | 10/1994 | De Doncker et al. | 5,903,452 | A | 5/1999 | Yang |
| 5,363,323 | A | 11/1994 | Lange | 5,907,481 | A | 5/1999 | Svärdsjö |
| 5,377,090 | A | 12/1994 | Steigerwald | 5,929,692 | A | 7/1999 | Carsten |
| 5,386,359 | A | 1/1995 | Nochi | 5,946,202 | A | 8/1999 | Balogh |
| 5,396,412 | A | 3/1995 | Barlage | 5,946,207 | A | 8/1999 | Schoofs |
| 5,398,182 | A | 3/1995 | Crosby | 5,949,658 | A | 9/1999 | Thottuvelil et al. |
| 5,400,239 | A | 3/1995 | Caine | 5,956,242 | A | 9/1999 | Majid et al. |
| 5,410,467 | A | 4/1995 | Smith et al. | 5,956,245 | A | 9/1999 | Rozman |
| 5,412,308 | A | 5/1995 | Brown | 5,959,370 | A | 9/1999 | Pardi |
| 5,412,557 | A | 5/1995 | Lauw | 5,991,167 | A | 11/1999 | Van Lerberghe |
| 5,424,932 | A | 6/1995 | Inou et al. | 5,999,417 | A | 12/1999 | Schlecht |
| 5,428,523 | A | 6/1995 | McDonnal | 6,002,597 | A | 12/1999 | Rozman |
| 5,430,632 | A | 7/1995 | Meszlenyi | 6,005,773 | A | 12/1999 | Rozman et al. |
| 5,430,633 | A | 7/1995 | Smith | 6,011,703 | A | 1/2000 | Boylan et al. |
| 5,434,770 | A | 7/1995 | Dreifuerst et al. | 6,016,258 | A | 1/2000 | Jain et al. |
| 5,442,534 | A | 8/1995 | Cuk et al. | 6,016,261 | A | 1/2000 | De Wit et al. |
| 5,448,469 | A | 9/1995 | Rilly et al. | RE36,571 | E | 2/2000 | Rozman |
| 5,461,301 | A | 10/1995 | Truong | 6,026,005 | A | 2/2000 | Abdoulin |
| 5,477,091 | A | 12/1995 | Fiorina et al. | 6,038,148 | A | 3/2000 | Farrington et al. |
| 5,481,449 | A | 1/1996 | Kheraluwala et al. | 6,046,920 | A | 4/2000 | Cazabat et al. |
| 5,500,791 | A | 3/1996 | Kheraluwala et al. | 6,058,026 | A | 5/2000 | Rozman |
| 5,513,092 | A | 4/1996 | Goebel | 6,066,943 | A | 5/2000 | Hastings et al. |
| 5,514,921 | A | 5/1996 | Steigerwald | 6,069,799 | A | 5/2000 | Bowman et al. |
| 5,519,599 | A | 5/1996 | Shinada et al. | 6,069,804 | A | 5/2000 | Ingman et al. |
| 5,528,480 | A | 6/1996 | Kikinis et al. | 6,084,792 | A | 7/2000 | Chen et al. |
| 5,528,482 | A | 6/1996 | Rozman | 6,087,817 | A | 7/2000 | Varga |
| 5,530,635 | A | 6/1996 | Yashiro | 6,088,329 | A | 7/2000 | Lindberg et al. |
| 5,534,768 | A | 7/1996 | Chavannes et al. | 6,091,616 | A | 7/2000 | Jacobs et al. |
| 5,535,112 | A | 7/1996 | Vazquez Lopez et al. | 6,137,697 | A | 10/2000 | Tarodo et al. |

**US 7,564,702 B2**

Page 6

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 6,137,698 | A | 10/2000 | Yukawa et al. | EP | 0 472 261 A2 | 2/1992 |
| 6,141,224 | A | 10/2000 | Xia et al. | EP | 0 474 471 B1 | 3/1992 |
| 6,169,675 | B1 | 1/2001 | Shimamori et al. | EP | 0 476 278 B1 | 3/1992 |
| 6,191,964 | B1 | 2/2001 | Boylan et al. | EP | 0 481 466 A1 | 4/1992 |
| 6,208,535 | B1 | 3/2001 | Parks | EP | 0 484 610 A1 | 5/1992 |
| 6,222,742 | B1 | 4/2001 | Schlecht | EP | 0 503 806 B1 | 9/1992 |
| 6,246,592 | B1 | 6/2001 | Balogh et al. | EP | 0 508 664 B1 | 10/1992 |
| 6,252,781 | B1 | 6/2001 | Rinne et al. | EP | 0 291 403 B1 | 1/1993 |
| 6,278,621 | B1 | 8/2001 | Xia et al. | EP | 0 529 180 B1 | 3/1993 |
| RE37,510 | E | 1/2002 | Bowman et al. | EP | 0 549 920 B1 | 7/1993 |
| 6,385,059 | B1 | 5/2002 | Telefus et al. | EP | 0 550 167 A2 | 7/1993 |
| 6,417,653 | B1 | 7/2002 | Massie et al. | EP | 92120812.0 | 7/1993 |
| 6,430,071 | B1 | 8/2002 | Haneda | EP | 0 575 626 B1 | 12/1993 |
| RE37,889 | E | 10/2002 | Rozman | EP | 0 582 814 A2 | 2/1994 |
| RE37,898 | E | 11/2002 | Seragnoli | EP | 0 588 569 A2 | 3/1994 |
| 6,477,065 | B2 | 11/2002 | Parks | EP | 0 257 817 B1 | 4/1994 |
| 6,487,093 | B1 | 11/2002 | Vogman | EP | 0 595 232 B1 | 5/1994 |
| 6,504,267 | B1 | 1/2003 | Giannopoulos | EP | 0 599 814 B1 | 6/1994 |
| 6,535,407 | B1 | 3/2003 | Zaitsu | EP | 0 336 725 B1 | 7/1994 |
| 6,552,917 | B1 | 4/2003 | Bourdillon | EP | 0 605 752 A2 | 7/1994 |
| 6,580,258 | B2 | 6/2003 | Wilcox et al. | EP | 0 608 091 A2 | 7/1994 |
| 6,594,159 | B2 | 7/2003 | Schlecht | EP | 0 610 158 A1 | 8/1994 |
| 6,608,768 | B2 | 8/2003 | Sula | EP | 0 616 281 A2 | 9/1994 |
| 6,700,365 | B2 | 3/2004 | Isham et al. | EP | 0 618 666 B1 | 10/1994 |
| 6,721,192 | B1 | 4/2004 | Yang et al. | EP | 0 622 891 A2 | 11/1994 |
| 6,728,118 | B1 | 4/2004 | Chen et al. | EP | 0 665 634 B1 | 8/1995 |
| 6,731,520 | B2 | 5/2004 | Schlecht | EP | 0 694 826 A2 | 1/1996 |
| 6,735,094 | B2 | 5/2004 | Steigerwald et al. | EP | 0 696 831 A2 | 2/1996 |
| 6,804,125 | B2 * | 10/2004 | Brkovic ...................... 363/17 | EP | 0 709 949 A2 | 5/1996 |
| 6,836,415 | B1 | 12/2004 | Yang et al. | EP | 0 720 278 A1 | 7/1996 |
| 6,845,019 | B2 | 1/2005 | Kim et al. | EP | 0 736 959 A1 | 10/1996 |
| 6,853,563 | B1 | 2/2005 | Yang et al. | EP | 0 741 447 A2 | 11/1996 |
| 6,853,568 | B2 | 2/2005 | Li et al. | EP | 0 757 428 B1 | 2/1997 |
| 6,862,194 | B2 | 3/2005 | Yang et al. | EP | 0 798 846 B1 | 10/1997 |
| 6,862,198 | B2 | 3/2005 | Muegge et al. | EP | 0 805 540 B1 | 11/1997 |
| 6,930,893 | B2 | 8/2005 | Vinciarelli | EP | 0 848 485 A2 | 6/1998 |
| 6,987,679 | B2 * | 1/2006 | Gan et al. ..................... 363/89 | EP | 0 851 566 B1 | 7/1998 |
| 7,031,128 | B2 | 4/2006 | Nam | EP | 0 854 564 B1 | 7/1998 |
| 7,050,309 | B2 | 5/2006 | Farrington | EP | 0 884 829 A1 | 12/1998 |
| 7,072,190 | B2 | 7/2006 | Schlecht | EP | 0 925 638 B1 | 6/1999 |
| 7,187,562 | B2 | 3/2007 | Stojcic et al. | EP | 0 932 929 B1 | 8/1999 |
| 7,269,034 | B2 | 9/2007 | Schlecht | EP | 0 944 162 A1 | 9/1999 |
| 7,272,023 | B2 | 9/2007 | Schlecht | EP | 0 954 088 A1 | 11/1999 |
| 7,727,021 | | 9/2007 | Schlecht et al. | EP | 0 973 246 A1 | 1/2000 |
| 7,501,715 | B2 * | 3/2009 | Saeueng et al. ............... 307/34 | EP | 0 996 219 A2 | 4/2000 |
| 2003/0174522 | A1 | 9/2003 | Xu et al. | EP | 1 231 705 A2 | 8/2002 |
| 2005/0047177 | A1 | 3/2005 | Tobita | FR | 2 535 133 | 4/1984 |
| 2006/0209572 | A1 | 9/2006 | Schlecht | FR | 2 608 857 | 12/1986 |
| 2006/0262575 | A1 | 11/2006 | Schlecht | GB | 2 110 493 A | 6/1983 |
| 2006/0285368 | A1 | 12/2006 | Schlecht | GB | 2 117 144 A | 10/1983 |
| 2008/0151582 | A1 * | 6/2008 | Schlecht ................. 363/21.06 | GB | 2 131 238 A | 6/1984 |
| 2008/0175204 | A1 * | 7/2008 | Schlecht et al. ............... 363/15 | GB | 2 160 722 A | 12/1985 |
| | | | | GB | 2 217 931 A | 11/1989 |
| | | FOREIGN PATENT DOCUMENTS | | GB | 2 233 479 A | 1/1991 |
| | | | | GB | 2 244 155 A | 11/1991 |
| CA | | 2042274 | 12/1991 | GB | 2 255 865 A | 11/1992 |
| DE | | 29 02 862 | 8/1979 | GB | 2 291 287 A | 1/1996 |
| EP | | 0 016 537 | 10/1980 | GB | 2 313 495 A | 11/1997 |
| EP | | 0 041 883 | 12/1981 | JP | 61-49583 | 4/1986 |
| EP | | 0 058 400 | 8/1982 | JP | 61-27171 | 12/1986 |
| EP | | 0 139 870 | 5/1985 | JP | 61-277372 | 12/1986 |
| EP | | 0 077 958 B1 | 1/1986 | JP | 62-233067 | 10/1987 |
| EP | | 0 184 963 | 6/1986 | JP | 63-257458 | 10/1988 |
| EP | | 0 102 614 | 7/1987 | JP | 63-277471 | 11/1988 |
| EP | | 0 244 186 | 11/1987 | JP | 64-50762 | 2/1989 |
| EP | | 0 289 196 | 11/1988 | JP | 1-134989 | 9/1989 |
| EP | | 0 343 855 A2 | 11/1989 | JP | 1-278265 | 11/1989 |
| EP | | 0 223 504 | 6/1990 | JP | 1-283061 | 11/1989 |
| EP | | 0 410 866 A1 | 1/1991 | JP | 2-155465 | 6/1990 |
| EP | | 0 428 377 B1 | 5/1991 | JP | 2-202362 | 8/1990 |
| EP | | 0 429 310 B1 | 5/1991 | JP | 2-246774 | 10/1990 |
| EP | | 0 449 504 A2 | 10/1991 | JP | 3-18275 | 1/1991 |
| EP | | 0 467 778 A2 | 2/1992 | JP | 3-89851 | 4/1991 |

| JP | 4-105556 | 4/1992 |
| JP | H5-64446 | 3/1993 |
| JP | 5-207745 | 8/1993 |
| JP | 05199744 A | 8/1993 |
| JP | 06098540 A | 4/1994 |
| JP | 6-187056 | 7/1994 |
| JP | 6-315263 | 11/1994 |
| JP | 06315263 A | 11/1994 |
| JP | 6-343262 | 12/1994 |
| JP | 06339266 A | 12/1994 |
| JP | 07007928 A | 1/1995 |
| JP | 07115766 A | 5/1995 |
| JP | 7-194104 | 7/1995 |
| JP | 07308062 A | 11/1995 |
| JP | 07337005 A | 12/1995 |
| JP | 07337006 A | 12/1995 |
| JP | H7-337005 | 12/1995 |
| JP | 08019251 A | 1/1996 |
| JP | 8-223906 | 8/1996 |
| JP | 08205533 A | 8/1996 |
| JP | 08223906 A | 8/1996 |
| JP | 08275518 A | 10/1996 |
| JP | 8-289538 | 11/1996 |
| JP | 08336282 A | 12/1996 |
| JP | 09093917 A | 4/1997 |
| JP | 09172775 A | 6/1997 |
| JP | 09182416 A | 7/1997 |
| JP | 10066336 A | 3/1998 |
| JP | 10136646 A | 5/1998 |
| JP | 10146054 A | 5/1998 |
| JP | 10210740 A | 8/1998 |
| JP | 10248248 A | 9/1998 |
| JP | 11004577 A | 1/1999 |
| JP | 11069803 A | 3/1999 |
| JP | 11103572 A | 4/1999 |
| JP | 11146650 A | 5/1999 |
| JP | 11178335 A | 7/1999 |
| PL | 177578 B3 | 10/1995 |
| SA | 9711503 | 12/1997 |
| WO | WO 84/04634 | 11/1984 |
| WO | WO 86/02787 | 5/1986 |
| WO | WO 87/05165 | 8/1987 |
| WO | WO 88/09084 | 11/1988 |
| WO | WO 88/09084 A1 | 11/1988 |
| WO | WO 89/01719 | 2/1989 |
| WO | WO 91/07803 | 5/1991 |
| WO | WO 95/123451 | 8/1995 |
| WO | WO 95/30182 | 11/1995 |
| WO | WO 95/32458 | 11/1995 |
| WO | WO 98/18198 | 4/1998 |
| WO | WO 98/26496 | 6/1998 |
| WO | WO 01/97371 A1 | 12/2001 |
| WO | WO 2004/082119 A2 | 9/2004 |
| WO | WO 2005/008872 A1 | 1/2005 |

## OTHER PUBLICATIONS

Defendant Artesyn Technologies, Inc.'s Amended Invalidity Contentions and associated exhibits contained in binders, vols. 1-3, filed in *Synqor, Inc. v. Artesyn Technologies, Inc., et al.*, Civil Action No. 2:07-CV-497-TJW-CE (E.D. Tex.), on Sep. 10, 2008.

Defendant Astec America Inc.'s Invalidity Contentions and associated exhibits contained in binders, vols. 1-3, filed in *Synqor, Inc. v. Artesyn Technologies, Inc., et al.*, Civil Action No. 2:07-CV-497-TJW-CE (E.D. Tex.), on Jul. 15, 2008.

Defendant Astec America Inc.'s Amended Invalidity Contentions and associated exhibits contained in binders, vols. 1-3, filed in *Synqor, Inc. v. Artesyn Technologies, Inc., et al.*, Civil Action No. 2:07-CV-497-TJW-CE (E.D. Tex.), on Sep. 10, 2008.

Defendant Bel Fuse Inc.'s Invalidity Contentions Pursuant to Patent Rule 3-3 and Accompanying Document Production Pursuant to Patent Rule 3-4 and associated exhibits contained in binders, vols.

1-3, filed in *Synqor, Inc. v. Artesyn Technologies, Inc., et al.*, Civil Action No. 2:07-CV-497-TJW-CE (E.D. Tex.), on Jul. 15, 2008.

Defendant Cherokee International Corp.'s Invalidity Contentions and Accompanying Document Production Pursuant to Rules 3-3 and 3-4 and associated exhibits contained in binders vols. 1-3, filed in *Synqor, Inc. v. Artesyn Technologies, Inc., et al.*, Civil Action No. 2:07-CV-497-TJW-CE (E.D. Tex.), on Jul. 15, 2008.

Delta Electronics, Inc. and Delta Products Corp.'s Invalidity Contentions Pursuant to Patent Rule 3-3 and Production of Documents Under patent Rule 3-4 and associated exhibits contained in binders, vols. 1-3, filed in *Synqor, Inc. v. Artesyn Technologies, Inc., et al.*, Civil Action No. 2:07-CV-497-TJW-CE (E.D. Tex.), on Jul. 15, 2008.

Delta Electronics, Inc. and Delta Products Corp.'s First Supplemental Invalidity Contentions and associated exhibits contained in binders, vols. 1-3, filed in *Synqor, Inc. v. Artesyn Technologies, Inc., et al.*, Civil Action No. 2:07-CV-497-TJW-CE (E.D. Tex.), on Sep. 9, 2008.

Lineage Power Corp.'s Invalidity Contentions Pursuant to Patent Rule 3-3 and Production of Documents Under Patent Rule 3-4(b) and associated exhibits contained in binders, vols. 1-4, filed in *Synqor, Inc. v. Artesyn Technologies, Inc., et al.*, Civil Action No. 2:07-CV-497-TJW-CE (E.D. Tex.), on Jul. 15, 2008.

Lineage Power Corp.'s First Supplemental Invalidity Contentions and associated exhibits contained in binders, vols. 1-4, filed in *Synqor, Inc. v. Artesyn Technolgoies, Inc., et al.*, Civil Action No. 2:07-CV-497-TJW-CE (E.D.Tex.), on Sep. 18, 2008.

Murata Electronics North America, Inc., Murata Manufacturing Co., Ltd., and Murata Power Solutions, Inc.'s Invalidity Contentions Pursuant to Patent Rule 3-3 and Production of Documents Under Patent Rule 3-4 and associated exhibits contained in binders, vols. 1-3, filed in *Synqor, Inc. v. Artesyn Technologies, Inc., et al.*, Civil Action No. 2:07-CV-497-TJW-CE (E.D. Tex.), on Jul. 15, 2008.

Murata Electronics North America, Inc., Murata Manufacturing Co., Ltd., and Murata Power Solutions, Inc.'s First Supplemental Invalidity Contentions and associated exhibits contained in binders, vols. 1-3, filed in *Synqor, Inc. v. Artesyn Technologies, Inc., et al.*, Civil Action No. 2:07-CV-497-TJW-CE (E.d. Tex.), U.S.D.C. (E.D. Tex.), on Sep. 9, 2008.

Power-One, Inc.'s Invalidity Contentions Pursuant to Patent Rule 3-3 and Production of Documents Under Patent Rule 3-4 and associated exhibits contained in binders, vols. 1-3, filed in *Synqor, Inc. v. Artesyn Technologies, Inc., et al.*, Civil Action No. 2:07-CV-497-TJW-CE (E.D. Tex.), on Jul. 15, 2008.

Power-One, Inc.'s First Supplemental Invalidity Contentions and associated exhibits contained in binders, vols. 1-3, filed in *Synqor, Inc. v. Artesyn Technologies, Inc., et al.*, Civil Action No. 2:07-CV-497-TJW-CE (E.D. Tex.), on Sep. 9, 2008.

"Building-Block Converters Distribute Power Throughout Large Systems," Electronic Design, pp. 202 .

Carbone, Jim, "Distributed Power Tags Keep Falling." *Purchasing*. Jul. 11, 1996.

"Power Module Lets Users Customize Supplies," Electronic Design, Jun. 25, 1961, p. 213.

Abe, Seiya, et al., "Stability Improvement of Distributed Power System by Using Full-Regulated Bus Converters," pp. 2549-2553, Nov. 6-10, 2005, Annual Conference of IEEE.

Abe, Seiya, et al., "System Stability of Full-Regulated Bus Converter in Distributed Power System," Undated Abstract prepared in conjunction with Dept. of EESE, Kyushu University, TDK Corporation, and TDK Innoveta, Inc., pp. 563-568.

Abramczyk, Edward R.,et al., "Mospower Applications Handbook," Siliconix Incorporated, 1984. ISBN 0-930519-00-0.

Abramovitz, Alexander, et al., " A Novel Self-Oscillating Synchronously-Rectified DC-DC Converter," pp. 163-170 (1991). ISBN 0-7803-0090-4.

Abramovitz, Alexander, et al., "A Novel Self-Oscillating Synchronously-Rectified DC-DC Converter," PESC '91: 22nd Annual IEEE Power Electronics Specialists Conference, pp. 163-170 (1991). ISBN 0-7803-0090-4.

Acker, Brian, et al., "Current-Controlled Synchronous Rectification," pp. 185-191.

Acker, Brian, et al., "Current-Controlled Synchronous Rectification," pp. 88-95. ISBN 0-7803-2730-6.

**US 7,564,702 B2**

Page 8

Aguilar, A., et al., "An Improved Battery Charger/Discharger Topology with Power Factor Correction," CIEP '95, San Luis Potosf, Mexico, Oct. 16-19, 1995, pp. 2-7. ISBN0-7803-3071-4.

Ahn, K.S., et al., "Clamp Mode Forward ZVS-MRC with Self-Driven Synchronous Rectifier," pp. 470-475, (1996). ISBN 0-7803-3507-4.

Alou, P., et al., "A High Efficiency Voltage Regulator Module with Single Winding Self-Driven Synchronous Rectification," pp. 1510-1515 (2000). ISBN 0-7803-5692-6.

Alou, P., et al., "Design of a 1.5V Output Voltage On-Board DC/DC Converter with Magnetic Components Integrated in a Multilater PCB," pp. 764-769. ISBN 0-7803-3704-2/97.

Alou, P., et al., "Design of a Low Output Voltage DC/DC Converter for Telecom Application with a New Scheme for Self-Driven Synchronous Rectification," pp. 866-872. ISBN 0-7803-5160-6/99.

Alvarez, Leon Scott, "Control of Multi-Switch Multi-Output Power Converters," Unpublished master's thesis, Massachusetts Institute of Technology, May 1988.

Alvarez-Barcia, L., et al., "Low Power Multioutput Converter with Post-Regulation based on Synchronous Rectification and Windings Integrated in the PCB," pp. 191-197. ISBN 0-7803-4340-0/98.

Amtex Electronics Pty Ltd., "Chapter 1: Principles of Power Conversion," pp. 1-17, undated.

Andreycak, Bill, "Power Management Solution Delivers Efficient Multiple Outputs," Aug. 1, 2001, Power Electronics Technology website, http://www.printthis.clickability.com/pt/cpt?action=cpt&title=Power+Management+Solut . . . printed on Dec. 15, 2007.

Arduini, Douglas, P., "A Distributed Power System with a Low-Cost Universal DC/DC Converter," Power Conversion Electonics Sep. 1995 Proceedings, pp. 315-322.

Artesyn Technologies and Amtex Electronics Pty. Ltd., "Chapter 1: Principles of Power Conversion," pp. 1-17.

Ashdowne, B., et al., "L'Alimentation Repartie—Une Solution Pour Les Annees Quatre Vingt Dix," S.21.A Distributed Power System, Programme General, Intelec '93, pp. xv-xxxxii, and pp. 47-50.

Astec Powerpoint Presentation entitled, AMPSS®, Astec Modular Power Supply System, undated.

Author unknown, "Chapter II: Inverters and Converters," and "Chapter III, Regulated Power Supplies." Undated.

Balogh, Laszlo, "Design Review: 100W, 400kHz, DC/DC Converter With Current Doubler Synchronous Rectification Achieves 92% Efficiency," pp. 2-1-2-26, DC/DC Converter by Texas Instruments.

Balogh, Laszlo, "The Performance of the Current Doubler Rectifier with Synchronous Rectification," Technical Papers of the Tenth International High Frequency Power Conversion 1995 Conference, pp. 216-225; May 6-12, 1995. ISBN 0-931033-54-3.

Balogh, Laszlo, et al., "Unique Cascaded Power Converter Topology for High Current Low Output Voltage Applications," 2001 Texas Instruments Incorporated, pp. 1-1 through 1-23.

Barlage, F. Michael, "Synchronous Rectification and Regulation in Multiple Cross Regulated Outputs," Technical Papers of the Ninth International High Frequency Power Conversion 1994 Conference, pp. 185-193, Apr. 17-21, 1994.

Barry, Mike, "Design Issues in Regulated and Unregulated Intermediate Bus Converters," pp. 1389-1394. ISBN 0-7803-8269-2/04.

Beatty, Debra, et al., "Topical Overview of Soft-Switching PWM High Frequency Converters," Electrical and Computer Engineering Department, University of Central Florida, pp. 47-52. Undated.

Belopolsky, Yakov, et al., "Hybrid Technologies for High Frequency Switching Power Supplies," pp. 103-108. ISSN 0569-5503/91.

Berkowitz, R., et al., "A Distributed Power Architecture for System 75 Digital Communications System," The Power Sources Conference 1984, pp. S9/1-1 through S9/1-6.

Billings, Keith H., Handbook of Switchmode Power Supplies, McGraw-Hill Publishing Company, 1989. ISBN 0-07-005330-8.

Bindra, Ashok, "Two-Stage Conversion Redefines Dsitributed Power Architecture," May 1, 2003, Power Electronics Technology website, http://www.printthis.clickability.com/pt/cpt&title=Two-Stage-Conversion+R . . . , printed on Dec. 15, 2007.

Blanchard, R., et al., "The Design Of A High Efficiency, Low Voltage Power Supply Using Mosfet Synchronous Rectification And Current Mode Control," 16th Annual IEEE Power Electronics Specialists Conference, pp. 353-361 (1985). IEEE Catalog No. 85CH2117-0.

Blake, Carl, et al., "Synchronous Rectifiers Versus Schottky Diodes: A Comparison of the Losses os a Sychronous Rectifier Versus the Losses of a Schottky Diode Rectifier," pp. 17-23 (1994). IEEE 0-7803-1456-5.

Blake, Carl, et al., "Synchronous Rectifiers versus Schottky Diodes: A Comparison of the Losses of a Synchronous Rectifier Versus the Losses of a Schottky Diode Rectifier," 1994 IEEE.

Blanc, J., "Practical Application of MOSFET Synchronous Rectifiers," Intelec Thirteenth International Telecommunications Energy Conference, 494-501 (1991). IEEE Catalog No. CH2970-2/91/0000-0495.

Blanc, James, et al., "Use of Enhancement- And Depletion-Mode Mosfets in Sychronous Rectification," Proceedings of The Power Electronics Show & Conference, pp. 1-8, 390-395; Oct. 7-9, 1986.

Blanchard, R., et al., "MOSFETs Move in on Low Voltage Rectification," Official Proceedings of the Ninth International PCI '84 Conference, pp. 213-222, Oct. 29-31, 1984.

Boschert Incorporated marketing brochure, "Boschert An International Leader in Switching Power Supplies," undated.

Boschert Incorporated marketing brochure, Boschert An International Leader in Switching Power Supplies.

Boschert, Inc., "Power Module Lets Users Customize Supplies," Electronic Design, Jun. 25, 1981, p. 213.

Bowles, B.A., et al., "Modelling Interference Properties of SMPS DC Power Distribution Busses," pp. 119-126.

Bowman, Wayne C., et al., "A High Density Board Mounted Power Module for Distributed Powering Architectures," pp. 43-54. IEEE Catalog No. CH2853-0/90/0000-0043.

Brakus, Bogdan, "DC/DC Modules for Low Voltage Applications: The New Generation of Board Mounted Modules in Thick-Copper Multilayer Technology," Intelec '98, Twentieth International Telecommunications Energy Conference Oct. 4-8, 1998, ISBN: 0-7803-5069-3, IEEE Catalog No. 98CH36263C.

Briskman, R.D., "Comsat Technical Review," vol. 7, No. 1, Spring 1977.

Brown, Jess, "Addressing the topologies, converters, and switching devices for intermediate bus architectures," ISBN :90-75005-OS-S, pp. 1-9. EPE 2005—Dresden.

Burns, J., et al., "An Intelligent, Fault Tolerant, High Power, Distributed Power System for Massively Parallel Processing Computers," pp. 795-800 (1994). ISBN 0-7803-1456-5/94.

Carpenter, B., et al., "A Distributed Power System for Military VLSI Applications," Technical Papers of the Third International High Frequency Power Conversion 1988 Conference, May 1-5, 1988, pp. 430-441. ISBN 0-931033-07-1.

Carr, Gregory A., et al., "X2000 Power System Architecture," pp. 381-386. Unpublished paper, California Institute of Technology, Jet Propulsion Laboratory.

Carsten, B., "Distributed Power Systems of the Future Utilizing High Frequency Converters," Technical Papers of the Second International High Frequency Power Conversion 1987 Conference, Apr. 21-23, 1987. pp. 1-14.

Carsten, B., "VLSI & VHSIC Power System Design Considerations," International PCI '86 Conference, Oct. 1986, pp. 1-15.

Casey, Leo F., et al., "A High Frequency, Low Volume, Point-of-Load Power Supply for Distributed Power Systems" Proceedings of the 18th Annual IEEE Power Electronics Specialists Conference—PESC, Blacksburg, VA, Jun. 21, 26, 1987. ISSN 0275-9306/87/0000-0439.

Casey, Leo Francis, "Circuit Design for 1-10 MHZ DC-DC Conversion," Unpublished doctoral dissertation, Massachusetts Institite of Technology (Feb. 1, 1989).

Chen, W., et al., "Design of a High-Efficiency, Low-Profile Forward Converter with 3.3-v Output," The Thirteenth Annual VPEC Power Electronics Seminar, pp. 105-112; Sep. 24-26, 1995.

Chen, Wei, et al., "Design of High Efficiency, Low Profile, Low Voltage Converter with Integrated Magnetics," pp. 911-917 (1987). ISBN 0-7803-3704-2/97.

Chen, Y., "New Multi-Output Switching Converters with MOSFET-Rectifier Post Regulators," IEEE Transactions on Industrial Electronics, vol. 45, No. 4 (1998). ISSN 0278-0046/98.

Cheng, K. W.E., "Comparative Study of AC/DC Converters for More Electric Aircraft," Power Electronics and Variable Speed Drives, pp. 21-21, Sep. 21-23, 1998, Conference Publication No. 456 IEE 1998.

Choi, Byungcho, "Intermediate Line Filter Design to Meet Both Impedance Compatibility and EMI Specifications," IEEE Transactions on Power Electronics, vol. 10, No. 5, Sep. 1995, pp. 583-588.

Chol, Byungcho, Ph.D., "Dynamics and Control of Switchmode Power Conversions in Distributed Power Systems," Unpublished doctoral dissertation, Virginia Polytechnic Institute and State University (1992).

Cobos, J., et al., "Active Clamp PWM Forward Converter with Self Driven Synchronous Rectification \highlight2 ," S.20.C DC/DC Converters: Distributed Power, pp. 200-206, undated.

Cobos, J.A., et al., "Comparison of High Efficiency Low Output Voltage Forward Topologies\highlight2 ," pp. 887-894 (1994). ISBN 0-7803-1859-5.

Cobos, J.A., et al., "Low Output Voltage DC/DC Conversion," pp. 1676-1681 (1994). ISBN 0-7803-1328-3. (\highlight0).

Cobos, J.A., et al., "New Driving Scheme for Self Driven Synchronous Rectifiers," Fourteenth Annual Applied Power Electronics Conference and Expedition, vol. 2, pp. 840-846, Mar. 14-18, 1999. ISBN 0-7803-5160-6.

Cobos, J.A., et al., "Optimized Synchronous Rectification Stage for Low Output Voltage (3.3V) DC/DC Conversion," 25th Annual IEEE Power Electronics Specialists Conference, Jun. 20-25, 1994, pp. 902-908.

Cobos, J.A., et al., "RCD Clamp PWM Forward Converter With Self Driven Synchronous Rectification," pp. 1336-1341 (1993). ISBN 0-7803-0891-3.

Cobos, J.A., et al., "Resonant Reset Forward Topologies for Low Output Voltage on Board Converters," pp. 703-708 (1994). ISBN 0-7803-1456-5.

Cobos, J.A., et al., "Self Driven Synchronous Rectification in Resonant Topologies: Forward ZVS-MRC, Forward ZCS-QRC and LCC-PRC," 0-7803-0582-5, 1992 IEEE, pp. 185-190.

Cobos, J.A., et al., "Several Alternatives for Low Output Voltage on Board Converters," pp. 163-169 (1998). ISBN 0-7803-4340-9.

Cobos, J.A., et al., "Study of the Applicability of Self-Driven Synchronous Rectification to Resonant Topologies," pp. 933-940 (1992). ISBN 0-7803-0695-3.

Photograph from Tektronix, Inc.'s, "TM 503 Power Module Instruction Manual," Rev. May 1984.

Croll, P., et al., "Multiple Output DC/DC Zero-Current Switch Quasi-Resonant Converter," S.20.C DC/DC Converters—Distributed Power, Convertisseurs Continu-Continu, pp. 215-220.

de Hoz, A., et al., "Analysis and Design of a Zero Current Switched Quasi-Resonant Converter with Synchronous Rectification for Low Output Voltage Applications," pp. 221-228 (1992). ISBN 0-7803-0695-3.

de la Cruz, E., et al., "Analysis of Suitable PWM Topologies to Meet Very High Efficiency Requirements for on Board DC/DC Converters in Future Telecom Systems," S.20.C DC/DC Converters: Distributed Power, pp. 207-214.

de la Cruz, E., et al., "Performances Comparison of Four Practical Implementations Based on PWM, Quasi, and Multiresonant Topologies for on Board DC/DC Converters in Distributed Power Architectures," pp. 917-925 (1992). ISBN 0-7803-0695-3.

de la Cruz, E., et al., "Review of Suitable Topologies for on Board DC/DC Converters in Distributed Power Architectures for Telecom Applications," pp. 59-65 (1992). ISBN 0-7803-0779-8.

Diaz, J., et al., "A New Lossless Power Mosfet Driver Based on Simple DC/DC Converters," pp. 37-43 (1995). ISBN 0-7803-2730-6.

Diazzi, C., et al., "80W-400W Monolithic Buck Regulators Integrated in Multipower BCD Technology," HFPC May 1988 Proceedings, pp. 212-226.

Dixon, L.H., Jr., "High Power Factor Preregulators for Off-Line Power Supplies," Unitrode Corporation and Texas Instruments Incorporated, pp. 6-1 through 6-16 (2003).

Dwane, Patrick, et al., "A Resonant High Side Gate Driver for Low Voltage Applications," pp. 1979-1985 (2005). ISBN 0-7803-9033-4.

Ericsson, Inc., "Selection of Architecture for Systems Using Bus Converters and POL Converters," Ericsson Design Note 023, pp. 1-7, May 2005.

"Electronics Life" magazine excerpts, Mar. 1995, pp. 45-52. (Translation not provided).

"Electronics Life" magazine excerpts, Nov. 1995, pp. 81-90. (Translation not provided).

Farrington, R., et al., "Comparison of Single-Ended-Parallel MRC and Forward MRC," pp. 203-210 (1992). ISBN 0-7803-0485-3.

Ferencz, A., "A 250 W High Density Point-of-Lead Converter," Unpublished master's thesis, Massachusetts Institute of Technology (Sep. 1989).

Ferenczi, O., "Power Supplies, Part B: Switched-Mode Power Supplies," StuElsevier Science Publishers (1987). ISBN 0-444-98998-6.

Ferreira, J.A., et al., "A Self Oscillating Bidirectional DC to DC Converter Employing Minimum Circuitry," pp. 125-129. Undated.

Fisher, R.A., et al., "A 1 MHz 100W Commercial, High-Density Point-of-Load Power Supply Using Direct-Bond Copper and Surface Mount Technologies," Fifth Annual IEEE Applied Power Electronics Conference and Exposition, Mar. 11-16, 1990, pp. 55-63.

Franz, G.A., "Multilevel Simulation Tools for Power Converters," pp. 629-633 (1990). IEEE Catalog No. CH2853-0/90/0000-0629.

Fu-Sheng, Tsai, "A Low-Cost, Low-Loss Active Voltage-Clamp Circuit for Interleaved Single-Ended Forward PWM Converter," 1993 IEEE, pp. 729-733.

Gachora, John Mburu, "Design of a Four-Phase Switchmode High Efficiency Power Supply," Unpublished master's thesis, Massachusetts Institute of Technology, Cambridge, MA (May 16, 1994).

Garcia, O., "Zero Voltage Switching in the PWM Half Bridge Topology with Complementary Control and Synchronous Rectification," pp. 286-291 (1995). ISBN 0-7803-2730-6.

Garcia, O., et al., "PCB Based Transformers for Multiple Output DC/DC Converters," pp. 51-55 (1995). ISBN 0-7803-3071-4.

Gaudreau, M.P.J., et al., "Solid-State High Voltage, DC Power Distribution & Control," Proceedings of the 1999 Particle Accelerator Conference, New York, 1999, pp. 568-570. ISBN 0-7803-5573-3.

Gegner, J.P., et al., "High Power Factor AC-to-DC Converter Using a Reactive Shunt Regulator," pp. 349-355 (1994). ISBN 0-7803-1859-5.

Ghislanzoni, L., "Parallel Power Regulation of a Constant Frequency, ZV-ZC Switching Resonant Push-Pull," Proceedings of the European Space Power Conference, Florence, Italy, Sep. 2-6, 1991, (ESA SP-320, Aug. 1991). ISBN 92-9092-122-6.

Gillett, J.B., et al., "Transistor Rectifier-Regulator," IBM Technical Disclosure Bulletin, vol. 22, No. 6, Nov. 1979, pp. 2319-2320.

Goodenough, F., "Power-Supply Rails Plummet and Proliferate," Electronic Design, Jul. 24, 1995, pp. 51-54.

Gottlieb, Irving M., "Power Control with Solid State Devices," pp. 1-372, Reston Publishing Company, Inc., 1985. ISBN 0-8359-5584-2.

Gottlieb, Irving M., "Power Supplies, Switching Regulators, Inverters and Converters, Second Editiion," TAB Books, pp. 1-483 (1994). ISBN 0-8306-4405-9 (H).

Graf, Rudolf F., "Converter and Filter Circuits," Butterworth-Heinemann, (1997). ISBN 0-7506-9878-0.

Grant, Duncan A., et al., "Power MOSFETS: Theory and Applications," Chapter 7.1, pp. 183-253; John Wiley & Sons.

Greenland, P., "Start:DPA Developments: A Reason for Change in Power Conversion," Nov. 5, 2004, "http://www.powermanagementdesignline.com/52200069;jsessionid=WEKDPBVXEVRK...12/15/2007."

Greenland, P., "Start:DPA Developments: A Reason for Change in Power Conversion," Nov. 5, 2004, http://www.powermanagementdesignline.com/52200069;jsessionid=WEKDPBVXEVRK...12/15/2007.

Gutmann, R.J., "Applications of RF Circuit Design Principles to Distributed Power Converters," IEEE Transactions of Industrial Electronics and Control Instrumentation, pp. 156-164 (1980). ISSN 0018-9421.

Hadjivassilev, S.T., et al., "Front-End Converter System for Distributed Power Supply," ENE Conference on Power Electronics and Applications, Sep. 13-16, 1993, Publication No. 377 vol. 3 Electronic Power Supply Systems. ISBN 0-85296-585-0.

Hamo, D., "A 360W, Power Factor Corrected, Off-Line Power Supply, Using the HIP5500," Intersil Intelligent Power, No. AS9417, Nov. 1994, pp. 1-6.

Harada, Kazurou, et al., "A Novel ZVS-PWM Half-Bridge Converter," pp. 588-593 (1994). ISBN 0-7803-2034-4.

Harada, Kazurou, et al., "Analysis and Design of ZVS-PWM Half-Bridge Converter with Secondary Switches," pp. 280-285 (1995). ISBN 0-7803-2730-5. \par.

Harada, Kazurou, et al., "Analysis and Design of ZVS-PWM Half-Bridge Converter with Secondary Switches," pp. 280-285 (1995). ISBN 0-7803-2730-6.

Harper, D.J., et al., "Controlled Synchronous Rectifier," 1988 High Frequency Power Conversion International, pp. 165-172 (May 1988). ISBN 0-931033-07-1.

Hartman, W.D., "System Designer's Guide to Modular dc/dc Converters," Electronic Products, vol. 30, No. 19, Mar. 1, 1998.

Hartman, William D., "System Designer's Introduction to Modular DC/DC Converters," Proceedings of the Power Electronics Show & Conference, Anaheim, CA, Feb. 22-25, 1988.

Heath, C.C., "The Market for Distributed Power Systems," pp. 225-229 (1991). IEEE Catalog No. CH2992-6/91/0000/0225.

Higashi, T., et al., "On the Cross Regulation of Multi-Output Resonant Converters," 1988 Spring National Convention Record, The Institute of Electronics, Information and Communication Engineers, pp. 289-290 (Mar. 28-31, 1988).Translation not available.

Honeywell, Inc., "Low Input Voltage D.C. to D.C. Converter, Final Report, Contract No. NAS 5-3441, National Aeronautics and Space Administration," Jun. 26, 1993-Mar. 26, 1984.

Hsieh, G-C., et al., "A Study on Full-Bridge Zero-Voltage Switched PWM Converter: Design and Experimentation," pp. 1281-1285 (1993). ISBN 0-7803-0891-3.

Hua, G.C., et al., "Development of a DC Distributed Power System," pp. 763-769 (1994). ISBN 0-7803-1456-5.

Huang, H., "Coordination Design Issues in the Intermediate Bus Architecture," DCDC Technical White Paper from Astec Power (Jul. 2004).

Huang, Hong, "Coordination Design Issues in the Intermediate Bus Architecture," DCDC Technical White Paper, Jul. 2004, Astec International Limited.

Huillet, H., et al., "High Frequency Quasi-Resonant Buck Converter on Insulated Substrate for Avionics Distributed Power Systems," pp. 647-653 (1992). ISBN 0-7803-0485-3.

Huliehel, F.A., et al., "A New Design Approach for Distributed Power Systems," VPEC, pp. 214-218 (1993).

Hunter, R.D., "Regulatory and Technological Trends in Power Supplies," pp. 10-15 (1993). IEEE Catalog No. CH3310-0/93/0000-0002.

IEEE Technology Update Series, "Power Electronics Technology and Applications 1993," Pierre A. Thollot, ed. (NJ: IEEE Technical Activities Board) (1992). ISBN 0-7803-0880-8.

IEEE Technology Update Series, "Power Electronics Technology and Applications 1993," Pierre A. Thollot, ed. (NJ: IEEE Technical Activities Board) (1992). ISBN 0-7803-0880-8.

Ivensky, G., et al., "A Resonant DC-DC Transformer," pp. 731-737 (1992). ISBN 0-7803-0485-3.

Jacobs, M.E., et al., "Disbributed Power Architecture Concepts," ntelec International Telecommunications Energy Conference, New Orleans, LA, Nov. 4-7, 1984. IEEE Catalog No. CH2073-5/84/0000-0105.

Jamerson, C., "Post-Regulation Techniques for 100 KHz to 300 KHz Multiple-Output PWM Supplies (Limitations, Trends, and Predictions)," Technical Papers of the Fourth International High Frequency Power Conversion Conference, May 14-18, 1989, Naples, FL, pp. 260-273.

Jamerson, Cliff, et al., "1500 Watt Magnetics Design Comparison: Parallel Forward Converter vs. Dual Forward Converter," Technical Papers of the Fifth International High Frequency Power Conversion 1990 Conference, May 6-11, 1990, Santa Clara, CA, pp. 347-358. ISBN 0-931033-25-X.

Jenson, James Lee, "An Improved Square-Wave Oscillator Curcuit," IEEE Transactions on Circuit Theory, pp. 276-279, Sep. 1957.

Ji, H.K., et al., "Active Clamp Forward Converter with MOSFET Synchronous Rectification," PESC '94, 25th Annual IEEE Power Electronics Specialists Conference, Record vol. II, pp. 895-901. ISBN 0-7803-1859-5.

Jitaru, I.D., "High Efficiency DC-DC Converter," APEC '94, Ninth Annual Applied Power Electronics Conference and Exposition, vol. 2, pp. 638-208 (Feb. 13-17, 1994). ISBN 0-7803-1456-5.

Jitaru, Ionel Dan, "The Impact of Low Output Voltage Requirements on Power Converters," Technical Papers of the Tenth International High Frequency Power Conversion 1995 Conference, May 6-12, 1995, San Jose, CA, pp. 1-10. ISBN 0-931033-54-3.

Jitaru, Ionel, Dan, et al., "High Efficiency DC-DC Converter," Abstract, \highlight2 Department of Electrical Engineering, Polytechnic Institute of Bucharest, Bucharest, Romania, \highlight pp. 638-644 (1994). ISBN 0-7803-1456-5.

Jovanovic, M.M., et al., "Design Considerations for Forward Converter with Synchronous Rectifiers," Virginia Power Electronics Center, 1993 Power Electronics Seminar, Sep. 19-21, 1993, pp. 163-173.

Jovanovic, M.M., et al., "Evaluation of Synchronous-Rectification Efficiency Improvement Limits in Forward Converters," pp. 387-395 (1995). ISSN 0278-0046.

Jovanovic, Milan M., et al., "Evaluation of Synchronous-Rectification Efficiency Improvement Limits in Forward Converters," IEEE Transactions on Industrial Electronics, vol. 42, No. 4, Aug. 1995, pp. 387-395. ISBN0278-0046.

Kagan, Richard S., et al., "Improving Power Supply Efficiency with MOSFET Synchronous Rectifiers," Ninth International Solid-State Power Electronics Conference, Jul. 13-15, 1982, D-4 p. 1 through D-4 p. 5.

Kagan, Richard, et al., "Improving Power Supply Efficiency with MOSFET Synchronous Rectifiers," Proceedings of the Powercon.9 Ninth International Solid-State Power Electronics Conference Washington, D.C., Jul. 13-15, 1982, pp. D-4 p. 1 through D-4 p. 5.

Kang, Y.G., et al., "A Parallel Resonant Converter with Postregulators," IEEE Transactions on Power Electronics, 7:296-303 (1992). ISSN 0885-8993.

Kassakian, J.G., et al., "High-Frequency High-Density Converters for Distributed Power Supply Systems," Proceedings of the IEEE, 76:362-376 (1988).

Kester, W., et al., "Section 3, Switching Regulators," pp. 3.1-3.71, undated.

Kester, W., et al., "Section 3, Switching Regulators," pp. 3.1-3.71, undated.

Klapfish, M., "Trends in AC/DC Switching Power Supplies and DC/DC Converters," pp. 361-365 (1993). ISBN 0-7803-0982-0.

Kociecki, John, et al., "A High Power-Density DC-DC Converter Board," Second Annual IEEE Applied Power Electronics Conference and Exposition, Mar. 2-6, 1987, San Diego, CA. IEEE Catalog No. 87CH2402-6.

Kollman, R., et al., "Processor Power Subsystem Architectures," pp. 1183-1189 (2000). ISBN 0-7803-5864-3.

Korman, C.S., et al., "A Synchronous Rectifier for High-Density Power Supplies," HFPC—May 1985 Proceedings, pp. 126-139.

Krauthamer, S., "High Efficiency Synchronous Rectification in Spacecraft Power Systems," European Space Power Conference, Graz, Austria, Aug. 23-27, 1993, pp. 1-5.

Krauthamer, Stan, et al., "State-of-the-Art of DC Components for Secondary Power Distribution on Space Station Freedom," Fifth Annual IEEE Applied Power Electronics Conference and Exposition, Mar. 11-16, 1990, Los Angeles, CA.

Krein, P.T., et al., "Autonomous Control Technique for High-Performance Switches," IEEE Transactions on Industrial Electronics, 39:215-222 (1992). ISSN 0278-0046.

Lam, E., et al., "Revolutionary Advances in Distributed Power Systems," pp. 30-36 (2003). ISBN 0-7803-7768-0.

Lee, F.C., et al., "Power Management Issues for Future Generation Microprocessors," pp. 27-33 (1999). ISBN 0-7803-5290-4.

Lemnios, Z.J., et al., "Low-Power Electronics," IEEE Design & Test of Computers, pp. 8-13 (1994). ISSN 0740-7475.

Leu, Ching-shan, et al., "A High-Frequency AC Bus Distributed Power System," Virginia Power Electronics Center, 1990 Power Electronics Seminar, Sep. 17-19, 1990, pp. 98-107.

Leung, H.M., "SPICE Simulation and Modeling of DC-DC Flyback Converter," unpublished master's thesis, Massachusetts Institute of Technology (Aug. 1995).

US 7,564,702 B2

Page 11

Lewis, L.R., et al., "Modeling, Analysis and Design of Distributed Power Systems," pp. 152-159 (1989). IEEE Catalog No. CH2721-9/89/0000/0152.

Lewis, L.R., et al., "Modeling, Analysis, and Design of Distributed Power Systems," pp. 452-459, IEEE Catalog No. CH2721-9/89/0000/0152, 1989 IEEE.

Lewis, R., et al., "Distributed Power System Analysis, Final Report Prepared for IBM Corporation," Mar. 1989, Virginia Power Electronic Center, Bradley Department of Electrical Engineering, Virginia Polytechnic Institute and State University, Mar. 1989.

Liang, Y.C., et al., "Design Considerations of Power MOSFET for High Frequency Synchronous Rectification," pp. 388-395 (1995). ISSN 0885-8993/95.

Lindman, P., "Powering Tomorrow's Data Internetworking Systems," Ericsson Microelectronics, pp. 506-511, undated.

Lindman, P., et al., "Applying Distributed Power Modules in Telecom Systems," pp. 365-373 (1996). ISSN 0885-8996/96.

Linera, F.F., et al., "Closing the Feedback Loop in the Half-Bridge Complementary-Control DC-to-DC Converter," Twelfth Annual Applied Power Electronics Conference and Exposition vol. 2, Feb. 23-27, 1997, Atlanta, GA. ISBN 0-7803-3704-2.

Lingle, John T., "Low Input Voltage D.C. to D.C. Converter Final Report," National Aeronautics and Space Administration, Contract No. NAS 5-3441, pp. 1-64, Appendices A-C; Jun. 26, 1963—Mar. 26, 1964.

Lingle, John T., "Low Input Voltage D.C. to D.C. Converter Final Report," National Aeronautics and Space Administration, Contract No. NAS 5-3441, pp. 1-64, Appendices A-C; Jun. 26, 1963—Mar. 26, 1964.

Lo, D.S., et al., "A Compact DC-to-DC Power Converter for Distributed Power Processing," IEEE Transactions on Power Electronics, 7:714-724 (1992). ISSN 0885-8993/92.

Lo, Edward Wai-chau, "Cost Analysis of Powering an Optical Customer Access Network," ntelec Fourteenth International Telecommunications Energy Conference, Oct. 4-8, 1992, Washington, D.C., pp. 96-103, ISBN0-7803-0779-8.

Lo, P.S., et al., "Development of a DC-to-DC Power Converter for Distributed Power Processing," Unisys Corporation, pp. 413-422. IEEE Catalog No. CH2719-3/89/0000-0413. 1989 IEEE.

Maksimovic, Dragan, "A Mos Gate Drive with Resonant Transitions," pp. 527-532 (1991). ISBN 0-7803-0090-4.

Malik, R., "The Power System Challenge—Understanding the Total Picture," IEEE, pp. 202-208 (2003). ISBN 0-7803-7768-0.

Mammano, B., "Distributed Power Systems," pp. 1-1-1-12, Unitrode Corporation (1993).

Mammano, R., "Isolating the Control Loop," pp. 2-1-2-16, Unitrode Corporation and Texas Instruments Incorporation (2001).

Mannion, Patrick, "New Challenges Place Power Squarely in the Spotlight," Electronic Design, Nov. 3, 1997, 8 pages, numbers illegible.

Marchetti, R., "Power Systems Architectures What's In? What's Out?," Battery Power Products & Technology, (2003).

Matsuo, H., "Comparison of Multiple-Output DC-DC Converters using Cross Regulation," IEEE Power Electronics Specialists Conference, San Diego, CA, Jun. 18-22, 1979. IEEE Catalog No. 79CH1461-3 AES.

Maxim Integrated Products, "Power Supplies for Telecom Systems," Sep. 6, 2000.

Maxim Integrated Products, "Synchronous Rectification Aids Low-Voltage Power Supplies," Maxim Application Note, http://www.maxim-ic.com/appnotes.cfm/an_pk/652, Jan. 31, 2001.

MC-Service, "Service Manual for Sony DCR-VX1000/VX1000E RMT-803 Sony Digital Video Camera Recorder." Contains the following supplements: "DCR-XV1000/VX1000E RMT-803, Service Manual, Supplement-3: Electrical Part Changed,"; "DCR-VX1000/VX1000E RMT-803, Service Manual, Supplement-2: Addition for Bist Check," "DCR-VX1000/VX1000E RMT-803, Service Manual, Supplement-2: Addition for Bist Check," "DCR-VX1000/VX1000E RMT-803, Service Manual, upplement-1,"; "DV Mechanical Adjustment Manual I,".

Micro Linear Battery Power Control IC General Description and Features, Jan. 1997.

Miles, F.M., et al., "Market Trends Toward Enhanced Control of Electronic Power Systems," pp. 92-98 (1993). ISBN 0-7803-0982-0.

Miwa, B.A., "Hybrid Construction of a 10MHz DC-DC Converter for Distributed Power Systems," Unpublished master's thesis, Massachusetts Institute of Technology, Feb. 1989.

Miwa, B.A., et al., "High Efficiency Power Factor Correction Using Interleaving Techniques," pp. 557-568 (1992). ISBN 0-7803-0485-3.

Miwa, Brett, et al., "Copper-Based Hybrid Fabrication of a 50\highlight2 W, 5 MHz 40V-5V DC/DC Converter," Massachusetts Institute of Technology, pp. 256-261. IEEE Catalog No. CH2719-3-89/0000-0256, 1989 IEEE.

Moore, B.D., "Step-Up/Step-Down Converters Power Small Portable Systems," EDN, Feb. 3, 1994, pp. 79-84.

Moore, Bruce, "Synchronous rectification aids low-voltage power supplies," EDN Access—Apr. 27, 1995, http://www.edn.com/archives/1 995/042795/09dF4.htm.

Morrison, D.G., "Distributed Power Moves to Intermediate Voltage Bus," Electronic Design, pp. 56-62 (Sep. 16, 2002).

Morrison, David G., "Distributed Power Moves to Intermediate Voltage Bus," http://electronicdesign.com/Articles/Print.cfm?ArticleID=2744, Sep. 16, 2002.

Mullett, C.E., "The Rule of the Power Source In System Design," Proceedings of the Power Sources Users Conference, Oct. 15-17, 1985, Anaheim, CA.

Mullett, Charles E., "Practical Design of Small Distributed Power Systems," PCIM, Jan. 1991, pp. 21-27.

Mullett, Charles E., "Practical Design of Small Distributed Power Systems," Power Conversion & Intelligent Motion, pp. 104-111 (Jan. 1991).

Murakami, N., et al., "A High-Efficiency 30-W Board Mounted Power Supply Module," Thirteenth International Telecommunications Energy Conference, ntelec91, Nov. 5-8, 1991, Kyoto, Japan. ISBN 0-87942-670-5.

Murakami, N., et al., "A Highly Efficient Low-Profile 300-W Power-Pack for Telecommunications Systems," pp. 786-792 (1994). ISBN 0-7803-1456-5.

Murakami, N., et al., "A Simple and Efficient Synchronous Rectifier for Forward DC-DC Converters," pp. 463-468. ISBN 0-7803-0982-0.

Mweene, L.H., "The Design of Front-End DC-DC Converters of Distributed Power Supply Systems with Improved Efficiency and Stability," unpublished doctoral thesis, Massachusetts Institute of Technology, Sep. 1992.

Mweene, L.H., et al., "A High Efficiency 1.5kW, 390-50 V Half-Bridge Converter Operated at 100% Duty-Ratio," pp. 723-730 (1992). ISBN 0-7803-0485-3.

Mweene, Lovedoy H., et al., "A 1 kW, 500 kHz Front-end Converter for Distributed Power Supply System," pp. 423-432 (1989). IEEE Catalog No. CH2719-3/89.

Narveson, B., "How Many Isolated DC-DC's Do You Really Need?," pp. 692-695 (1996). ISBN 0-7803-3044-7.

Narveson, B., "What is the Right Bus Voltage?," pp. 883-888 (1998). ISBN 0-7803-4430-9.

Narveson, B., et al., "Why the Market is Ready for a Non-Isolated DC/DC Power Module Standard," pp. 335-341 (1998). ISBN 0-7803-8269-2.

Newhart, Milton, "Product Report on DC-DC Converters," Electronic Design, vol. 34, Issue 21, pp. 169-170, Sep. 11, 1986.

Newhart, Milton, "Product Report: On DC-DC Converters," Electronic Design, Sep. 11, 1986, pp. 169-170.

Nochi, H., et al., "Full-Wave Current Resonant Multi-Output Converters," pp. 528-535 (1990). IEEE Catalog No. CH2873-8/90.

Ollero, S., et al., "New Post-Regulation and Protection Methods for Multiple Output Power Converters With Synchronous Rectification," pp. 462-469 (1996). ISBN 0-7803-3507-4. )

Ollero, S., et al., "Post-Regulation and Protection Methods for Multiple Output Power Converters With Synchronous Rectification," pp. 462-469. ISBN 0-7803-3507-4.

Osiichin, N., et al., "Evolving Central-Office Powering Architecture," Fifth International Telecommunications Energy Conference; Oct. 18-21, 1983. IEEE Catalog No. 83CH1855-6.

Pagotto, L., "Distributed Power Supplies, Course Notes for a Seminar Presented During the Power Electronics Conference '90," The Power Electronics Conference '90, Feb. 14-16, 1990, Long Beach, CA.

Panov, Y., et al., "Design and Performance Evaluation of Low-Voltage/High-Current DC/DC On-Board Modules," Fourteen Annual Applied Power Electronics Conference and Exposition, vol. 1, Mar. 14-18, 1999, Dallas, TX. ISBN 0-7803-5160-6.

Pedersen, F.H., "Low Voltage High Efficiency Power Conversion," Proceedings of the Fifth European Space Power Conference, Tarragon, Spain, Sep. 21-25, 1998, ESA SP-416, Sep. 1998, pp. 51-56.

Pepper, S.H., "A New High Efficiency Post-Regulation Technique for Multiple Output Converters," Ninth International Solid-State Power Electronics Conference, Washington, D.C., Jul. 13-15, 1982, pp. D-3 p. 1 through D-3 p. 9.

Perkinson, Joseph, "UPS Systems- A Review," Third Annual IEEE Applied Power Electronics Conference and Exposition, pp. 151-154 (Feb. 1-5, 1988). IEEE Catalog No. CH1504-9.

Peterson, William A., et al., "A Half Bridge, Self-Oscillating, Multi-Resonant Converter," pp. 77-84 (1993). ISBN 0-7803-0982-0.

Photograph from "Instruction Manual for AA501 Distortion Analyzer WIth Options," Artek Media, Revised Nov. 1981.

Powerex, Inc., "Introduction to Solid State Power Electronics", John William Motto, Jr., ed., (PA: Powerex, Inc.), Feb. 1977.

Pressman, Abraham I., "Switching and Linear Power Supply, Power Converter Design," Hayden Book Company, Inc. (1977). ISBN 0-8104-5847-0.

Qian, J., "Advance Single-Stage Power Factor Correction Techniques," unpublished doctoral thesis, Virginia Polytechnic Institute and State University, Sep. 25, 1997.

Cho, R.B., et al., "Analysis and Design of Multi-Stage Distributed Power Systems," Virginia Power Electronics Center, pp. 55-61.

Ratajczak, Robin, "Linear/Switching Supply Isolates, Holds Down Noise," Electronic Design 25, Dec. 6, 1979, p. 156.

Ren, Y., et al., "Two-Stage 48V Power Pod Exploration for 64-Bit Microprocessor," pp. 426-431 (2003). ISBN 0-7803-7768-0.

Renauer, J.G., "Challenges in Powering High Performance Low Voltage Processors," Eleventh Annual Applied Power Electronics Conference and Exposition, vol. 2, Mar. 3-7, 1996, San Jose, CA. ISBN 0-7803-3045-5.

Rittenhouse, G.E., et al., "A Low-Voltage Power MOSFET With a Fast-Recovery Body Diode for Synchronous Rectification," pp. 96-106 (1996). IEEE Catalog No. CH2873-8/90.

Rodriguez, G.E., "Voltage Conversion and Regulation Techniques Employed in the Prime Converter for the Anchored Interplanetary Monitoring Platfrom (AIMP) Spacecraft," Supp. to IEEE Transactions on Aerospace and Electronics Systems, vol. AES-2, pp. 466-476 (1966).

Rostek, Paul M., "Power System Design for Massive Parallel Computer Systems," Ninth Annual Applied Power Electronics Conference and Exposition, vol. 2, Feb. 13-17, 1994, Orlando, FL, pp. 808-814. ISBN 0-7803-1456-5.

Rozman, A.F., et al., "Circuit Considerations for Fast, Sensitive Low-Voltage Loads in a Distributed Power System," pp. 34-42 (1995). ISBN 0-7803-2482-X.

Rutledge, W.T., "Distributed Power 'Time for a Second Look,'", Conference Proceedings ntelec '86 International Telecommunications Energy Conference, Oct. 19-22, 1986, Toronto, Canada, ISBN 0-9692316-1-X.

Sakai, E., et al., "Mosfet Synchronous Rectificer with Saturable Transformer Commutation for High Frequency Converters," pp. 1024-1031 (1993). ISBN 0-7803-1243-0.

Sakai, Eiji, et al., "A New Synchronous Rectifier Using Bipolar Transistor Driven by Current Transformer," pp. 424-429 (1992). ISBN 0-7803-0779-8.

Sakai, Eiji, et al., "Synchronous Rectificer for Low Voltage Switching Converter," pp. 1-5 (1995). ISBN 0-7803-2750-0.

Sampson, P. et al., "Energy Systems Meeting the Requirements for Distributed Telecommunications Systems," Trends in Telecommunications, vol. 8, No. 3, pp. 24-32, undated.

Schulz, S., et al., "Design Considerations for a Distributed Power System," pp. 611-617 (1990). IEEE Catalog No. CH2873-8/90. (DMMP0006867—DMMP0006873).

Schulz, S., et al., "Integrating a Series of High-Density Converters," PowerTechnics Magazine, pp. 32-37 (Jan. 1990).

Schwartz, F.C., "A Controllable DC Transformer," Paper 18.3, presented at the 1970 Intermag Conference, Washington, D.C., Apr. 21-24.

Sebastian, J., et al., "A Complete Study of the Double Forward-Flyback Converter," PESC '88 Record, pp. 142-149 (1988). IEEE Catalog No. CH2523-9/88.

Sebastian, J., et al., "A Study of the Two-Input DC-to-DC Switching Post-Regulators," pp. 35-45 (1996). ISBN 0-7803-3633-4.

Sebastian, J., et al., "An Overall Study of the half-Bridge Complementary-Control DC-to-DC Converter," pp. 1229-1235 (1995). ISBN 0-7803-2730-6.

Sebastian, J., et al., "Average-Current-Mode Control of Two-Input Buck Postregulators Used in Power-Factor Correctors," pp. 569-576 (1999). ISSN 0278-0046/99.

Sebastian, J., et al., "Input Current Shaper Based on the Series Connection of a Voltage Source and Loss-Free Resistor," pp. 461-467 (1998). ISBN 0-7803-4340-9.

Sebastian, J., et al., "Very Efficient Two-Input DC-to-DC Switching Post-Regulators," pp. 874-880 (1996). ISBN 0-7803-3500-7.

Severns, Rudolf P., et al., "Modern DC-To-DC Switchmode Power Converter Circuits," Van Nostrand Reinhold Company, 1985. ISBN 0-442-21396-4.

Severns, Rudy, "Switchmode Converter Topologies-Make Them Work for You!", Intersil Inc. Application Bulletin A035.

SGS-Thomson, "Microelectronics Application Note: Designing with the L296 Monolithic Power Switching Regulator," pp. 1-43 (1996).

Shepard, Jeffrey D., "Power Supplies," by Reston Publishing Company (1984). ISBN 0-8359-5568-0.

Shi, F., et al. "Fault Tolerant Distributed," pp. 671-677 (1996). ISBN 0-7803-3044-75.

Shoyama, Masahito, et al., "Zero-Voltage-Switching by Magnetizing Current of Transformer in Push-Pull DC-DC Converter," Intelec'91, Nov. 1991, pp. 640-647.

Smith, Craig D., "Distributed Power Systems Via ASICs Using SMT," Surface Mount Technology, Oct. 1990, pp. 29-32.

Steigerwald, Robert L., et al., "Investigation of Power Distribution Architectures for Distributed Avionics Loads," PESC95 Record, vol. 1, 26th Annual IEEE Power Electronics Specialists Conference, 1995. ISBN 0-7803-2730-6.

Sun, Ning, et al., "Forward Converter Regulator Using Controlled Transformer," IEEE Transactions on Power Electronics, vol. 11, No. 2, Mar. 1996, pp. 356-364. ISSN 0885-8993/96.

Suranyi, Gabriel G., "Bus Voltage Level Comparisons for Distributed Power Architectures," PCIM, Jun. 1995, pp. 8-26.

Suranyi, Gabriel G., "Bus Voltage Level Comparisons for Distributed Power Architectures," PCIM'94, Official Proceedings of the Twenty-Ninth International Power Conversion Conference, Sep. 17-22, 1994, pp. 10-18. ISBN 0-931033-51-9.

Suranyi, Gabriel G., "The Value of Distributed Power," pp. 104-110 (1995). ISBN 0-7803-2482-X.

SynQor Marketing Brochure, "SynQor High Efficiency DC/DC Converters," Rev. B, Nov. 2003.

SynQor Marketing Brochure, "The PowerQor Series of DC/DC Converters."

SynQor, Inc. "Technical Specification BQ50120QTA20," Mar. 17, 2006.

SynQor, Inc. "Technical Specification: Product #NQ04T33VMA16, 16Amp, Wide Output Range, Non-Isolated DC/DC Converter," Jul. 6, 2006.

SynQor, Inc. "Technical Specification: Product #NQ12T50SMA16, 16A Non-Isloated, SMT DC/DC Converter with Wide Trim," May 24, 2004.

SynQor, Inc. Press Release, "SynQor Introduces 1.2V output Module for 60A series of Half-Brick DC/DC Converters," Mar. 28, 2002.

SynQor, Inc. Press Release, "SynQor Introduces Wide-Input, Point-of-Load DC/DC Converters," Apr. 30, 2004.

SynQor, Inc. Press Release, "SynQor's Bus Converter Delivers 240 Watts in Quarter-Brick," Aug. 2, 2002.

SynQor, Inc., "IBA vs. DPA: What to Consider When Choosing an On-Board Power Architecture," a Technical White Paper by SynQor, pp. 1-4, undated.

**US 7,564,702 B2**

Page 13

Tabisz, Wojciech A., et al., "A MOSFET Resonant Synchronous Rectifier for HIgh-Frequency DC/DC Converters," pp. 769-779. IEEE Catalog No. CH2873-8/90/0000-0769.

Tabisz, Wojciech, et al., "Present and Future of Distributed Power Systems," pp. 11-18 (1992). ISBN 0-7803-0485-3.

Takagi, Masakazu, et al., "Ultra High Efficiency of 95% for DC/DC Converter—Considering Theoretical Limitation of Efficiency," Seventeenth Annual IEEE Applied Power Electronics Conference and Exposition, Mar. 10-14, 2002, vol. 2, pp. 735-741. ISBN 0-7803-7404-5.

Tam, Kwa-Sur, et al., "Functional Models for Space Power Electronics Circuit," IEEE Transactions on Aerospace and Electronic Systems, vol. 31, No. 1, Jan. 1995, pp. 288-296.

Taylor, T.M., et al., "Distributing Power Processing: The Systems Solution," Fifth International Telecommunications Energy Conference, Tokyo, Japan, Oct. 18-21, 1983.

TDK Innoveta Inc., and TDK Corporation Powerpoint Presentation, "Stability Analysis of Bus Architecture," 2004 IBM Power Technology Symposium, Sep. 14-15, 2004.

Tektronix, Inc. "Instruction Manual for AA501 Distortion Analyzer WIth Options," Artek Media, Revised Nov. 1981.

Tektronix, Inc., "PS5004 Precision Power Supply, Instruction Manual," Rev. Jan. 1986.

Tektronix, Inc., "TM 5003 Power Module Instruction Manual," Rev. Dec. 1981.

Tektronix, Inc., "TM 503 Power Module Instruction Manual," Rev. May 1984.

Theron, P.C., et al., "Soft Switching Self-Oscillating FET-Based DC-DC Converters," pp. 641-648 (1992). ISBN 0-7803-0695-3.

Thorsell, Lars, "Mini DC-DC Supplies Simplify Redundacy in Parallel Systems," Academic OneFile, Gale. Northeastern University, Gale Document No. A6321372; Jul. 2008.

Thorsell, Lars, "Will Distributed On-Board DC/DC Converters Become Economically Beneficial in Telecom Switching Equipment," pp. 63-69 (1990). IEEE Catalog No. CH2928-0/90.

Traister, Robert J., "Voltage Regulator Circuit Manual," CA: Academic Press, Inc., et al. (1989). ISBN 0-12-697410-1.

Uceda, J., et al., "Supplying Power at Low Voltage (3.3V)," pp. 244-251 (1995). ISBN 0-7803-2672-5.

Unknown, "Transistor Inverters and Converters," Chapters 7-11, pp. 116-204.

Vazquez, M., et al., "Fixed Frequency Forward-Flyback Converter with Two Fully Regulated Outputs," pp. 161-166 (1995). ISBN 0-7803-2750-0.

Vazquez, Manuel, et al., "A Systematic Approach to Select Distributed, Centralised or Mixed Power Architecture in Telecom Applications," pp. 129-136 (1998). ISBN 0-7803-5069-3.

Vithanage, A., et al., "150W Board Mounted Power Supply Module Using Highly Compact and Efficient Synchronous Rectifiers," pp. 177-183 (1998). ISBN 0-7803-4340-9.

Vlatkovic, Vlatko, "Small-Signal Snalysis of the Phase-Shifted PWM Converter," pp. 128-135 (1992). ISSN 0885-8993/92.

Watson, Robert, "New Techniques in the Design of Distributed Power Systems," unpublished doctoral thesis, Virginia Polytechnic Institute and State University, Aug. 7, 1998.

Weinberg, Alan H., et al., "A New Zero Voltage and Zero Current Power-Switching Technique," IEEE Transactions on Power Electronics, vol. 2, No. 4, pp. 655-665; Oct. 4, 1992. ISSN 0885-9893.

Weinberg, S.H., "A Novel Lossless Resonant MOSFET Driver," pp. 1003-1010 (1992). ISBN 0-7803-0695-3.

White, Robert V., "Emerging On-Board Power Architectures," pp. 799-804 (2003). ISBN 0-7803-7768-0/03.

White, Robert V., et al., "Principles of Fault Tolerance," pp. 18-25 (1996). ISBN 0-7803-3044-7/96.

Wiegman, Herman L., "A Resonant Pulse Gate Drive For High Frequency Applications," pp. 738-743 (1992). ISBN 0-7803-0485-3.

Wildrick, Carl M., "Stability of Distributed Power Supply Systems," Unpublished doctoral dissertation, Virginia Polytechnic Institute and State University, Feb. 1993.

Wildrick, Carl M., et al., "A Method of Defining the Load Impedance Specification for a Stable Distributed Power System," IEEE Transactions on Power Electronics, vol. 10, No. 3, May 1995, pp. 280-285.

Xi, Y., et al., "A Zero Voltage Switching and Self-Reset Forward Converter Topology," pp. 827-833 (1999). ISBN 0-7803-5160-6/99.

Xi, Y., et al., "An Improved Technique for the Synchronous Rectifier Mosfets in the Forward Converter Topology," CCECE '97, pp. 552-555 (1997). ISBN 0-7803-3716-6.

Xi, Y., et al., "The Point of Use DC/DC Power Distribution: The Architecture and an Implementation," pp. 498-505 (2000). ISBN 0-7803-6407-7.

Xi, Youhao, et al., "A Precisely Regulated Multiple Output Forward Converter Topology," Fifteenth Annual IEEE Applied Power Electronics Conference and Exposition, vol. 2, pp. 986-992; Feb. 6-10, 2000. IEEE Catalog No. 00CH37058.

Xian, Li, et al., "Soft Switched PWM DC/DC Converter with Synchronous Rectifiers," pp. 476-484 (1996). ISBN 0-7803-3507-4.

Xuefei, Xie, et al., "Studies of Self-Driven Synchronous Rectification in Low Voltage Power Conversion," IEEE 1999 International Conference on Power Electronics and Drive Systems, PEDS '99, pp. 212-217 (1999). ISBN 0-7803-5769-8.

Yang, E.X., et al., "Isolated Boost Circuit for Power Factor Correction," Virginia Power Electronics Center: The VPEC Annual Power Electronics Seminar, pp. 97-104 (Sep. 20-22, 1992).

Yang, Zhihua, et al., "A New Dual Channel Resonant Gate Drive Circuit For Synchronous Rectifiers," pp. 756-762 (2006). ISBN 0-7803-9547-62.

Yoshida, Koji, et al., "A Novel Zero Voltage Switching Half Bridge Converter," pp. 566-572 (1994). ISBN 0-7803-2034-4.

Yoshida, Koji, et al., "Zero Voltage Switching Approach For Flyback Converter," pp. 324-329 (1992). ISBN 0-7803-0779-8.

Yuancheng, Ren, et al., "Two-Stage Approach for 12V VR," pp. 1306-1312. ISBN 0-7803-8269-2.

Yuhui, Chen, et al., "Resonant MOSFET Gate Driver with Efficient Energy Recovery," IEEE Transactions on Power Electronics, vol. 19, No. 2, pp. 470-477 (Mar. 2004). ISSN 0885-8993.

Zhang, Michael T., et al. "Analysis and Evaluation of Interleaving Techniques in Forward Converters," IEEE Transactions on Power Electronics, vol. 13, No. 4, pp. 690-698 (Jul. 1998). ISSN 0885-8993.

Zhang, Michael T., et al., "Commutation Analysis of Self-Driven Synchronous Rectifiers in an Active-Clamp Forward Converter," pp. 868-873 (1996). ISBN 0-7803-3500-7.

Zhang, Michael T., et al., "Design Considerations and Performance Evaluations of Synchronous Rectification in Flyback Converters," pp. 623-630 (1997). ISBN 0-7803-3704-2.

Zhang, Michael T., et al., "Design Considerations for Low-Voltage On-Board DC/DC Modules for Next Generations of Data Processing Circuits," pp. 328-337 (1996). ISSN 0885-8993.

Zhou, Xunwei, et al., "A Novel High-input-voltage, High Efficiency and Fast Transient Voltage Regulator Module—Push-pull Forward Converter," pp. 279-283 (1999). ISBN 0-7803-5160-6.

Zhou, Xunwei, et al., "A Novel High-input-voltage, High Efficiency and Fast Transient Voltage Regulator Module—Push-pull Forward Converter," pp. 279-283 (1999). ISBN 0-7803-5160-6.

Zhou, Xunwei, et al., "Investigation of Candidate VRM Topologies for Future Microprocessors," Thirteenth Annual Power Electronics Conference and Exposition, vol. 1, pp. 145-150 (Feb. 15-19, 1988). ISBN 0-7803-4340-9.

Casey, Leo Francis, "Circuit Design For 1-10 MHZ DC-DC Conversion," MIT Doctoral Thesis, Jan. 1989, pp. 1-216.

Ferencz, Andrew, "A 250 W High Density Point-of-Load Converter," MIT Master of Science Thesis, Sep. 1989, pp. 1-117.

Mohandes, Bijan, MOSFET Synchronous Rectifiers Achieve 90% Efficiency—Part I and Part II, PCIM, Jun. 1991, pp. 10-13 & 55-61.

Cobos, J.A., et al., "Resonant Reset Forward Topologies for Low Output Voltage On Board Converters," IEEE, 1994, pp. 703-708.

Tabisz, W.A., et al., "A MOSFET Resonant Synchronous Rectifier for High-Frequency DC/DC Converters," Proceedings of the Power Electronics Specialists Conference, San Antonio, TX, Jun. 10-15, 1990, pp. 769-779.

Wiegman, H.L.N., et al., "A Dual Active Bridge SMPS Using Synchronous Rectifiers," HFPC May 1990 Proceedings, pp. 336-346.

Shoyama, Masahito, et al., "Zero-Voltage-Switching Realized by Magnetizing Current of Transformer in Push-Pull Current-Fed DC-DC Converter," IEEE, 1993, pp. 178-184.

Shoyama, Masahito, et al., "Zero-Voltage-Switched Push-Pull DC-DC Converter," IEEE, 1991,pp. 223-229.

Xiao, Li, et al, "Soft Switched PWM DC/DC Converter With Synchronous Rectifiers," IEEE 1996, pp. 476-484.

Blanchard, Richard, et al., "The Design of a High Efficiency, Low Voltage Power Supply Using MOSFET Synchronous Rectification and Current Mode Control," IEEE, 1985, pp. 355-361.

Jitaru, Ionel Dan, et al, "High Efficiency DC-DC Converter," IEEE, 1994, pp. 638-644.

Harper, D.J., et al., "Controlled Synchronous Rectifier," HFPC May 1988 Proceedings, pp. 165-172.

Acker, Brian, et al., "Current-Controlled Synchronous Rectification," IEEE 1994, pp. 185-191.

Murakami, Naoki, et al., "A High-Efficiency 30-W Board Mounted Power Supply Module," IEEE 1991, pp. 122-127.

Casey, Leo F., et al., "A High Frequency, Low Volume, Point-of-Load Power Supply for Distributed Power Systems," IEEE 1987, pp. 439-450.

Schlecht, Martin F., "Research Results from the Study of A High Efficiency, Highly Manufacturable DC-DC Converter," unpublished, pp. 1-32.

Gachora, John Mburu, "Design of a Four-Phase Switchmode High Efficiency Power Supply," MIT Master of Engineering Thesis, 1994, pp. 1-66.

Blanchard R., et al., "MOSFETs Move In On Low Voltage Rectification," Official Proceedings of the Ninth International PCI '84 Conference, Oct. 29-31, 1984, pp. 213-222.

Garcia, O. et al., "Zero Voltage Switching In The PWM Half Bridge Topology With Complementary Control And Synchronous Rectification," Record of the Annual Power Electronics Specialist Conference, Pesc, Atlanta, Jun. 12-15, 1995, vol. 1, No. CONF. 26, Jun. 12, 1995, IEEE, pp. 286-291.

Mweene, L. Haachitaba, et al., "A High-Efficiency 1.5kW, 390-50 V Half-Bridge Converter Operated at 100% Duty-Ratio,"IEEE, 1992, pp. 723-730.

Mweene, Loveday Haachitaba, "The Design of Front-End DC-DC Converters of Distributed Power Supply Systems with Improved Efficiency and Stability," Thesis, Massachusetts Institute of Technology, Sep. 1992, pp. 1-184.

* cited by examiner



FIG. 1

FIG. 2



FIG. 3

FIG. 4



FIG. 5



FIG. 6A

FIG. 6B



## FIG. 7



## FIG. 8



FIG. 9



FIG. 10

Appx00076

US 7,564,702 B2

1

# HIGH EFFICIENCY POWER CONVERTER

## RELATED APPLICATIONS

This application is a continuation of application Ser. No. 11/390,494, filed Mar. 27, 2006, issuing as U.S. Pat. No. 7,272,023 on Sep. 18, 2007, which is a continuation of application Ser. No. 10/812,314, filed on Mar. 29, 2004, now U.S. Pat. No. 7,072,190, which is a continuation of application Ser. No. 10/359,457, filed Feb. 5, 2003, now U.S. Pat. No. 6,731, 520, which is a continuation of application Ser. No. 09/821, 655, filed Mar. 29, 2001, now U.S. Pat. No. 6,594,159, which is a divisional of application Ser. No. 09/417,867, filed Oct. 13, 1999, now U.S. Pat. No. 6,222,742, which is a divisional of Ser. No. 09/012,475, filed Jan. 23, 1998, now U.S. Pat. No. 5,999,417, which claims the benefit of U.S. Provisional Application 60/036,245 filed Jan. 24, 1997.

The entire teachings of the above applications are incorporated herein by reference.

## BACKGROUND OF THE INVENTION

This invention pertains to switching power converters. A specific example of a power converter is a DDC power supply that draws 100 watts of power from a 48 volt DC source and converts it to a 5 volt DC output to drive logic circuitry. The nominal values and ranges of the input and output voltages, as well as the maximum power handling capability of the converter, depend on the application.

It is common today for switching power supplies to have a switching frequency of 100 kHz or higher. Such a high switching frequency permits the capacitors, inductors, and transformers in the converter to be physically small. The reduction in the overall volume of the converter that results is desirable to the users of such supplies.

Another important attribute of a power supply is its efficiency. The higher the efficiency, the less heat that is dissipated within the supply, and the less design effort, volume, weight, and cost that must be devoted to remove this heat. A higher efficiency is therefore also desirable to the users of these supplies.

A significant fraction of the energy dissipated in a power supply is due to the on-state (or conduction) loss of the diodes used, particularly if the load and/or source voltages are low (e.g. 3.3, 5, or 12 volts). In order to reduce this conduction loss, the diodes are sometimes replaced with transistors whose on-state voltages are much smaller. These transistors, called synchronous rectifiers, are typically power MOSFETs for converters switching in the 100 kHz and higher range.

The use of transistors as synchronous rectifiers in high switching frequency converters presents several technical challenges. One is the need to provide properly timed drives to the control terminals of these transistors. This task is made more complicated when the converter provides electrical isolation between its input and output because the synchronous rectifier drives are then isolated from the drives of the main, primary side transistors. Another challenge is the need to minimize losses during the switch transitions of the synchronous rectifiers. An important portion of these switching losses is due to the need to charge and discharge the parasitic capacitances of the transistors, the parasitic inductances of interconnections, and the leakage inductance of transformer windings.

## SUMMARY OF THE INVENTION

Various approaches to addressing these technical challenges have been presented in the prior art, but further

2

improvements are needed. In response to this need, a new power circuit topology designed to work with synchronous rectifiers in a manner that better addresses the challenges is presented here.

In preferred embodiments of the invention, a power converter comprises a power source and a primary transformer winding circuit having at least one primary winding connected to the source. A secondary transformer winding circuit has at least one secondary winding coupled to the at least one primary winding. Plural controlled rectifiers, such as voltage controlled field effect transistors, each having a parallel uncontrolled rectifier, are connected to a secondary winding. Each controlled rectifier is turned on and off in synchronization with the voltage waveform across a primary winding to provide an output. Each primary winding has a voltage waveform with a fixed duty cycle and transition times which are short relative to the on-state and off-state times of the controlled rectifiers. A regulator regulates the output while the fixed duty cycle is maintained.

In the preferred embodiments, first and second primary transformer windings are connected to the source and first and second primary switches are connected in series with the first and second primary windings, respectively. First and second secondary transformer windings are coupled to the first and second primary windings, respectively. First and second controlled rectifiers, each having a parallel uncontrolled rectifier, are in series with the first and second secondary windings, respectively. A controller turns on the first and second primary switches in opposition, each for approximately one half of the switching cycle with transition times which are short relative to the on-state and off-state times of the first and second controlled rectifiers. The first and second controlled rectifiers are controlled to be on at substantially the same times that the first and second primary switches, respectively, are on.

In a system embodying the invention, energy may be nearly losslessly delivered to and recovered from capacitors associated with the controlled rectifiers during their transition times.

In the preferred embodiments, the first primary and secondary transformer windings and the second primary and secondary transformer windings are on separate uncoupled transformers, but the two primary windings and two secondary windings may be coupled on a single transformer.

Preferably, each controlled rectifier is turned on and off by a signal applied to a control terminal relative to a reference terminal of the controlled rectifier, and the reference terminals of the controlled rectifiers are connected to a common node. Further, the signal that controls each controlled rectifier is derived from the voltage at the connection between the other controlled rectifier and its associated secondary winding.

Regulation may be through a separate regulation stage which in one form is on the primary side of the converter as part of the power source. Power conversion may then be regulated in response to a variable sensed on the primary side of the converter. Alternatively, the regulator may be a regulation stage on the secondary side of the converter, and power conversion may be regulated by control of the controlled rectifiers. Specifically, the on-state voltage of a controlled rectifier may be made larger than its minimum value to provide regulation, or the on-state duration of a controlled rectifier may be shorter than its maximum value to provide regulation.

The preferred systems include reset circuits associated with transformers for flow of magnetizing current. The energy stored in the magnetizing inductance may be recov-

US 7,564,702 B2

3

ered. In one form, the reset circuit comprises a tertiary transformer winding, and in another form it comprises a clamp.

In preferred embodiments, the power source has a current fed output, the current fed output characteristic of the power source being provided by an inductor. Alternatively, the power source may have a voltage-fed output where the voltage-fed output characteristic of the power source is provided by a capacitor. In either case, the characteristics may alternatively be provided by active circuitry.

With the preferred current-fed output, the primary switches are both turned on during overlapping periods, and the overlapping periods may be selected to achieve maximum efficiency. With the voltage-fed output, the primary switches are both turned off during overlapping periods. Additional leakage or parasitic inductance may be added to the circuit to accommodate an overlap period.

In one embodiment, a signal controlling a controlled rectifier is derived with a capacitive divider circuit. A circuit may determine the DC component of the signal controlling the controlled rectifier, and the DC component of the signal may be adjusted to provide regulation.

In accordance with another aspect of the invention, an ORing controlled rectifier connects the converter's output to an output bus to which multiple converter outputs are coupled, and the ORing controlled rectifier is turned off if the power source fails. Preferably, the signal controlling the ORing controlled rectifier is derived from one or more secondary windings. The ORing controlled rectifier is turned on when the converter's output voltage approximately matches the bus voltage.

BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing and other objects, features and advantages of the invention will be apparent from the following more particular description of preferred embodiments of the invention, as illustrated in the accompanying drawings in which like reference characters refer to the same parts throughout the different views. The drawings are not necessarily to scale, emphasis instead being placed upon illustrating the principles of the invention.

FIG. 1 is a block diagram illustrating a preferred embodiment of the invention.

FIG. 2 is a schematic of an embodiment of the invention with synchronous rectifiers replaced by diodes.

FIG. 3 is an illustration of a preferred embodiment of the invention with the controlled rectifiers and parallel uncontrolled rectifiers illustrated.

FIG. 4 illustrates an alternative location of the synchronous rectifiers in the circuit of FIG. 3.

FIG. 5 illustrates the circuit of FIG. 3 with important parasitic capacitances and inductances illustrated.

FIG. 6A illustrates another embodiment of the invention with the tertiary winding connected to the primary side.

FIG. 6B illustrates another embodiment of the invention with a voltage fed isolation stage.

FIG. 7 illustrates a secondary circuit having capacitive dividers to divide the voltages applied to the control terminals of the controlled rectifiers.

FIG. 8 shows an alternative embodiment in which the output is regulated by controlling the voltage applied to the control terminals of the controlled rectifiers.

FIG. 9 illustrates an embodiment of the invention in which the primary windings are tightly coupled.

4

FIG. 10 illustrates the use of an ORing controlled rectifier to couple the power converter to an output bus.

DETAILED DESCRIPTION OF THE INVENTION

A description of preferred embodiments of the invention follows.

One embodiment of the invention described herein pertains to an electrically isolated DDC converter that might be used to deliver power at a low DC voltage (e.g. 5 volts) from a DC source such as a battery or a rectified utility. In such a converter a transformer is used to provide the electrical isolation and to provide a step-down (or step-up) in voltage level according to its turns-ratio. Switches in the form of power semiconductor transistors and diodes are used in conjunction with capacitors and inductors to create the conversion. A control circuit is typically included to provide the drive signals to the transistors' control terminals.

When the switching frequency is high (e.g. 100 kHz and above) it is typical today to use power MOSFETs and Schottky diodes for the converter's switches since these majority carrier devices can undergo faster switch transitions than minority carrier devices such as power bipolar transistors and bipolar diodes.

Most DDC converters are designed to provide regulation of their output voltage in the face of input voltage and output current variations. For example, a converter might need to maintain a 5 volt output (plus or minus a few percent) as its input varies over the range of 36 to 75 volts and its output current ranges from 1 to 25 amps. This ability to provide regulation is usually the result of the power circuit's topology and the manner in which its switching devices are controlled. Sometimes the regulation function is supplied by (or augmented with) a linear regulator.

FIG. 1 shows a block diagram of a DDC converter that represents one embodiment of the invention. It shows a two stage converter structure where the power first flows through one stage and then through the next. One stage provides the regulation function and the other provides the electrical isolation and/or step-down (or step-up) function. In this embodiment the regulation stage is situated before the isolation stage, but this ordering is not necessary for the invention. Notice also that the block diagram shows a control function. As mentioned, the purpose of this control function is to determine when the transistors in the power circuit will be turned on and off (or to determine the drive of a linear regulator). To aid in this function the control circuit typically senses voltages and currents at the input, at the output, and/or within the power circuit.

FIG. 2 shows one way to implement the two power stages represented in the block diagram of FIG. 1. In this figure diodes, rather than synchronous rectifiers, are used to simplify the initial description of the circuit's operation. The topology of the regulation stage is that of a "down converter". This canonical switching cell has a capacitor, $C_{IN}$, a transistor, $Q_R$, a diode, $D_R$, and an inductor, L. Regulation is by control of the duty cycle of the transistor $Q_R$ in response to one or more parameters sensed in the circuit. In a well known manner the regulation stage can be modified by providing higher order filters at its input and output, by replacing the diode with a synchronous rectifier, by adding resonant elements to create a "multi-resonant" converter and the like.

The topology of the isolation stage shown in FIG. 2 has two transformers that are not, in this case, coupled. Each of these transformers T1 and T2 has three windings: a primary winding $T1_{PRI}$, $T2_{PRI}$; a secondary winding $T1_{SEC}$, $T2_{SEC}$; and a tertiary winding $T1_{TER}$, $T2_{TER}$. The transformer windings are

5

connected through MOSFETs Q1 and Q2 on the primary windings and through diodes D1, D2, D3, and D4 on the secondary and tertiary windings. The stage is "current-fed", in this case by the inductor L from the output of the regulation stage. By this it is meant that the current flowing into the primary side of the isolation stage is held relatively constant over the time frame of the switching cycle. It also means that the voltage across the primary side of the isolation stage is free to have large, high frequency components. The output filter is simply a capacitor $C_{OUT}$ whose voltage is relatively constant over the time frame of the switching cycle. Additional filtering stages could be added to this output filter in a known manner.

The operation of the isolation stage proceeds in the following manner. First, for approximately one half of the switching cycle, transistor Q1 is on and Q2 is off. The current flowing through inductor L therefore flows through the primary winding of transformer T1, and a corresponding current (transformed by the turns ratio) flows through the secondary winding of T1 and through diode D1 to the output filter capacitor $C_{OUT}$ and the load. During this time the magnetizing current in T1 is increasing due to the positive voltage placed across its windings. This positive voltage is determined by the output capacitor voltage, $V_{OUT}$, plus the forward voltage drop of D1.

During the second half of the switching cycle, transistor Q2 and diode D2 are on and Q1 and D1 are off. While the current of inductor L flows through transformer T2 in the same manner as described above for T1, the magnetizing current of transformer T1 flows through its tertiary winding and diode D3 to the output filter capacitor, $C_{OUT}$. This arrangement of the tertiary winding provides a means to reset the T1 transformer core with a negative voltage and to recover most of the magnetizing inductance energy. The tertiary winding may alternatively be connected to other suitable points in the power circuit, including those on the primary side of the transformer.

Other techniques for resetting the core and/or for recovering the magnetizing energy are known in the art and may be used here. In particular, the tertiary winding could be eliminated and replaced with a conventional clamp circuit attached to either the primary or secondary winding and designed to impose a negative voltage across the transformer during its operative half cycle. Techniques to recover the energy delivered to this clamp circuit, such as the one in which a transistor is placed in anti-parallel with a clamping diode so that energy can flow from the clamping circuitry back into the magnetizing inductance, could also be used.

Notice that because the isolation stage of FIG. 2 is fed by an inductor (L), it is important to make sure there is at least one path through which the current in this inductor can flow. At the transitions between each half cycle, it is therefore typical to turn on the new primary side transistor (say Q2) before turning off the old primary side transistor (say Q1). The time when both transistors are on will be referred to as an overlap interval.

In a conventional current-fed push-pull topology where all the transformer windings are coupled on a single core, turning on both primary-side transistors will cause the voltage across the transformer windings to drop to zero, the output diodes to turn off, and the power to stop flowing through the isolation stage.

Here, however, since two separate, uncoupled transformers are used, the voltage across the transformer windings does not have to collapse to zero when both Q1 and Q2 are on. Instead, both of the output diodes D1 and D2 turn on, both transformers have a voltage across them determined by the output voltage, and the current of inductor L splits (not necessarily

6

equally) between the two halves of the isolation stage. The power flow through the isolation stage is therefore not interrupted (except to charge/discharge parasitic capacitances and inductances). This means the output filter ($C_{OUT}$) can be made much smaller and simpler than would otherwise be necessary. It also means that the isolation stage does not impose a large fundamental frequency voltage ripple across the inductor (L) which provides its current-fed input characteristic.

After an appropriate amount of overlap time has elapsed, the old primary side transistor (say Q1) is turned off. The voltage across this transistor rises as its parasitic capacitance is charged by the current that had been flowing through the channel. Once this voltage rises high enough to forward bias diode D3 connected to the tertiary winding, the transistor voltage becomes clamped, although an over-ring and/or a commutation interval will occur due to parasitic leakage inductance. Eventually, all of the current in inductor L will flow through switch Q2, switch Q1 will be off, and the magnetizing current of T1 will flow through diode D3.

Now replace output diodes D1 and D2 with MOSFET synchronous rectifiers Q3 and Q4, as shown in FIG. 3. Note that in this and later figures, the body diode of the MOSFET synchronous rectifier is explicitly shown since it plays a role in the circuit's operation. More generally, the schematical drawings of Q3 and Q4 depict the need for a controlled rectifier (e.g. a transistor) and an uncontrolled rectifier (e.g. a diode) connected in parallel. These two devices may be monolithically integrated, as they are for power MOSFETs, or they may be separate components. The positions of these synchronous rectifiers in the circuit are slightly different than the positions of the diodes in FIG. 2. They are still in series with their respective secondary windings, but are connected to the minus output terminal rather than the positive output terminal. This is done to have the sources of both N-channel MOSFETs connected to a single, DC node. If P-channel MOSFETs are to be used, their position in the circuit would be as shown in the partial schematic of FIG. 4. This position permits the P-channel devices to also have their sources connected to a single, DC node.

As shown in FIG. 3, the gates of the synchronous rectifier MOSFETs are cross-coupled to the opposite transformers. With this connection, the voltage across one transformer determines the gate voltage, and therefore the conduction state (on or off) of the MOSFET connected to the other transformer, and vice versa. These connections therefore provide properly timed drives to the gates of the MOSFETs without the need for special secondary side control circuitry.

For instance, during the half cycle in which transistor Q1 is turned on and transistor Q2 is off, the current of inductor L flows into the primary of T1 and out its secondary. This secondary side current will flow through transistor Q3 (note that even if Q3's channel is not turned on, the secondary side current will flow through the transistor's internal anti-parallel body diode). The voltage across transformer T1's secondary winding is therefore positive, and equal to the output voltage $V_{OUT}$ plus the voltage drop across Q3. The voltage across T2's secondary winding is negative during this time, with a magnitude approximately equal to the output voltage if the magnetizing inductance reset circuitry takes approximately the whole half cycle to finish its reset function. (The negative secondary winding voltage may be made greater than the positive voltage so that the core will finish its reset before the next half cycle begins. This could be accomplished, for example, by using less turns on the tertiary winding.)

Referring to FIG. 3, the voltage at node A during this state of operation is nearly zero with respect to the indicated sec-

US 7,564,702 B2

7

ondary-side ground node (actually the voltage is slightly negative due to the drop across Q3). The voltage at node B, on the other hand, is, following our example, approximately twice the output voltage (say 10 volts for a 5 volt output). Given the way these nodes are connected to the synchronous rectifier transistors, Q3 is turned on and Q4 is turned off. These respective conduction states are consistent with transformer T1 delivering the power and transformer T2 being reset.

In the second half-cycle when Q2 is on and Q1 is off, the voltage at node B will be nearly zero (causing Q3 to be off) and the voltage at node A will be approximately twice the output voltage (causing Q4 to be on).

During the transition from one half-cycle to the next, the sequence of operation is as follows. Start with Q1 and Q3 on, Q2 and Q4 off. (The clamp circuit's diode D4 may still be on, or it may have stopped conducting at this point if the magnetizing inductance has finished resetting to zero.) First, Q2 is turned on. If we ignore the effects of parasitic capacitances and inductances, the voltage across T2 steps from a negative value to a positive value. The current flowing through inductor L splits between the two primary windings, causing current to flow out of both secondary windings. These secondary currents flow through Q3 and Q4. Since the voltages at both node A and node B are now nearly zero, Q3, which was on, will now be off, and Q4 will remain off (or more precisely, the channels of these two devices are off). The secondary side currents therefore flow through the body diodes of Q3 and Q4.

At the end of the overlap interval, Q1 is turned off. The current stops flowing through transformer T1, the body diode of Q3 turns off, and the voltage at node A rises from nearly zero to approximately twice the output voltage as T1 begins its reset half-cycle. With node A voltage high, the channel of transistor Q4 turns on, and the secondary side current of transformer T2 commutates from the body diode of Q4 to its channel.

Notice that during the overlap interval, the secondary side currents flow through the body diodes of transistors Q3 and Q4, not their channels. Since these diodes have a high on-state voltage (about 0.9V) compared to the on-state voltage of the channel when the gate-source voltage is high, a much higher power dissipation occurs during this interval. It is therefore desirable to keep the overlap interval short compared to the period of the cycle.

Notice also the benefit of using two, uncoupled transformers. The voltage across a first transformer can be changed, causing the channel of the MOSFET synchronous rectifier transistor connected to a second transformer to be turned off, before the voltage across the second transformer is made to change. This could not be done if both primary and both secondary windings were tightly coupled in the same transformer, since the voltages across all the windings would have to change together.

FIG. 5 shows the same topology as FIG. 3, but with several important parasitic capacitances and inductances indicated schematically. Each indicated capacitor (C3 and C4) represents the combined effect of one synchronous rectifier's input capacitance and the other rectifier's output capacitance, as well as other parasitic capacitances. Each indicated inductor ($L_{P1}$ and $L_{P2}$) represents the combined effect of a transformer leakage inductance and the parasitic inductance associated with the loops formed by the primary side components and the secondary side components. These elements store significant energy that is dissipated each switching cycle in many prior art power circuits where diodes are replaced with synchronous rectifiers. Here, however, the energy stored in these parasitic components is nearly losslessly delivered to and

8

recovered from them. By nearly lossless it is meant that no more than approximately 30% of the energy is dissipated. With one implementation of the present invention, less than 10% dissipation is obtained.

The nearly lossless delivery and recovery of energy is achieved because the circuit topology permits the synchronous rectifier switch transitions to proceed as oscillations between inductors and capacitors. These transitions are short compared to the overall on-state and off-state portions of the switching cycle (e.g. less than 20% of the time is taken up by the transition). This characteristic of nearly lossless and relatively short transitions, which we will call soft switching, is distinct from that used in full resonant, quasi-resonant, or multi-resonant converters where the oscillations last for a large portion, if not all, of the on-state and/or off-state time.

The way in which the soft-switching characteristic is achieved can be understood in the following manner. Start with transistors Q1 and Q3 on, Q2 and Q4 off. The voltage at node A, and therefore the voltage across C4, is nearly zero and the voltage at node B (and across C3) is approximately twice the output voltage. The current flowing through inductor L, $I_L$, is flowing into the primary winding of T1. The current flowing out of the secondary winding of T1 is IL minus the current flowing in T1's magnetizing inductance, $I_M$, both referenced to the secondary side. The magnetizing current is increasing towards its maximum value, $I_{MPK}$, which it reaches at the end of the half cycle.

When Q2 is turned on at the end of the half cycle, the voltage across both windings of both transformers steps to zero volts in the circuit model depicted in FIG. 5. An L oscillatory ring ensues between capacitor C3 and the series combination of the two parasitic inductances, $L_{P1}$ and $L_{P2}$. If we assume the parasitic capacitances and inductances are linear, the voltage across C3 decreases cosinusoidally toward zero while the current flowing out of the dotted end of T2's secondary winding, $I_{LP2}$, builds up sinusoidally toward a peak determined by the initial voltage across C3 divided by the characteristic impedance

$$\sqrt{\frac{L_{P1} + L_{P2}}{C_3}}.$$

Note that the current flowing out of the dotted end of T1's secondary winding, $I_{LP1}$, decreases by the same amount that $I_{LP2}$ increases such that the sum of the two currents is ($I_L$ − $I_{MPK}$), referenced to the secondary side. Also note that during this part of the transition, the voltages across both transformers' secondary windings will be approximately the output voltage minus half the voltage across C3. As the oscillation ensues, therefore, the transformer winding voltages, which started at zero, build up toward the output voltage.

The oscillation described above will continue until either the current $I_{LP2}$ reaches ($I_L$−$I_{MPK}$) or the voltages across C3 reaches zero. The first scenario occurs for lower values of ($I_L$−$I_{MPK}$) and the second occurs for higher values of this current.

If $I_{LP2}$ reaches ($I_L$−$I_{MPK}$) first (and assuming the voltage across C3 has fallen below the threshold voltage of Q3 so that $I_{LP1}$ is flowing through the body diode of Q3), the oscillation stops because the body diode will not let $I_{LP1}$ go negative. $I_{LP2}$ and $I_{LP1}$ will hold constant at ($I_L$−$I_{MPK}$) and zero, respectively. Whatever voltage remains across C3 will then discharge linearly due to the current $I_{LP2}$ until the body diode of Q4 turns on. The body diode will then carry $I_{LP2}$ until the overlap interval is over and Q1 is turned off.

US 7,564,702 B2

When Q1 is turned off, the magnetizing current $I_{MPK}$ will charge the parallel capacitance of C4 and C1, the parasitic output capacitance of Q1, until the voltage across them is high enough to forward bias the clamping diode D3. At this point the reset portion of T1's cycle commences.

Notice that for this first scenario, the complete transition is accomplished with portions of oscillatory rings that, to first order, are lossless. (Some loss does occur due to parasitic series resistance, but this is generally less than 20% of the total energy and typically around 5%.) It could be said that the energy that had been stored in LP1 has been transferred to $L_{P2}$, and that the energy that had been stored in C3 has been transferred to C4.

If, on the other hand, the voltage across C3 reaches zero (or, more precisely, a diode drop negative) first, then the body diode of Q4 will turn on and prevent this voltage from ringing further negative. The currents $I_{LP1}$ and $I_{LP2}$ (which are flowing through the body diodes of Q3 and Q4) will hold constant until the overlap interval is over and Q1 is turned off.

Once Q1 is turned off, an oscillation ensues between $L_{P1}$ and C1. This oscillation is driven by the current remaining in LP1 when Q1 was turned off. Given typical parameter values, this oscillation will continue until $I_{LP1}$ reaches zero, at which point the body diode of Q3 will turn off. Finally, the magnetizing current $I_{MPK}$ charges up the parallel combination of C4 and C1 until the clamping diode D3 turns on to start the reset half-cycle.

Notice that for this second scenario, the transition is almost accomplished in a (to first order) lossless manner. Some loss does occur because in the final portion of the transition the voltages across C4 and C1 do not start out equal. C1 has already been partially charged whereas C4 is still at zero volts. As these capacitor voltages equalize, an energy will be lost. This lost energy is a small fraction (typically less than one third) of the energy stored in C1 before the equalization occurs. The energy stored in C1 equals the energy stored in $I_{LP1}$ when Q1 was turned off, which itself is a small fraction (typically less than one third) of the energy that was stored in this parasitic inductance when it was carrying the full load current, $(I_L–I_M)$. As such, the energy lost in this second scenario is a very small fraction (typically less than one ninth) of the total energy originally stored in (or delivered to) $L_{P1}$, $L_{P2}$, C3 and C4. In other words, most of the parasitic energy is recovered.

Note that since the second scenario has a small amount of loss, it may be desirable to avoid this scenario by adjusting component values. One approach would be to make C3 and C4 bigger by augmenting the parasitic capacitors with explicit capacitors placed in parallel. With large enough values it is possible to ensure that the first scenario described above holds true for the full range of load currents expected.

The descriptions given above for both scenarios must be modified to account for the nonlinear nature of capacitors C3, C4, and C1, and also to account for the reverse recovery charge of the body diodes of Q3 and Q4. The details of the nonlinear waveforms are too complex to be described here, but the goal of recovering most of the parasitic energy is still achieved.

As mentioned previously, it is desirable to keep the overlap period as short as possible to minimize the time that the secondary currents are flowing through the body diodes of Q3 and Q4. It is also desirable to allow the energy recovering transitions just described to reach completion. These two competing desires can be traded off to determine an optimum overlap duration. In general, it is desirable to make sure the new primary switch is turned on before the old one is turned off, and that the portion of the half-cycle during which the

uncontrolled rectifiers are conducting should, for efficiency sake, be less than 20%. Note that due to delays in the gate drive circuitry it is possible for the overlap interval to appear negative at some point in the control circuit.

The size of the output filter required to achieve a given output voltage ripple is affected by the AC ripple in the current of inductor L. This ripple current is largely caused by the switching action of the preregulation stage. A larger inductance, or a higher order filter for the output of the regulation stage, as shown in FIG. 6 where inductor LB and capacitor $C_B$ have been added, will reduce this ripple current.

The required size of the output filter is also affected by the AC ripple currents flowing in the magnetizing inductances of the transformers. Making these inductances as large as possible to reduce their ripple currents is therefore desirable. It is also beneficial to connect the tertiary reset windings back to a suitable point on the primary side as shown in FIG. 6A where they are connected to capacitor $C_B$, rather than to connect them to the output filter, as shown in FIG. 3. This alternative connection reduces by a factor of two the ripple current seen by the output filter due to the magnetizing inductance currents, compared to the connection shown in FIG. 3, since these magnetizing currents no longer flow to the output capacitor during their respective reset half cycles.

The power converter circuits described so far have all had an isolation stage that is current fed. It is also possible to incorporate the invention with an isolation stage that is voltage fed. By "voltage fed" it is meant that the voltage across the primary side of the isolation stage is held relatively constant over the time frame of the switching cycle. Such a converter circuit is shown in FIG. 6B where two uncoupled transformers are used.

The operation of the voltage-fed isolation stage is slightly different than for a current-fed isolation stage. Each primary transistor is still turned on for approximately one half the cycle, but instead of providing a brief overlap period during which both primary transistors, Q1 and Q2, are turned on together, here the primary transistors are both turned off for a brief overlap period.

During each half cycle, the current flowing into one primary winding and out its respective secondary winding can be determined as follows. Say transistors Q1 and Q3 have just been turned on to begin a new half cycle. At the completion of their switch transition they will be carrying some initial current (to be discussed in more detail below). There is also a difference between the voltage across capacitor $C_B$ and the voltage across capacitor $C_{OUT}$, both reflected to the secondary side. This voltage differential will be called $\Delta V$. It appears across the series circuit composed of the leakage/parasitic inductances and resistances of the primary and secondary windings, $T_{1PRI}$ and $T_{1SEC}$, the transistors Q1 and Q3, and the capacitors $C_B$ and $C_{OUT}$. The current flowing through this series L-R circuit responds to the voltage across it, $\Delta V$, in accordance with the component values, all referenced to the secondary side.

Since $C_B$ and $C_{OUT}$ are charged and discharged throughout the half cycle, $\Delta V$ will vary. But if we assume $\Delta V$ is relatively constant, then the current flowing through the series L-R circuit will change exponentially with an L/R time constant. If this time constant is long compared to the duration of the half cycle, then the current will have a linearly ramping shape. If the time constant is short, that the current will quickly reach a steady value determined by the resistance.

To understand the switch transitions that occur between each half cycle, consider the leakage/parasitic inductances, $L_{P1}$, and $L_{P2}$, and the capacitances associated with the controlled rectifiers, C3 and C4, to be modeled in the same way

US 7,564,702 B2

11

as was shown in FIG. 5. Assume Q2 and Q4 have been on and are carrying a final current level, $I_F$, at the end of the half cycle. Transistor Q1 is then turned on, causing the voltage $V_{CB}$ to be applied across primary winding T1$_{PRI}$, and its reflected value across secondary winding T1$_{SEC}$. An oscillation between C4 and $L_{P1}$, will ensue, with the voltage across C4 starting at approximately twice the output voltage. After approximately one quarter of a cycle of this oscillation, the voltage across C4 will attempt to go negative and be clamped by the body diode of Q3. At this point the current flowing through $L_{P1}$ will have reached a peak value, $I_S$, determined by approximately twice the output voltage divided by the characteristic impedance, $\sqrt{L_{P1}/C4}$. This transition discharges capacitor C4 and builds up the current in $L_{P1}$, to the value $I_S$ in a nearly lossless manner.

During the quarter cycle of oscillation the voltage across the gate of transistor Q4 will drop below the threshold value for the device, and the channel of Q4 will turn off. The current that had been flowing through the channel will commutate to the body diode of Q4.

At this point current if flowing through both transformers' secondary windings and through the body diodes of Q3 and Q4. Q3 is carrying the current $I_S$ and Q4 is carrying the current $I_F$. Now transistor Q2 is turned off and its voltage rises as parasitic capacitors is losslessly charged until the voltage is clamped by the diode in series with the tertiary windings, T2$_{TER}$. Inductor $L_{P2}$ now has a negative voltage across it and its current $I_{LP2}$, will therefore linearly ramp down to zero as its energy is recovered back to CB through the clamping circuit. Once this current reaches zero, the body diode of Q4 will turn off and the current will become negative, but only to the point where it equals the second transform's magnetizing current, $I_{MPK}$ (reflected to the secondary side). This current will linearly charge capacitor C3 nearly losslessly as energy is delivered to the capacitor from the magnetizing inductance of the second transformer (reflected to the secondary side). This current will linearly charge capacitor C3 nearly losslessly as energy is delivered to the capacitor from the magnetizing inductance of the second transformer.

As the voltage across C3 rises above the threshold value, transistor Q3 will turn on and the current that had been flowing through the body diode of Q3 will commutate to the channel of Q3. The new half cycle will then proceed as discussed above, with Is being the initial value of current mentioned in that discussion.

As with the current-fed isolation stage, the transition between the two half cycles has a period of time when the two body diodes are conducting. This condition is highly dissipative and should be kept short by keeping the overlap period that both primary side transistors, Q1 and Q2, are off short.

In all of the power converter circuits described above, it might be desirable to slow down the switch transitions in the isolation stage for many reasons. For instance, slower transitions might reduce the high frequency differential-mode and common-mode ripple components in the output voltage waveform. There are several ways the switch transitions might be slowed down. For instance, in a well known manner a resistor could be placed in series with the gate of the primary side transistor Q1 (or Q2) in FIG. 5 so that its gate voltage would change more slowly. Similarly, a resistor could be placed in series with the gate of a synchronous rectifier Q3 or (Q4). In either case an RC circuit is created by the added resistor, R, and the capacitance, C, associated with the transistor. If this RC product is longer compared to the normal length of the oscillatory transitions described above, the switch transitions will be slowed down.

12

If the length of the switch transitions are on the order of $\sqrt{(LC)}$ or longer, where L is the leakage/parasitic inductance ($L_{P1}$ and/or $L_{P2}$) that oscillates with the capacitor C4 (or C3), then the nearly lossless transitions described above will not be achieved. The more the switch transitions are slowed down, the more the energy delivered to and/or recovered from the capacitors associated with the controlled rectifiers will be dissipated. As such, there is a tradeoff between the power converter's efficiency and its other attributes, such as output ripple content. This tradeoff might result in slower switch transitions in situations where high efficiency is not required or if better synchronous rectifiers in the future have much smaller capacitances.

As discussed above, the synchronous rectifier MOSFETs Q3 and Q4 in the circuit of FIG. 3 are driven with a gate-source voltage equal to approximately twice the output voltage. For a 5 volt output, the 10 volt drive that results is appropriate for common MOSFETs. If the output voltage is such that the gate drive voltage is too large for the ratings of the MOSFET, however, steps must be taken to reduce the drive voltage. For example, if the output voltage is 15 volts, a 30 volt gate drive will result, and it is typically desired that the gate be driven to only 10 volts. Also, some MOSFETs are designed to be driven with only 5 volts, or less, at their gates.

FIG. 7 shows one way to reduce the drive voltage while maintaining the energy recovery feature. The voltage waveform at node B (or at node A) is capacitively divided down by the series combination of capacitors C5 and C3 (or by C6 and C4). The values of these capacitors are chosen to provide the division of the AC voltage provided at node B (or node A) as desired. For example, if node B has a 30 volt step change and a 10 volt step change is desired at the gate of Q3, then C5 should have one half the capacitance of C3. Since C3 may be comprised of the parasitic capacitance of Q3, it is likely to be nonlinear. In this case, an effective value of capacitance that relates the large scale change in charge to the large scale change in voltage should be used in the calculation to determine C5.

Since a capacitor divider only divides the AC components of a waveform, additional components need to be added to determine the DC component of the voltage applied to the gates of Q3 and Q4. FIG. 7 shows one way to do this in which two resistors, R1 and R2 (or R3 and R4), provide the correct division of the DC component of the voltage at node B (or node A). These resistors should have values large enough to keep their dissipation reasonably small. On the other hand, the resistors should be small enough such that the time constant of the combined capacitor/resistor divider is short enough to respond to transients such as start-up.

Other techniques employing diodes or zener diodes that are known in the art could be used instead of the resistor technique shown in FIG. 7.

One variation of the invention described herein would be to create a power supply with multiple outputs by having more than one secondary winding on each transformer in the isolation stage. For example, by using two secondary windings with the same number of turns it would be possible to create a positive 12 volt output and a negative 12 volt output. If the two secondary windings have a different number of turns it would be possible to create two output voltages of different magnitudes (e.g., 5 volts and 3.3 volts). Another approach for creating multiple outputs would be to have multiple isolation stages, each with a turns-ratio appropriate for their respective output voltages.

When multiple outputs are provided in this manner, a phenomenon commonly called cross-regulation occurs. A single regulation stage cannot control the various output voltages

13

independently, and these output voltages depend not just on the relative turns ratios, but also on the voltage drops that result as the various output currents flow through the impedances of their various output paths. A change in any one or more output currents therefore causes a change in the voltages of those outputs that are not used for feedback to the regulation stage. If this variation due to changes in output currents is a problem, then various approaches for providing regulation of the uncontrolled outputs can be provided. For example, a linear regulator might be added to each output that is not otherwise regulated.

One advantageous approach to providing linear regulation with the power circuits described here is to control how much the synchronous rectifier MOSFETs are turned on during their conduction state. This can be done by adding circuitry to limit the peak voltage to which their gates will be driven so that their on-state resistances can be made larger than their minimum values. It can also be done by controlling the portion of operative half cycle during which a MOSFET's gate voltage is allowed to be high so that the MOSFET's body diode conducts for the rest of the time. With both techniques, the amount to which the output voltage can be regulated is the difference between the voltage drop of the synchronous rectifiers when their channels are fully on (i.e., when they are at their minimum resistance) and when only their body diodes are carrying the current.

One way to accomplish the first technique, that of controlling the peak gate voltage, is to use the basic capacitor divider circuit that was shown in FIG. 7. All that is needed is to make the resistor divider ratio, (or, alternatively, the diode clamping voltage if such an approach is chosen) dependent on a control signal derived from the error in the output voltage compared to its desired value. The goal is to shift the DC component of the gate voltage in response to the error signal such that the peak voltage applied to the gate, and therefore the on-state resistance and voltage of the synchronous rectifier, helps to minimize this error. Various control circuitry schemes that might be used to achieve this goal will be obvious to one skilled in the art. Note that this approach preserves the energy recovery feature of the gate drive. Note also that if the voltages at nodes A and B are such that no AC division is desired, then C5 and C6 should be made large compared to C3 and C4.

FIG. 8 shows an alternative method to control the DC component of the gate voltage waveform. The output voltage (or a scaled version of it) is subtracted from a reference voltage and the error is multipled by the gain of an op-amp circuit. The output of the op-amp (node C) is then connected to the synchronous rectifier gates through resistors that are large enough to not significantly alter the AC waveforms at the gates. With this connection, the DC components of the gate voltages will equal the output voltage of the op-amp at node C. If the gain of the op-amp circuit is large enough, such as when an integrator is used, the error in the output voltage will be driven toward zero. $Z_F$ and $Z_I$ are impedances that should be chosen, with well established techniques, to ensure stability of this feedback loop while providing the gain desired.

The range of voltage required at the output of the op-amp depends on the particular application, and it may include negative values. This range influences the supply voltage requirements for the op-amp. Also, if the op-amp's output voltage gets too high, the synchronous rectifiers may not turn off when they are supposed to. Some means of limiting this voltage, such as a clamp circuit, may therefore be desirable.

One way to accomplish the second technique, that of controlling the portion of the half cycle in which the MOSFET is gated on, is to place a low power switch network between the

14

gate of Q3 (or Q4), node B (or node A), and ground. This network (composed, say, of analog switches operated with digital control signals) might be used to keep the gate voltage grounded for some period of time after the node voltage increases, and to then connect the gate to node B (or A) for the remainder of the half cycle with a switch capable of bidirectional current flow. The length of the delay would be based on a signal derived from the error in the output voltage. With this approach, the energy recovery feature associated with discharging each synchronous rectifier's gate capacitance is preserved, but the charging transition will become lossy. Alternatively, the switch network could be controlled to start out the half cycle with the gate connected to node B (or A), and then after some delay to connect the gate to ground.

Using a synchronous rectifier to provide regulation as well as rectification, as described above, is not limited to multiple-output situations. It can also be used in single-output situations either as the total regulation stage or as an additional regulation stage to augment the first one.

It is also possible to use DDC switching regulators on the secondary side to achieve the additional regulation desired, or to create more than one output voltage from any of the outputs of the isolation stage.

With multiple outputs it is not necessary for the gate of each controlled rectifier to be connected to secondary winding of the other transformer which corresponds to the same output. For instance, if the two outputs are 5 volts and 3.3 volts, the gates of the 3.3 volts output controlled rectifiers could be connected to the 5 volt output secondary windings. Doing so would give these controlled rectifiers a 10 volt gate drive, resulting in a lower on-state resistance than if they had a 6.6 volt gate drive.

In some situations, it may be desirable to place the isolation stage first in the power flow, and to have the regulation stage follow. For example, when there are many outputs sharing the total power, the circuit might be configured as one isolation/ step-down (or step-up) stage followed by several DDC switching or linear regulators.

No matter where the isolation stage is situated, if it is to be current fed this requirement could be met with active circuitry as well as by a passive component such as an inductor. For instance, if the current fed isolation stage follows a regulation stage that is achieved with a linear regulator, then this linear regulator could be designed to have a large AC output impedance to achieve the input requirement of the current fed isolation stage.

When the regulation stage precedes the isolation stage, it is not necessary to sense the isolated output voltage to control the regulation. An alternative approach is to sense the voltage on the primary side of the isolation stage, which may eliminate the need for secondary side circuitry and the need to bridge the feedback control signal across the isolation barrier.

For example, in FIG. 6 the voltage across $C_B$, the capacitor of the third-order output filter of the down converter, could be used. This voltage nearly represents the isolated output voltage (corrected for the turns-ratio). It differs only due to the resistive (and parasitic inductance commutation) drops between $C_B$ and the output. Since these drops are small and proportional to the current flowing through the isolation stage, the error in output voltage they create can either be tolerated or corrected.

To correct the error, the current on the primary side could be sensed, multiplied by an appropriate gain, and the result used to modify the reference voltage to which the voltage across $C_B$ is compared. Since these resistive drops vary with temperature, it might also be desirable to include temperature compensation in the control circuitry. Note that this approach

US 7,564,702 B2

15                                                                 16

could also be used to correct for resistive drops along the leads connecting the supply's output to its load.

The embodiments of the invention described above have used two uncoupled transformers for the isolation stage. It is also possible, as shown in FIG. **9**, to use a single transformer T in which, for example, there are two primary windings $T_{PRI1}$, $T_{PRI2}$ and two secondary windings, $T_{SEC1}$, $T_{SEC2}$. While the two primary windings may be tightly coupled, either the two secondaries should be loosely coupled to each other or the connections to the output capacitors and synchronous rectifier transistors should provide adequate parasitic inductance. The resulting leakage and parasitic inductance on the secondary side can then be modeled as is shown in FIG. **9**.

With this inductance present in the secondary side loops, the operation of the coupled isolation stage during the overlap period is similar to what was described above for the uncoupled case. With Q1 and Q3 on, turn Q2 on. The voltage across the transformer windings, as modeled in FIG. **9**, drops to zero, which is consistent with what must happen if the primary windings are tightly coupled. A nearly-lossless energy saving transition involving inductor/capacitor oscillations and linear discharges then ensues.

What is different here is that the overlap period during which both Q1 and Q2 are on cannot last too long. If the overlap lasts too long, the transient waveforms will settle into a state where the voltages at nodes A and B rise to the output voltage. If this voltage is higher than the gates' threshold levels, transistors Q3 and Q4 will partially turn on. A large amount of energy will then be dissipated while this state persists, and it is possible for the output capacitor to be significantly discharged.

These problems can be avoided by making sure the overlap period when both Q1 and Q2 are on does not last too long. For a given converter, an overlap period can be found which will give the highest converter efficiency. The more leakage/parasitic inductance there is, the longer an overlap period that can be tolerated. Based on the overlap time provided by a given control circuit, it may become necessary to add additional inductance by increasing the leakage or parasitic inductance.

With a coupled transformer it is not necessary to provide a separate reset circuit (whether it uses a tertiary winding or not) since the magnetizing current always has a path through which it can flow. With a coupled transformer it is necessary to keep the lengths of the two halves of the cycle well balanced to avoid imposing an average voltage across the core and driving it into saturation. Several techniques for balancing the two half cycles are well known in the art.

When two or more power supplies are connected in parallel, diodes are sometimes placed in series with each supply's output to avoid a situation where one supply's failure, seen as a short at its output, takes down the entire output bus. These "ORing" diodes typically dissipate a significant amount of energy. One way to reduce this dissipation is to replace the diode with a MOSFET having a lower on-state voltage. This "ORing" synchronous rectifier MOSFET can be placed in either output lead, with its body diode pointing in the direction of the output current flow.

With the invention described here, the voltage for driving the gate of this MOSFET, Q5, can be derived by connecting diodes to node A and/or node B (or to nodes of capacitor dividers connected to these nodes), as shown in FIG. **10**. These diodes rectify the switching waveforms at node A and/or node B to give a constant voltage suitable for turning on the ORing MOSFET at node D. A filter capacitor, CF, might be added to the circuit as shown in the figure, or the

parasitic input capacitance of the ORing MOSFET might be used alone. A resistor $R_F$ ensures the gate voltage discharges when the drive is removed.

If the power supply fails in a way that creates a short at its output, such as when a synchronous rectifier shorts, the voltages at nodes A and B will also be shorted after the transient is complete. With its gate drive no longer supplied, the ORing MOSFET will turn off, and the failed supply will be disconnected from the output bus.

When two (or more) power supplies of the type described here are placed in parallel, a problem can arise. If one power supply is turned on while another is left off (i.e. not switching), the output bus voltage generated by the first supply will appear at the gates of the second supply's synchronous rectifiers. Once this voltage rises above the threshold value, these synchronous rectifiers will turn on and draw current. At the least this will result in extra dissipation, but it could result in a shorted output bus. This problem can occur even if both supplies are turned on and off together if one supply's transition "gets ahead" of the other.

There are several approaches to solving this problem. One is to make sure both supplies have matched transitions. Another is to connect the supplies together with ORing diodes so that no supply can draw current from the combined output bus. If an ORing MOSFET is used instead of an ORing diode, however, this second approach can still fail to solve the problem. For instance, consider the case where a supply drives its ORing MOSFET with the technique shown in FIG. **10**. Assume the bus voltage is already high due to another supply, and the first supply is then turned on in a way that causes its output voltage to rise slowly toward its desired value. If the ORing MOSFET's gate voltage rises high enough to turn it on before the newly rising output voltage approximately matches the existing bus voltage, then there will be at least a momentary large current flow as the two voltages equalize. To avoid this problem additional circuitry can be added to make sure an ORing MOSFET is not turned on until its supply's output voltage has approximately reached the bus voltage. This might be done by sensing the two voltages and taking appropriate action, or it might be done by providing a delay between when the ORing MOSFET's gate drive is made available and when it is actually applied to the gate. Such a delay should only affect the turn-on, however; the turn-off of the ORing MOSFET should have minimal delay so that the protective function of the transistor can be provided.

While this invention has been particularly shown and described with references to preferred embodiments thereof, it will be understood by those skilled in the art that various changes in form and details may be made therein without departing from the spirit and scope of the invention as defined by the appended claims. Those skilled in the art will recognize or be able to ascertain using no more than routine experimentation, many equivalents to the specific embodiments of the invention described specifically herein. Such equivalents are intended to be encompassed in the scope of the claims. For instance, the regulation stage could be composed of an up-converter. The ideas that have been presented in terms of the N-channel implementation of the synchronous rectifier MOSFET can be modified to apply to the P-channel implementation, as well. The components shown in the schematics of the figures (such as Q3 in FIG. **3**) could be implemented with several discrete parts connected in parallel. In addition, certain aspects of the invention could be applied to a power converter having only one primary transformer winding and/or one secondary transformer winding.

US 7,564,702 B2

17 18

I claim:

**1.** A DC-DC power converter system providing plural regulated DC outputs, each having a regulated voltage, comprising:

a) a DC input providing an input voltage that varies over a range that is more than plus or minus a few percent;

b) a non-regulating isolating step-down converter through which power from the DC input flows first before flowing through any regulation stage, the non-regulating isolating step-down converter providing a non-regulated, isolated DC output having a non-regulated voltage and comprising:

i) at least one transformer that is not driven into saturation, the at least one transformer having plural windings including at least one primary winding and at least one secondary winding;

ii) plural power MOSFET switches in circuit with the at least one primary winding, the plural power MOSFET switches causing power to flow into the at least one primary winding;

iii) control circuitry coupled to the plural MOSFET switches, the control circuitry determining when the power MOSFET switches are turned on and off in a switching cycle at a switching frequency; and

iv) plural controlled rectifiers in circuit with the at least one secondary winding, each having a parallel uncontrolled rectifier, each controlled rectifier being turned on for an on-state time and off for an off-state time in synchronization with a voltage waveform of the at least one primary winding to provide the non-regulated, isolated DC output, the voltage waveform of the at least one primary winding having a fixed duty cycle and transition times which are short relative to the on-state and the off-state times of the controlled rectifiers; and

c) plural non-isolating down-converter switching regulators, each receiving power from the non-regulated, isolated DC output and each providing one of the regulated DC outputs having a regulated voltage.

**2.** A DC-DC power converter system as claimed in claim **1** wherein the DC input is a rectified source of power.

**3.** A DC-DC power converter system as claimed in claim **2** wherein the switching cycle substantially comprises two substantial portions, a first portion and a second portion, a first controlled rectifier of the plural controlled rectifiers being conductive during the first portion of the switching cycle and a second controlled rectifier of the plural controlled rectifiers being conductive during the second portion of the switching cycle, there being a short time, during a transition between the portions, when the first controlled rectifier and the second controlled rectifier are both off and their corresponding uncontrolled rectifiers are both conducting.

**4.** A DC-DC power converter system as claimed in claim **3** further comprising a filter inductor directly connected to plural of the windings of the at least one transformer, all current that flows through the inductor flowing through a first of the plural windings during the first portion of the switching cycle and a second of the plural windings during the second portion of the switching cycle.

**5.** A DC-DC power converter system as claimed in claim **4** comprising multiple non-regulating isolating step-down converters providing plural non-regulated, isolated DC outputs, there being plural of the non-isolating down-converter switching regulators receiving power from one of the non-regulated, isolated DC outputs.

**6.** A DC-DC power converter system as claimed in claim **4** wherein the input voltage is within the range of 36-75 volts.

**7.** A DC-DC power converter system as claimed in claim **4** wherein the non-regulated voltage of the non-regulated, isolated DC output is associated with the input voltage according to a turns ratio of the at least one transformer.

**8.** A DC-DC power converter system as claimed in claim **4** wherein the non-regulated voltage of the non-regulated, isolated DC output drops with increasing current flow through the non-regulating isolating step-down converter.

**9.** A DC-DC power converter system as claimed in claim **4** wherein power flow through the non-regulating isolating step-down converter is substantially uninterrupted.

**10.** A DC-DC power converter system as claimed in claim **4** wherein each of the at least one transformer has only one primary winding.

**11.** A DC-DC power converter system as claimed in claim **2** wherein the switching cycle substantially comprises two substantial portions, a first portion and a second portion, and further comprising a filter inductor directly connected to plural of the windings of the at least one transformer, all current that flows through the inductor flowing through a first of the plural windings during the first portion of the switching cycle and a second of the plural windings during the second portion of the switching cycle.

**12.** A DC-DC power converter system as claimed in claim **1** wherein the switching cycle substantially comprises two substantial portions, a first portion and a second portion, a first controlled rectifier of the plural controlled rectifiers being conductive during the first portion of the switching cycle and a second controlled rectifier of the plural controlled rectifiers being conductive during the second portion of the switching cycle, there being a short time, during a transition between the portions, when the first controlled rectifier and the second controlled rectifier are both off and their corresponding uncontrolled rectifiers are both conducting.

**13.** A DC-DC power converter as claimed in claim **12** wherein the fixed duty cycle is approximately 50% of the switching cycle.

**14.** A DC-DC power converter system as claimed in claim **12** wherein the switching frequency is in the range of 100 kHz and above.

**15.** A DC-DC power converter system as claimed in claim **12** wherein the input voltage is within the range of 36-75 volts.

**16.** A DC-DC power converter system as claimed in claim **12** wherein the input voltage is about 48 volts.

**17.** A DC-DC power converter system as claimed in claim **12** wherein the non-regulated voltage of the non-regulated, isolated DC output is associated with the input voltage according to a turns ratio of the at least one transformer.

**18.** A DC-DC power converter system as claimed in claim **12** wherein the non-regulated voltage of the non-regulated, isolated DC output drops with increasing current flow through the non-regulating isolating step-down converter.

**19.** A DC-DC power converter system as claimed in claim **12** wherein power flow through the non-regulating isolating step-down converter is substantially uninterrupted.

**20.** A DC-DC power converter as claimed in claim **12** wherein energy is nearly losslessly delivered to and recovered from capacitors associated with the controlled rectifiers during transition times of the power MOSFET switches.

**21.** A DC-DC power converter system as claimed in claim **12** wherein each of the at least one transformer has only one primary winding.

**22.** A DC-DC power converter system as claimed in claim **12** further comprising a filter inductor directly connected to plural of the windings of the at least one transformer, all current that flows through the inductor flowing through a first

US 7,564,702 B2

19                                                                    20

of the plural windings during the first portion of the switching cycle and a second of the plural windings during the second portion of the switching cycle.

**23**. A DC-DC power converter system as claimed in claim **12** comprising multiple non-regulating isolating step-down converters providing plural non-regulated, isolated DC outputs, there being plural of the non-isolating down-converter switching regulators receiving power from one of the non-regulated, isolated DC outputs.

**24**. A DC-DC power converter system as claimed in claim **1** wherein the switching cycle substantially comprises two substantial portions, a first portion and a second portion, and further comprising a filter inductor directly connected to plural of the windings of the at least one transformer, all current that flows through the inductor flowing through a first of the plural windings during the first portion of the switching cycle and a second of the plural windings during the second portion of the switching cycle.

**25**. A DC-DC power converter system as claimed in claim **24** comprising multiple non-regulating isolating step-down converters providing plural non-regulated, isolated DC outputs, there being plural of the non-isolating down-converter switching regulators receiving power from one of the non-regulated, isolated DC outputs.

**26**. A DC-DC power converter system as claimed in claim **1** comprising multiple non-regulating isolating step-down converters providing plural non-regulated, isolated DC outputs, there being plural of the non-isolating down-converter switching regulators receiving power from one of the non-regulated, isolated DC outputs.

**27**. A DC-DC power converter system as claimed in claim **1** comprising plural transformers in the isolating step-down converter, each transformer not driven into saturation, each transformer having at least one primary winding and at least one secondary winding, the switching cycle comprising two substantial portions, a first portion and a second portion, power flowing to the isolated DC output from a first of the plural transformers during the first portion of the switching cycle and from a second of the plural transformers during the second portion of the switching cycle.

**28**. A DC-DC power converter system providing plural regulated DC outputs, each having a regulated voltage, comprising:

a) a DC input providing an input voltage that varies over a percentage range that is greater than a respective percentage range over which the regulated voltage of each regulated output varies;

b) a non-regulating isolating step-down converter through which power from the DC input flows first before flowing through any regulation stage, the non-regulating isolating step-down converter providing a non-regulated, isolated DC output having a non-regulated voltage and comprising:

i) at least one transformer that is not driven into saturation, the at least one transformer having plural windings including at least one primary winding and at least one secondary winding;

ii) plural power MOSFET switches in circuit with the at least one primary winding, the plural power MOSFET switches causing power to flow into the at least one primary winding;

iii) control circuitry coupled to the plural MOSFET switches, the control circuitry determining when the power MOSFET switches are turned on and off in a switching cycle at a switching frequency; and

iv) plural controlled rectifiers in circuit with the at least one secondary winding, each having a parallel uncon-

trolled rectifier, each controlled rectifier being turned on for an on-state time and off for an off-state time in synchronization with a voltage waveform of the at least one primary winding to provide the non-regulated, isolated DC output, the voltage waveform of the at least one primary winding having a fixed duty cycle and transition times which are short relative to the on-state and the off-state times of the controlled rectifiers; and

c) plural non-isolating down-converter switching regulators, each receiving power from the non-regulated, isolated DC output and each providing one of the regulated DC outputs having a regulated voltage.

**29**. A DC-DC power converter system as claimed in claim **28** wherein the DC input is a rectified source of power.

**30**. A DC-DC power converter system as claimed in claim **29** wherein the switching cycle substantially comprises two substantial portions, a first portion and a second portion, a first controlled rectifier of the plural controlled rectifiers being conductive during the first portion of the switching cycle and a second controlled rectifier of the plural controlled rectifiers being conductive during the second portion of the switching cycle, there being a short time, during a transition between the portions, when the first controlled rectifier and the second controlled rectifier are both off and their corresponding uncontrolled rectifiers are both conducting.

**31**. A DC-DC power converter system as claimed in claim **30** further comprising a filter inductor directly connected to plural of the windings of the at least one transformer, all current that flows through the inductor flowing through a first of the plural windings during the first portion of the switching cycle and a second of the plural windings during the second portion of the switching cycle.

**32**. A DC-DC power converter system as claimed in claim **31** comprising multiple non-regulating isolating step-down converters providing plural non-regulated, isolated DC outputs, there being plural of the non-isolating down-converter switching regulators receiving power from one of the non-regulated, isolated DC outputs.

**33**. A DC-DC power converter system as claimed in claim **31** wherein the input voltage is within the range of 36-75 volts.

**34**. A DC-DC power converter system as claimed in claim **31** wherein the non-regulated voltage of the non-regulated, isolated DC output is associated with the input voltage according to a turns ratio of the at least one transformer.

**35**. A DC-DC power converter system as claimed in claim **31** wherein the non-regulated voltage of the non-regulated, isolated DC output drops with increasing current flow through the non-regulating isolating step-down converter.

**36**. A DC-DC power converter system as claimed in claim **31** wherein power flow through the non-regulating isolating step-down converter is substantially uninterrupted.

**37**. A DC-DC power converter system as claimed in claim **31** wherein each of the at least one transformer has only one primary winding.

**38**. A DC-DC power converter system as claimed in claim **29** wherein the switching cycle substantially comprises two substantial portions, a first portion and a second portion, and further comprising a filter inductor directly connected to plural of the windings of the at least one transformer, all current that flows through the inductor flowing through a first of the plural windings during the first portion of the switching cycle and a second of the plural windings during the second portion of the switching cycle.

**39**. A DC-DC power converter system as claimed in claim **28** wherein the switching cycle substantially comprises two

US 7,564,702 B2

21

substantial portions, a first portion and a second portion, a first controlled rectifier of the plural controlled rectifiers being conductive during the first portion of the switching cycle and a second controlled rectifier of the plural controlled rectifiers being conductive during the second portion of the switching cycle, there being a short time, during a transition between the portions, when the first controlled rectifier and the second controlled rectifier are both off and their corresponding uncontrolled rectifiers are both conducting.

**40**. A DC-DC power converter as claimed in claim **39** wherein the fixed duty cycle is approximately 50% of the switching cycle.

**41**. A DC-DC power converter system as claimed in claim **39** wherein the switching frequency is in the range of 100 kHz and above.

**42**. A DC-DC power converter system as claimed in claim **39** wherein the input voltage is within the range of 36-75 volts.

**43**. A DC-DC power converter system as claimed in claim **39** wherein the input voltage is about 48 volts.

**44**. A DC-DC power converter system as claimed in claim **39** wherein the non-regulated voltage of the non-regulated, isolated DC output is associated with the input voltage according to a turns ratio of the at least one transformer.

**45**. A DC-DC power converter system as claimed in claim **39** wherein the non-regulated voltage of the non-regulated, isolated DC output drops with increasing current flow through the non-regulating isolating step-down converter.

**46**. A DC-DC power converter system as claimed in claim **39** wherein power flow through the non-regulating isolating step-down converter is substantially uninterrupted.

**47**. A DC-DC power converter as claimed in claim **39** wherein energy is nearly losslessly delivered to and recovered from capacitors associated with the controlled rectifiers during transition times of the power MOSFET switches.

**48**. A DC-DC power converter system as claimed in claim **39** wherein each of the at least one transformer has only one primary winding.

**49**. A DC-DC power converter system as claimed in claim **39** further comprising a filter inductor directly connected to plural of the windings of the at least one transformer, all current that flows through the inductor flowing through a first of the plural windings during the first portion of the switching cycle and a second of the plural windings during the second portion of the switching cycle.

**50**. A DC-DC power converter system as claimed in claim **39** comprising multiple non-regulating isolating step-down converters providing plural non-regulated, isolated DC outputs, there being plural of the non-isolating down-converter switching regulators receiving power from one of the non-regulated, isolated DC outputs.

**51**. A DC-DC power converter system as claimed in claim **28** wherein the switching cycle substantially comprises two substantial portions, a first portion and a second portion, and further comprising a filter inductor directly connected to plural of the windings of the at least one transformer, all current that flows through the inductor flowing through a first of the plural windings during the first portion of the switching cycle and a second of the plural windings during the second portion of the switching cycle.

**52**. A DC-DC power converter system as claimed in claim **51** comprising multiple non-regulating isolating step-down converters providing plural non-regulated, isolated DC outputs, there being plural of the non-isolating down-converter switching regulators receiving power from one of the non-regulated, isolated DC outputs.

22

**53**. A DC-DC power converter system as claimed in claim **28** comprising multiple non-regulating isolating step-down converters providing plural non-regulated, isolated DC outputs, there being plural of the non-isolating down-converter switching regulators receiving power from one of the non-regulated, isolated DC outputs.

**54**. A DC-DC power converter system as claimed in claim **28** comprising plural transformers in the isolating step-down converter, each transformer not driven into saturation, each transformer having at least one primary winding and at least one secondary winding, the switching cycle comprising two substantial portions, a first portion and a second portion, power flowing to the isolated DC output from a first of the plural transformers during the first portion of the switching cycle and from a second of the plural transformers during the second portion of the switching cycle.

**55**. A DC-DC power converter system providing plural regulated DC outputs, each having a regulated voltage, comprising:

  a) a rectified source of power that is a DC input, the DC input providing an input voltage;

  b) a non-regulating isolating step-down converter through which power from the DC input flows first before flowing through any regulation stage, the non-regulating isolating step-down converter providing a non-regulated, isolated DC output having a non-regulated voltage and comprising:

   i) at least one transformer that is not driven into saturation, the at least one transformer having plural windings including at least one primary winding and at least one secondary winding;

   ii) plural power MOSFET switches in circuit with the at least one primary winding, the plural power MOSFET switches causing power to flow into the at least one primary winding;

   iii) control circuitry coupled to the plural MOSFET switches, the control circuitry determining when the power MOSFET switches are turned on and off in a switching cycle at a switching frequency; and

   iv) plural controlled rectifiers in circuit with the at least one secondary winding, each having a parallel uncontrolled rectifier, each controlled rectifier being turned on for an on-state time and off for an off-state time in synchronization with a voltage waveform of the at least one primary winding to provide the non-regulated, isolated DC output, the voltage waveform of the at least one primary winding having a fixed duty cycle and transition times which are short relative to the on-state and the off-state times of the controlled rectifiers; and

  c) plural non-isolating down-converter switching regulators, each receiving power from the non-regulated, isolated DC output and each providing one of the regulated DC outputs having a regulated voltage.

**56**. A DC-DC power converter system as claimed in claim **55** wherein the switching cycle substantially comprises two substantial portions, a first portion and a second portion, a first controlled rectifier of the plural controlled rectifiers being conductive during the first portion of the switching cycle and a second controlled rectifier of the plural controlled rectifiers being conductive during the second portion of the switching cycle, there being a short time, during a transition between the portions, when the first controlled rectifier and the second controlled rectifier are both off and their corresponding uncontrolled rectifiers are both conducting.

**57**. A DC-DC power converter system as claimed in claim **52** further comprising a filter inductor directly connected to

23

plural of the windings of the at least one transformer, all current that flows through the inductor flowing through a first of the plural windings during the first portion of the switching cycle and a second of the plural windings during the second portion of the switching cycle.

**58**. A DC-DC power converter system as claimed in claim **53** comprising multiple non-regulating isolating step-down converters providing plural non-regulated, isolated DC outputs, there being plural of the non-isolating down-converter switching regulators receiving power from one of the non-regulated, isolated DC outputs.

**59**. A DC-DC power converter system as claimed in claim **53** wherein the input voltage is within the range of 36-75 volts.

**60**. A DC-DC power converter system as claimed in claim **57** wherein the non-regulated voltage of the non-regulated, isolated DC output is associated with the input voltage according to a turns ratio of the at least one transformer.

**61**. A DC-DC power converter system as claimed in claim **57** wherein the non-regulated voltage of the non-regulated, isolated DC output drops with increasing current flow through the non-regulating isolating step-down converter.

**62**. A DC-DC power converter system as claimed in claim **57** wherein power flow through the non-regulating isolating step-down converter is substantially uninterrupted.

**63**. A DC-DC power converter system as claimed in claim **57** wherein each of the at least one transformer has only one primary winding.

**64**. A DC-DC power converter system as claimed in claim **56** comprising multiple non-regulating isolating step-down converters providing plural non-regulated, isolated DC outputs, there being plural of the non-isolating down-converter switching regulators receiving power from one of the non-regulated, isolated DC outputs.

**65**. A DC-DC power converter system as claimed in claim **55** wherein the switching cycle substantially comprises two substantial portions, a first portion and a second portion, and further comprising a filter inductor directly connected to plural of the windings of the at least one transformer, all current that flows through the inductor flowing through a first of the plural windings during the first portion of the switching cycle and a second of the plural windings during the second portion of the switching cycle.

**66**. A DC-DC power converter system as claimed in claim **65** comprising multiple non-regulating isolating step-down converters providing plural non-regulated, isolated DC outputs, there being plural of the non-isolating down-converter switching regulators receiving power from one of the non-regulated, isolated DC outputs.

**67**. A DC-DC power converter system as claimed in claim **55** comprising multiple non-regulating isolating step-down converters providing plural non-regulated, isolated DC outputs, there being plural of the non-isolating down-converter switching regulators receiving power from one of the non-regulated, isolated DC outputs.

**68**. A DC-DC power converter system as claimed in claim **55** comprising plural transformers in the isolating step-down converter, each transformer not driven into saturation, each transformer having at least one primary winding and at least one secondary winding, the switching cycle comprising two substantial portions, a first portion and a second portion, power flowing to the isolated DC output from a first of the plural transformers during the first portion of the switching cycle and from a second of the plural transformers during the second portion of the switching cycle.

24

**69**. A DC-DC power converter as claimed in claim **55** wherein the fixed duty cycle is approximately 50% of the switching cycle.

**70**. A DC-DC power converter system as claimed in claim **55** wherein the switching frequency is in the range of 100 kHz and above.

**71**. A DC-DC power converter system as claimed in claim **55** wherein the input voltage is within the range of 36-75 volts.

**72**. A DC-DC power converter system as claimed in claim **55** wherein the input voltage is about 48 volts.

**73**. A DC-DC power converter system as claimed in claim **55** wherein the non-regulated voltage of the non-regulated, isolated DC output is associated with the input voltage according to a turns ratio of the at least one transformer.

**74**. A DC-DC power converter system as claimed in claim **55** wherein the non-regulated voltage of the non-regulated, isolated DC output drops with increasing current flow through the non-regulating isolating step-down converter.

**75**. A DC-DC power converter system as claimed in claim **55** wherein power flow through the non-regulating isolating step-down converter is substantially uninterrupted.

**76**. A DC-DC power converter as claimed in claim **55** wherein energy is nearly losslessly delivered to and recovered from capacitors associated with the controlled rectifiers during transition times of the power MOSFET switches.

**77**. A DC-DC power converter system as claimed in claim **55** wherein each of the at least one transformer has only one primary winding.

**78**. A method of converting power from DC to DC to provide plural regulated DC outputs, each having a regulated voltage, comprising:

a) providing a DC input having an input voltage that varies over a range that is more than plus or minus a few percent;

b) flowing power from the DC input through a non-regulating isolating step-down converter first before any regulation stage, the non-regulating isolating step-down converter providing a non-regulated, isolated DC output having a non-regulated voltage, and in the isolating step-down converter:

i) causing plural power MOSFET switches to be turned on in a switching cycle at a switching frequency to cause power to flow into at least one transformer that is not driven into saturation, the at least one transformer having plural windings including at least one primary winding and at least one secondary winding; and

ii) turning plural controlled rectifiers on for an on-state time and off for an off-state time, the plural controlled rectifiers being in circuit with the at least one secondary winding, each controlled rectifier having a parallel uncontrolled rectifier, the plural controlled rectifiers being turned on and off in synchronization with a voltage waveform of the at least one primary winding to provide the non-regulated, isolated DC output, the voltage waveform of the at least one primary winding having a fixed duty cycle and transition times which are short relative to the on-state and the off-state times of the controlled rectifiers; and

c) applying power from the non-regulated, isolated DC output to plural non-isolating down-converter switching regulators, each providing one of the regulated DC outputs having a regulated voltage.

US 7,564,702 B2

25

**79**. A method as claimed in claim **78** wherein:

the DC input is a rectified source of power;

the switching cycle substantially comprises two substantial portions, a first portion and a second portion, a first controlled rectifier of the plural controlled rectifiers being conductive during the first portion of the switching cycle and a second controlled rectifier of the plural controlled rectifiers being conductive during the second portion of the switching cycle, there being a short time, during a transition between the portions, when the first controlled rectifier and the second controlled rectifier are both off and their corresponding uncontrolled rectifiers are both conducting; and

a filter inductor is directly connected to plural of the windings of the at least one transformer, all current that flows through the inductor flowing through a first of the plural windings during the first portion of the switching cycle and a second of the plural windings during the second portion of the switching cycle.

**80**. A method as claimed in claim **78** wherein the switching cycle substantially comprises two substantial portions, a first portion and a second portion, a first controlled rectifier of the plural controlled rectifiers being conductive during the first portion of the switching cycle and a second controlled rectifier of the plural controlled rectifiers being conductive during the second portion of the switching cycle, there being a short time, during a transition between the portions, when the first controlled rectifier and the second controlled rectifier are both off and their corresponding uncontrolled rectifiers are both conducting.

**81**. A method as claimed in claim **78** wherein power flows through multiple non-regulating isolating step down converters providing plural non-regulated, isolated DC outputs, plural of the non-isolating down-converter switching regulators receiving power from one of the non-regulated, isolated DC outputs.

**82**. A method of converting power from DC to DC to provide plural regulated DC outputs, each having a regulated voltage, comprising:

a) providing a DC input having an input voltage that varies over a percentage range that is greater than a respective percentage range over which the regulated voltage of each regulated output varies;

b) flowing power from the DC input through a non-regulating isolating step-down converter first before any regulation stage, the non-regulating isolating step-down converter providing a non-regulated, isolated DC output having a non-regulated voltage, and in the isolating step-down converter:

i) causing plural power MOSFET switches to be turned on in a switching cycle at a switching frequency to cause power to flow into at least one transformer that is not driven into saturation, the at least one transformer having plural windings including at least one primary winding and at least one secondary winding; and

ii) turning plural controlled rectifiers on for an on-state time and off for an off-state time, the plural controlled rectifiers being in circuit with the at least one secondary winding, each controlled rectifier having a parallel uncontrolled rectifier, the plural controlled rectifiers being turned on and off in synchronization with a voltage waveform of the at least one primary winding to provide the non-regulated, isolated DC output, the voltage waveform of the at least one primary winding having a fixed duty cycle and transition times which

26

are short relative to the on-state and the off-state times of the controlled rectifiers; and

c) applying power from the non-regulated, isolated DC output to plural non-isolating down-converter switching regulators, each providing one of the regulated DC outputs having a regulated voltage.

**83**. A method as claimed in claim **82** wherein:

the DC input is a rectified source of power;

the switching cycle substantially comprises two substantial portions, a first portion and a second portion, a first controlled rectifier of the plural controlled rectifiers being conductive during the first portion of the switching cycle and a second controlled rectifier of the plural controlled rectifiers being conductive during the second portion of the switching cycle, there being a short time, during a transition between the portions, when the first controlled rectifier and the second controlled rectifier are both off and their corresponding uncontrolled rectifiers are both conducting; and

a filter inductor is directly connected to plural of the windings of the at least one transformer, all current that flows through the inductor flowing through a first of the plural windings during the first portion of the switching cycle and a second of the plural windings during the second portion of the switching cycle.

**84**. A method as claimed in claim **82** wherein the switching cycle substantially comprises two substantial portions, a first portion and a second portion, a first controlled rectifier of the plural controlled rectifiers being conductive during the first portion of the switching cycle and a second controlled rectifier of the plural controlled rectifiers being conductive during the second portion of the switching cycle, there being a short time, during a transition between the portions, when the first controlled rectifier and the second controlled rectifier are both off and their corresponding uncontrolled rectifiers are both conducting.

**85**. A method as claimed in claim **82** wherein power flows through multiple non-regulating isolating step down converters providing plural non-regulated, isolated DC outputs, plural of the non-isolating down-converter switching regulators receiving power from one of the non-regulated, isolated DC outputs.

**86**. A method of converting power from DC to DC to provide plural regulated DC outputs, each having a regulated voltage, comprising:

a) providing a rectified source of power that is a DC input, the DC input having an input voltage;

b) flowing power from the DC input through a non-regulated isolating step-down converter first before any regulation stage, the non-regulating isolating step-down converter providing a non-regulated, isolated DC output having a non-regulated voltage, and in the isolating step-down converter:

i) causing plural power MOSFET switches to be turned on in a switching cycle at a switching frequency to cause power to flow into at least one transformer that is not driven into saturation, the at least one transformer having plural windings including at least one primary winding and at least one secondary winding; and

ii) turning plural controlled rectifiers on for an on-state time and off for an off-state time, the plural controlled rectifiers being in circuit with the at least one secondary winding, each controlled rectifier having a parallel uncontrolled rectifier, the plural controlled rectifiers being turned on and off in synchronization with a voltage waveform of the at least one primary winding

US 7,564,702 B2

27

to provide the non-regulated, isolated DC output, the voltage waveform of the at least one primary winding having a fixed duty cycle and transition times which are short relative to the on-state and the off-state times of the controlled rectifiers; and

c) applying power from the non-regulated, isolated DC output to plural non-isolating down-converter switching regulators, each providing one of the regulated DC outputs having a regulated voltage.

**87**. A method as claimed in claim **86** wherein:

the switching cycle substantially comprises two substantial portions, a first portion and a second portion, a first controlled rectifier of the plural controlled rectifiers being conductive during the first portion of the switching cycle and a second controlled rectifier of the plural controlled rectifiers being conductive during the second portion of the switching cycle, there being a short time, during a transition between the portions, when the first controlled rectifier and the second controlled rectifier are both off and their corresponding uncontrolled rectifiers are both conducting; and

a filter inductor is directly connected to plural of the windings of the at least one transformer, all current that flows

28

through the inductor flowing through a first of the plural windings during the first portion of the switching cycle and a second of the plural windings during the second portion of the switching cycle.

**88**. A method as claimed in claim **86** wherein the switching cycle substantially comprises two substantial portions, a first portion and a second portion, a first controlled rectifier of the plural controlled rectifiers being conductive during the first portion of the switching cycle and a second controlled rectifier of the plural controlled rectifiers being conductive during the second portion of the switching cycle, there being a short time, during a transition between the portions, when the first controlled rectifier and the second controlled rectifier are both off and their corresponding uncontrolled rectifiers are both conducting.

**89**. A method as claimed in claim **86** wherein power flows through multiple non-regulating isolating step down converters providing plural non-regulated, isolated DC outputs, plural of the non-isolating down-converter switching regulators receiving power from one of the non-regulated, isolated DC outputs.

*    *    *    *    *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 7,564,702 B2                                                      Page 1 of 1
APPLICATION NO. : 11/901263
DATED                  : July 21, 2009
INVENTOR(S)       : Martin F. Schlecht

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:


In Claim 57, Column 22, line 67, delete "52" and insert --56--;

In Claim 58, Column 23, line 7, delete "53" and insert --57--;

In Claim 59, Column 23, line 14, delete "53" and insert --57--.


Signed and Sealed this

Ninth Day of March, 2010

*David J. Kappos*

David J. Kappos
*Director of the United States Patent and Trademark Office*